# EXHIBIT H

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE HONORABLE EUGENE F. LYNCH

IN THE  COURT OF THE STATE OF
IN AND FOR THE COUNTY OF

IN RE THE ARBITRATION OF:

Anita Carr,

                           Plaintiff,

            v.

Liberty Life Assurance Company, a
Massachusetts Corporation, and
PROVIDIAN BANCORP SERVICES, a
domestic corporation,

                           Defendants.

NO.  1100048706

PLAINTIFF'S ARBITRATION
BRIEF SEEKING SET ASIDE OF
RELEASE DEFENSE, DE NOVO
REVIEW, ENTERTAINING NEW
EVIDENCE, AND JUDGMENT
FOR PLAINTIFF

    In this case, the records and even the limited discovery we were permitted to take

demonstrate an inherent bias in Liberty's evaluation of this claim involving a primary

PLAINTIFF'S INITIAL ARBITRATION BRIEF -1

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

1   disability based on Fibromyalgia and Sjogrens Syndrome. Taken together as will be detailed

2   below, under the new standard of review defined by the *Abatie* and *Saffon* cases and given the

3   obligations under the applicable ERISA regulations, Liberty's evaluation of Plaintiff Carr's

4   disability claim falls short of their obligations to Plaintiff. Furthermore, under California's

5   arbitration statute governing the mandatory arbitration of this claim regarding a dispute over

6   employee benefits, the law is to be liberally construed in favor of Plaintiff. California

7   Arbitration Act, Cal. Code Civ. Proc. §1281 et. seq.; Armendariz v. Foundation Health

8
9   Psychcare Services, Inc., 24,Cal.4th 83, 6 P.3d 669 (2000).

10

11          Looking at the evidence in the claim file, the evidence establishes that Ms. Carr met the

12  diagnosis of fibromyalgia October 24, 2001 upon referral by Dr. Carol Lamb to Dr.Rajiv

13  Dixit, a rheumatologist (**CF000985**). Liberty does not challenge that diagnosis. Given that

14  the diagnosis requires not only positive tender points, but also at least a three month history

15

16  of widespread pain, it is clear that Ms. Carr provided Dr. Dixit with a history of widespread

17  pain dating back at least to July 2001. (*See e.g.* **CF000497-505;   CF000506-514;**

18  **CF000672**).  In this case, the detailed letters and impairment reports filled out by Dr. Lamb

19
20  and Dr. Dixit, despite the erroneous Attending Physician Statement Dr. Lamb hurried to

21  complete in December 2001, establish the date of disability in July or August of 2001 and

22  describe the consistent symptoms since that time arising from a combination of Fibromyalgia

23  and Sjogrens. (**CF000204-211; CF000231-236;   CF000941; CF000241-242; CF000244**).

24
25  This disability date is further supported by the history and statements provided by Ms. Carr.

26

27  KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -2

1  (*e.g.***CF001094; CF000460-461**).  In addition, as will be noted below, there is considerable

2  meaningful evidence that Liberty record reviewers and claims analysts have ignored,

3  documentation of symptoms not reported in the medical records, but impairing Ms. Carr

4  during the elimination period and before and since.

5

6  **I.   STATEMENT OF FACTS**

7        Anita Carr began working for Providian 10/19/1998 as a Director of Information

8  Technology.  She last worked 8/28/2001. **(CF000120).**  However, based on a severance

9  agreement signed September 21, 2001 with her employer Providian, her employment and

10  active status were extended with full benefits until 11/28/2001. **(CF00091-93).**  According

11  to Providian, she was to be kept as Actively Employed until the end of the severance pay

12  period, November 28, 2001. **(*Id.*)**  This indeed was the instruction provided to payroll

13  through the Employee Action Request (EAR) filled out on September 24, 2001 following the

14  signing of the severance agreement. **(CF000117).**  This "EAR" stated: "PTO [paid time off]

15  paid.  Please pay regular salary every pay period thru 11/28/2001.  Send check to home

16  address on file.  Continue benefits and 401K deductions thru 11/28/2001." **(CF000117).**

17  The severance agreement itself provided for continuation of "regular pay subject to standard

18  payroll deductions." **(CF000091 section 3(a)).**   Ms. Carr's standard payroll deductions

19  included after tax deductions for long term disability coverage taken consistently both before

20  and after signing the severance agreement.. **(*See* Carr Pay Stubs July-November 2001).**

21  Thus on its face, the severance agreement did not limit in any way long term disability

22

23

24

25

26

27

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -3

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

coverage benefits and in fact provided for continuation of those benefits.

At the time she became disabled, in August 2001, Ms. Carr was earning $135,000 per year. **(CF000462)**. Along with her standard payroll deductions, Providian specifically agreed to continue Ms. Carr's health benefits and 401K contributions which Providian paid, *(See* **CF1000091-92, especially Sections 2 and 3(b).)**

In early 2001, Ms. Carr encountered what she believed to be workplace harassment. She had complained about the actions of one manager, and she believed her supervisor retaliated against her. Ms. Carr began to develop medical problems for which she sought help from her doctors. **(CF000460-461).**

In July 2001, Ms. Carr was treating with Dr. Carol Lamb. At a July 3, 2002 visit Ms. Carr reported headaches, neck pain, arm pain, hip pain, and knee pain. On exam her paracervical muscles were painful to palpation. Her blood pressure was elevated. It is unclear if Dr. Lamb did any further physical exam. However, these symptoms led Dr. Lamb to order blood tests. **(CF001032).** The test came back with a positive ANA result at 1.4. **(CF000827)**, indicating autoimmune problems.

While experiencing these medical problems, Ms. Carr missed work. She had been planning to file a workers compensation claim. However, she was selected for jury duty and sat as a juror in a trial for five weeks which ended in early August **(PROV000045)**. When she returned to work after the trial she could not find the paperwork in her huge stack of things to get done. She also stated she was going to doctors who were trying to find out what

PLAINTIFF'S INITIAL ARBITRATION BRIEF -4

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  was wrong with her. **(PROV00045)**.  She kept both Terrrace Ellis from HR and her direct

2  supervisor Vic Cozzoli apprised of her health issues. **(PROV00045)**

3      In this context, Providian provided Ms. Carr a choice between termination or severance

4  on August 28, 2001. **(CF000091-97)**.  Prior to being confronted with the termination versus

5

6  severance proposal, that same day,  Dr. Lamb evaluated Ms. Carr once again **(CF000171)**.

7  This time she notes reports of "achy joints, improved with Lodine, still has lumpy spots that

8  ache.  Exercising regularly.  Right arm feels weak with lifting without numbness /tingling..

9  Aches up  in muscles of arm.  Sleeps well.  Wakes feeling rested.  Sometimes feels

10  extraordinarily tired especially after exercising. Persistently increased blood pressure. Rule

11

12  out rheumatological disorder with palpable tender lesions, positive ANA, fatigue." Dr. Lamb

13  made the referral to rheumatologist Dr. Dixit at this point based on "palpable tender lesions,"

14

15  a "positive ANA," and "fatigue." **(CF00171)**.

16      Ms. Carr was unable to see Dr. Dixit until October 24, 2001. **(CF000460-461;**

17  **CF000985)**.   At that time Dr. Dixit took a history and examined Ms. Carr.  He concluded

18  that she had both Fibromyalgia and probable Sjogrens.  He based his probable Sjogrens

19

20  diagnosis on findings of dry eyes (xerophthalmia) and dry mouth (xerostomia) as well as an

21  enlarged **parotid** and abnormal ANA.  **(CF000213)**. Dr. Dixit ordered laboratory testing.

22  The testing came back with abnormal results for Anti-RNP(ENA) Antibody (35 in the

23

24  inconclusive range) and a positive ANA now 3.1. **(CF000833)**.

25      In order to diagnose Fibromyalgia, Dr. Dixit not only had to test her tender points, but

26

27  PLAINTIFF'S INITIAL ARBITRATION BRIEF -5

28

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

1    he also had to obtain a history of widespread pain existing for at least three months.

2    **(CF000497-505,** *see also, e.g.* **CF000687; CF000506-514; CF000672; CF00676-688;** *see*

3    *also* **LL1196 and LL2021).** This means, consistent with indications in Dr Lamb's records

4

5    from July 3, 2001, that the widespread pain would have to be identified as lasting at least

6    since July 2001. Liberty also knew symptoms would have needed to be present for at lest

7    three months, although their description of symptoms varies from the peer reviewed

8

9    literature. ( **LL1196 and LL2021).**

10      Based on the evaluation by Dr. Dixit, Ms. Carr determined to file a claim for disability

11    benefits. She telephoned in the claim on November 29, 2001. **(CF001079).** Nowhere in

12    the record is there any detailed record of the specific information of the intake call, although

13    the call is referenced in the claim notes for the day. **(CF001079).** We believe the note is

14

15    incomplete because it doesn't mention Drs. Dixit or Lamb, Ms. Carr's primary treating

16    physicians, nor does it mention Fibromyalgia or Sjogrens, the primary disabling conditions.

17    **(CF001079).** The records demonstrate that Liberty knew about Dr. Lamb,, and Dr. Wong.

18

19    **(CF001079).** The record further shows that Liberty chose only to send an attending

20    physician statement (APS) to Dr. Lamb, and not even to collect her records until Ms. Carr

21    appealed the STD claim.**(CF001087).**

22      Although Liberty sent the APS, Dr. Lamb did not respond to multiple requests for

23    information (the APS). Liberty enlisted Ms. Carr's aid. **(CF001079).** Ms. Carr wrote Dr.

24

25    Lamb on December 11, 2001 and sent a copy to Liberty recounting her symptoms

26

27

28    PLAINTIFF'S INITIAL ARBITRATION BRIEF -6

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370 Fax (206) 374-7377
klf@krafchick.com

1  (widespread general muscle pain, pain in other areas, and fatigue), the diagnoses by Dr. Dixit

2  (FM and Sjogrens), and the need for Dr. Lamb to fill out the forms. **(CF000180).**

3
4      Despite her letter to Dr. Lamb, by January 2, 2002, Dr. Lamb had still not filled out or

5  sent in the form she was sent, and Liberty threatened Ms. Carr to deny and close her claim.

6  **(CF001080).**  Ms. Carr responded saying she had both paid Dr. Lamb for "records" (filling

7  out the form) and had contacted Dr. Lamb before Christmas.  Liberty suggested she follow

8
9  up with the doctor's office. **(CF001080).**   Later that day Janice from Dr. Lamb's office

10  called asking for another day due to a mix up in the doctor's office. **(CF001095).** On January

11  3, 2002, Dr. Lamb's office faxed Liberty the completed Attending Physician's Statement.

12  **(CF000178).**

13
14     The way Dr. Lamb filled out the form makes no sense in light of Ms. Carr's multiple

15  diagnoses she notes on the form and in her records (GERD, Fibromyalgia, Hypertension).

16  **(CF000178).**  She had seen Ms. Carr on 11/29/2001 with a blood pressure of 164/100, a note

17  she has less headaches, that she was diagnosed with Sjogrens and Fibromyalgia by Dr. Dixit,

18
19  has abdominal pain and GI symptoms secondary to harassment by her bosses, and noted

20  complains of hearing problems. **(CF000176).**  She gets the request for information from

21  Liberty on December 3, 2001. **(CF000177).**  She gets Ms. Carr's letter December 11, 2001.

22  **(CF000180).**  She already had Dr. Dixit's October 24, 2001 letter. **(CF000123).**  Dr. Dixit

23  sees Ms. Carr on 11/27/2001 and notes her pain and fatigue problems. **(CF000215).**  Dr.

24
25  Lamb sees Ms. Carr again on 12/27/2001 noting Ms. Carr had hot flashes then threw up the

26
27
28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -7

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1   night before.  She was taking Prozac from Dr. Dixit for Fibromyalgia and mild depression.

2   Her blood pressure is 170/108, and Ms Carr had her own reading of 172/112 – both quite

3
    elevated. Dr. Lamb changes her meds. **(CF000181).**  Despite knowing Ms. Carr was having
4

5   trouble working due to pain and fatigue, and referring her to Dr. Dixit for evaluation, Dr.

6   Lamb  incorrectly  filled  out  the  form  saying  Ms.  Carr  could  engage  in  heavy  work.

7   **(CF000178)** in the face of just her recorded symptoms of GI upset, abdominal pain,

8
    headaches, nausea and vomiting..   Dr. Lamb, listening to Ms. Carr in July 2001 ordered
9

10  blood testing which identified a positive ANA reading of 1.4 and a lumbar spine XRAY

11  which proved abnormal. **(CF001032; CF000827; CF001000).**  Based on this reading and

12  symptoms, on August 28, 2001, before being offered severance, Dr. Lamb referred Ms. Carr

13
    to Dr. Dixit. **(CF000171).** This means Ms. Carr was experiencing serious enough symptoms
14

15  to warrant a referral to rheumatologist Dr. Dixit, which would be inconsistent with the box

16  Dr. Lamb checked on the attending physicians statement.  It also overlooks a letter Ms. Carr

17  sent her on December 11, 2001 describing her symptoms.  **(CF00180).**

18
            Dr. Lamb fully acknowledges her mistake in a letter we submitted on appeal in which
19

20  she says Ms. Carr would have mild to moderate limitations and she would defer to Dr. Dixit

21  regarding Ms. Carr's ability to work. **(Lamb 10/1/04 letter).**   Also, Dr. Lamb provided a

22  different, more studied, evaluation for Ms Carr's Social Security Disability Claim. Dr. Lamb

23
    completed  a  detailed  Multiple  Impairments  Questionnaire.  **(CF000204-211).**  In  that
24

25  questionnaire,  she  provided  more  detail  on  symptoms  and  functional  impairment  and

26

27  PLAINTIFF'S INITIAL ARBITRATION BRIEF -8

28

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

identifies July 2001 as the time symptoms began to impair Ms. Carr from working. **(CF000204-211).**

Ms. Carr saw Dr. Dixit on October 24, 2001.**(CF000213).** He diagnosed Fibromyalgia, probable Sjogrens, stomach polyps and esophageal ulceration, Rosacea, Mitral Valve Prolapse, Hypertension, anosmia (loss of sense of smell), among other diagnoses. **(CF000213).** These diagnoses typically represent diagnoses made on report of symptoms of pain and fatigue.

In order for Dr. Dixit to diagnose fibromyalgia, he not only had to perform a tender point examination which he did, but he also had to take a history to establish at least three months of widespread pain, as noted above. With the initial visit in which he diagnosed severe fibromyalgia occurring on October 24, 2001, as noted above, this means he had to obtain a history of widespread pain dating at least back to July 2001.

Therefore the attending physician statement filled out by Dr. Lamb at her patient's request makes no sense.

Liberty knew of the conflict between what Dr. Lamb said and what Ms. Carr was telling them caused her inability to work. Liberty had the December 11, 2001 letter. On January 22, 2002, at 5:10 pm, the same day they wrote her a letter denying her short term disability claim, Liberty conducted what they call their "initial interview" with Ms. Carr. **(CF001089).** When asked what forced her to stop working, she told them "she suffers from, excessive fatigue, nausea, pain in muscles/joints of arms legs hands, high blood pressure, gastric reflux,

PLAINTIFF'S INITIAL ARBITRATION BRIEF -9

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  anxiety." Liberty recorded that Ms. Carr described "that she was a senior executive and

2  everything started when she had to file a sexual harassment claim against a peer Executive.

3  (**CF001089**).  After learning this, and that Dr. Lamb had not taken her off work, the Liberty

4

5  claims analyst tells her what Dr. Lamb had said on the attending physicians statement and that

6  she had no alternative but to deny the claim. (**CF001090**).  However, she actually had an

7  alternative she rejected: investigating the conflict between the check mark on the Attending

8  Physicians Statement and the symptoms Ms. Carr described.  She had no records at that time,

9

10  and she did not do any further investigation . The file demonstrates that as of 3/12/2002, the

11  only medical in the file was the Lamb attending physicians statement. (**CF001087**).  Instead,

12  she then referred her recommendation to deny the claim to her manager who agreed, and the

13  claim was denied. (**CF001090**).

14

15       That same day, apparently after the "initial interview", Liberty wrote the  January 22,

16  2002 denial letter which is two pages long. (**CF001097**). It does not provide a an explanation

17  for denial other than Dr. Lamb does not support her disability and filled out a form saying she

18  was able to engage in heavy work without any functional limitations. (**CF001097-98**).  The

19

20  letter provides 60 days to appeal. (**CF001098**).  The ERISA regulations effective January

21  2001, require ERISA plans issuing adverse benefit determinations in disability claims to give

22  their claimants 180 days to appeal.  29 CFR 2560.503-1(h)(4) and (3)(I).

23

24       In Ms. Carr's appeal of the January 22, 2001 denial, on March 15, 2002 in writing, Ms.

25  Carr urged Liberty to talk with Dr. Dixit and noted that she had been complaining to Dr. Lamb

26

27  PLAINTIFF'S INITIAL ARBITRATION BRIEF -10

28

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

1   about the problems that got Dr. Lamb to refer her to Dr. Dixit throughout the summer of 2001

2   prior to her date of disability. **(CF001094)**.  Liberty never contacted Dr. Dixit other than to

3   ask for records.  Similarly they never contacted Dr. Lamb to explain the differences in her

4   Attending Physicians Statement and Ms. Carr's statements as to her problems. **(CF1089-**

5   **1091)**.

6

7        Ms. Carr, also in her March 15, 2002 appeal expresses confusion over what she needs to

8   provide Liberty to review, evidence that the denial letter failed to communicate with her in

9   a manner she could understand in violation of 29 CFR 2560.503-1(g)(iii).  Ms. Carr wrote

10  Liberty:

11

12       Dr. Dixit has completed and submitted to the State of California the required
         paperwork to establish my disability.

13

14       **Since I am not confident about what Liberty needs to review, but I do want a**
         **review, please contact Dr. Dixit for data or information about my disabling**

15       **condition**

16

17  **(CF001094)**.  This statement clearly tells Liberty that their prior correspondence did not

18  adequately inform Ms. Carr of the type of information she could submit to perfect her claim,

19  as she tells them she is confused.  *See* 29 CFR 2560.503-1(g)(3); *Saffon v. Wells Fargo &*

20  *company Long Term Disability Plan, 511 F.3d 1206 (9th Cir. 2008).*

21

22       On appeal, Liberty did obtain medical records from both Dr. Lamb and Dr. Dixit

23  including Dr. Dixit's diagnoses of Sjogrens Syndrome and Fibromyalgia.  These records also

24  included Ms. Carr's abnormal ANA lab report from Dr. Dixit's visit **(CF000825-861;**

25  **CF000833; CF000854)**.  The records from Dr. Lamb included a prior abnormal ANA lab

26

27

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -11

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  report for Ms. Carr from July 3, 2001. **(CF000827).**

2      Liberty recognizes the March 15, 2002 letter as an appeal.  **(CF001091.)** Liberty has no

3  further communication with Ms. Carr.  They do obtain medical records from Dr. Lamb, Dr.

4  Dixit, and Dr. Wong.  They do not choose to contact any of the doctors, as Ms. Carr

5  requested, nor does Liberty advise Ms. Carr to contact her doctors herself and what to ask for

6  in any manner so that she would understand what she could get that Liberty would need to

7  perfect her claim. *See Saffon v. Wells Fargo & company Long Term Disability Plan, 511 F.3d*

8  *1206 (9th Cir. 2008).*  The internal notes stop at the date 3/28/2002 **(CF001091)** and do not

9

10  resume again until August 2003 **(CF000003)**.

11

12      Without contacting any of Ms. Carr's doctors, and particularly Dr. Dixit as she had

13  requested, or to advise her they would not contact Dr. Dixit other than to get his records,

14  Liberty issued their final denial letter of Ms. Carr's appeal of her short term disability claim

15  adverse benefit decision on  4/29/2002.  **(CF000960-961).**   Furthermore, Liberty never

16  advised Ms. Carr that despite the denial of her short term disability benefits, she could file a

17  claim for long term disability benefits, although because they denied benefits there would be

18  no automatic referral for a long term disability claim. **(*See* CF000768-773; CF000937-940).**

19

20      About a year later, Ms. Carr contacts attorney William Corman, and Mr. Corman writes

21  Liberty to commence a long term disability claim July 28, 2003.  **(CF000937).**  With this

22  request Mr. Corman included information from Dr. Dixit including a letter Dr. Dixit wrote

23  March 26, 2003 **(CF000941)** the Fibromyalgia Impairment Questionnaire Dr. Dixit completed

24

25

26

27

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -12

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1   5/30/03. **(CF000231-236)**   To Liberty's credit, they do allow the claim to be evaluated.

2   **(CF00915; CF000770).**   Liberty writes Mr. Corman on August 8, 2003 allegedly providing

3

4   forms for Ms. Carr to fill out. **(CF00934-936).**   Mr. Corman writes back that he did not get

5   the forms and addressing Liberty's concern that the claim came much too late. **(CF000931-**

6   **932).**

7       Nevertheless, Liberty determines to accept and review the claim and deny the claim by

8

9   a letter dated November 17, 2003.**(CF000768-773).**  Liberty began their review of the long

10  term disability claim October 1, 2003 when they indicated they had all the material they

11  needed. **(CF000771).**   In this review, they obtained medical records this time, **(CF000771).**

12  They had the records reviewed by a medical consultant used many times before in disability

13

14  claims, Dr. John Holbrook.   According to Defendant Liberty's supplemental response to

15  Plaintiff's interrogatory 6, Dr. Holbrook worked on 492 claims for Liberty in 2003-2005.  In

16  2005 he earned $60,912 from  Liberty.   He performed a review of records and issued an

17

18  opinion in this case Liberty used to deny  the claim 10/20/2003. **(CF000785-791).**

19      The November 17, 2003 adverse benefit determination, this time, offers Ms. Carr 180

20  days to appeal in compliance with applicable regulations. **(CF000773).**

21      Curiously, on November 19, 2003, two days after the date of the initial adverse benefit

22  decision of November 17, 2003, at the request of Mary Ellen Smith, Liberty's Disability Case

23

24  Manager,  another  well-known  record  reviewer  liked  by  insurers,  Gale  Brown  Jr.  MD,

25  provided a second record review.   In the same answer to Interrogatory 6 referenced above,

26

27                                                 **KRAFCHICK LAW FIRM**
                                                   100 W. Harrison
                                                   SouthTower, Suite 300
28   PLAINTIFF'S INITIAL ARBITRATION BRIEF -13    Seattle, Washington 98119
                                                   (206) 374-7370  Fax (206) 374-7377
                                                   klf@krafchick.com

1  defendant Liberty disclosed that Dr. Gale Brown was consulted in 1766 claims.  He earned

2  $336,163.73 in 2003, $346,113 in 2004, and $301,335 in 2005 totaling $983,361.73, just from

3  Liberty.  Dr. Brown also consulted for other disability insurers.  Not surprisingly, this record

4  review Liberty finds also supports denying the claim. **(CF000775-782)**.  I say curiously

5  because this report is referenced in the letter drafted two days before the date on the report.

6  *(See and compare* **CF000771-772; CF000775)**.

7          While noting that they looked at the Dixit FM Impairment Questionnaire supporting

8  disability, neither the denial letter nor the Holbrook record review nor the Gale Brown record

9  mention the Lamb Multiple Impairments Questionnaire of 4/16/2003 **(CF000204-211)** or

10 provide any cogent reasons for dismissing the Dixit opinions offered in the Dixit

11 Fibromyalgia Impairment Questionnaire signed 5/30/2003 which they did have. **(CF000231-**

12 **236; CF000781; CF000786;** *but see* **CF000775-782; CF000785-791; CF000768-773 )**.

13 They also provide no cogent reason for dismissing the grant of SSD benefit with an 8/27/2001

14 date of disability from the ability to do any occupation, other than they essentially say the do

15 not have to consider it. **(CF000772)**. They ignore the report of symptoms that Ms. Carr

16 provides, again without providing any good reason for ignoring those reports, particularly in

17 light of the opinions provided by Dr. Lamb and Dr. Dixit in the impairment questionnaires.

18 **(Cites of Carr statements of symptoms)(CF000768-773)**.

19         The analysis offered in the record reviews and the adverse benefit determination does

20 however rely on medical records prior to the date of disability, records the short term

21

22

23

24

25

26

27

28 PLAINTIFF'S INITIAL ARBITRATION BRIEF -14

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119 ·
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1   disability evaluation had collected on appeal, all records obtained during the pendency of the

2   short term disability claim.  They also reference the APS that Dr. Lamb filed with respect to

3   that claim. **(CF000789;CF000779).**

4

5       Within the 180 days, Ms. Carr contacted Krafchick Law Firm to handle the appeal of the

6   initial adverse benefit determination.   We sent a letter of representation to Liberty on

7   3/16/2004   notifying  Liberty  that  Ms.  Carr  was  appealing  the  adverse  benefit

8   determination.**(CF000703-705).** We requested all material we are entitled to receive pursuant

9   to 29 CFR 2560.503-1. The regulations include a very specific list of the types of information

10  Liberty is to provide.  **29 CFR 2560.503-1(m)(8).**   All of the materials provided in answers

11  to discovery after litigation commenced should have been provided in response to the request

12  contained in this letter.  Liberty has no excuse for failure to provide this information.  The

13  failure to disclose is subject to ERISA penalties dating from the 3/14/2004 written requests.

14  These materials were not presented in response to our written request. ***See* 29 CFR 2560.503-**

15  **1(i)(5),(j), (m)(8) and CF000703-705.**  Simon Harris, the ERISA Plan Administrator for

16  Providian  also  knew  of  these  requests  and  did  nothing  to  provide  more  than  personnel

17  information from Providian and the Summary Plan Description.

18

19      On 9/3/04, we sent a review of medical literature regarding fibromyalgia and disability

20  and  copies  of  relevant  medical  literature.  **(CF000497-505; CF000506-692).**   We  have

21  attached pages and articles we specifically reference in the brief in the attached excerpts. The

22  rest are available in the claim file with CF numbers.

26

27  PLAINTIFF'S INITIAL ARBITRATION BRIEF -15

28

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

On December 14, 2004 we sent our letter of appeal of the adverse benefit decision **(CF000465-480)** and materials supporting the appeal to Liberty including a medical review by internationally recognized rheumatologist and one of the authors of the ACR Criteria for FM published in 1990, Robert Bennett MD **(CF000249-303;** *see e.g.***CF000553-578***);* a neuropsychological evaluation by Jay Uomoto PhD **(CF000351-381)**; a performance based physical capacity evaluation by Dr. Theodore Becker **(CF000309-350)**, a vocational evaluation by vocational and rehabilitation consultant Donald Uslan **(CF000382-454)**, a letter from Dr. Dixit dated 9/2/04 **(CF000241-248** including CV- disabled since summer 2001),a second brief statement from Dr. Dixit that symptoms related to Ms. Carr's disability began in August 2001 **(CF000244)**, a letter from Dr. Lamb 10/1/04 (missing from claim file, but referenced in claim file by Liberty without any request that we send them the letter and first notice coming in their next adverse benefit decision **CF000016)**, the SSD award letter **(CF000304-307)**. We also sent lay witness statements for Liberty's consideration including statements from Amy Cherrnay **(CF000455)**, Ellen Hancock **(CF000456-57)**, Bill Lindley **(CF000458)**, and Elena Carr **(CF000459)**. Finally we provided a statement from Ms. Anita Carr **(CF000460-461)**.    Ms. Carr's statement is important because she testifies to the consistency of symptoms since she stopped work and therefore helps establish that the testing she had represents the problems she had been having while trying to work and problems that ultimately led her to claim disability. Dr. Lamb notes that Ms. Carr's symptoms she was seeing in July and August 2001 did not change in the time between those visits and the time

PLAINTIFF'S INITIAL ARBITRATION BRIEF -16

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  Ms. Carr got to Dr. Dixit.  **(Lamb 10/1/04 letter).**   Dr. Dixit is the physician who has

2  consistently evaluated and treated Ms. Carr since October 2001.  Ms. Carr states that she has

3
4  had consistent problems with pain, fatigue, and cognitive problems since at least August 2001.

5  **(CF000460-461).**

6      Liberty obtained a review by another well-known insurance doctor, Amy Hopkins MD.

7  She provides the third record review in her report dated 1/14/2005 supporting continued

8
9  denial of the claim.  **(CF000048-61).**   Dr. Hopkins, according to Defendant Liberty's

10  supplemental response to Interrogatory 6 evaluated 492 claims in 2003-2005 and earned

11  $42,117 in 2004 and $212,450 just from Liberty in 2005.  She too gets income from

12  evaluations done for other disability insurers.

13
14      On January 28, 2005, once again, Liberty, without addressing why they fail to credit

15  information supporting the claim, denied the claim. **(CF000021-28)** Liberty continued to rely

16  on the initial APS by Dr. Lamb, their narrow-minded belief that claimed lack of clear support

17  of functional disability in the records concurrent with the date of disability shortly before and

18
19  after.  They provide no reason for ignoring the later opinions more detailed by Dr. Lamb and

20  Dr. Dixit in their Impairment questionnaires and letters.  They provide no reason for ignoring

21  the lay witness statements or the statements previously in the file from Ms Carr, or her

22  statement accompanying the appeal.  They provide no cogent reason for ignoring the Social

23
24  Security award.  They rehash much of the same reasoning expressed by Dr. Holbrook and Dr.

25  Gale Brown Jr. and Claims Manager Mary Ellen Smith from their evaluations and continued

26
27
28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -17

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

1   denial of the short term disability claim. **(CF000021-28)**. Essentially, Liberty refused to look

2   beyond the concurrent medical records and the questionable APS by Dr. Lamb in all of the

3   denials without ever addressing why the later information from the treating doctors would not

4   be adequate to support the claim.

5

6

7   **II.   AUTHORITY AND ARGUMENT**

8

9

10   **A.         ERISA LAW UNDERWENT A MAJOR CHANGE WITH THE**
     ***ABATIE*** **DECISION, REQUIRING THE DISTRICT COURTS**
11       **TO ENGAGE IN A MORE SEARCHING REVIEW IN THE**
         **CONTEXT OF AN ADMITTED STRUCTURAL CONFLICT OF**
12       **INTEREST.**

13

14       In *Abatie v. Alta Health & Life Insurance Company*, 458 F.3d 955 (9th Cir 2006)(*en*

15   *banc)*, the Ninth Circuit threw out eleven years of case law based on *Atwood v. Newmont Gold*

16   *Co.,* 45 F.3d 1317 (9th Cir 1995) and defined a new standard of review and method for

17   evaluating a case subject to an abuse of discretion standard of review, while preserving *de*

18   *novo* review.   In particular, *de novo* review apples when an ERISA plan does not

19   unambiguously grant discretion or fails to exercise discretion in deciding to deny or terminate

20   a claim .*Abatie v. Alta Health & Life Insurance Company*, 458 F.3d 955, 963. 971-973 (9th Cir

21   2006)(*en banc)*.

22       To determine the degree of deference to give an adverse benefits decision, *Abatie*

23   requires that the Court look at both conflict of interest based on comment d in the Restatement

24

25

26

27   PLAINTIFF'S INITIAL ARBITRATION BRIEF -18

28

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1   of Trusts and procedural violations including violations of ERISA minimum standards and

2   internal procedures set up by the ERISA insurer or plan. *Abatie* at 971-972

3
4       In evaluating conflict of interest evidence to determine the degree of skepticism with

5   which the Court should view Liberty's decisions, the *Abatie* Court points to the Restatement

6   of Trusts:

7       As Comment d to the Restatement makes clear, **key factors in determining**
8       **whether or not a trustee has abused discretion include "the motives of the**
        **trustee in exercising or refraining from exercising [a power granted to the**
9       **trustee]; [and] the existence or non-existence of an interest in the trustee**
        **conflicting with that of beneficiaries."**
10

11  *Abatie* at 967 citing Restatement(Second) of Trusts § 187, Comment d (1959) (emphasis

12  added).  Liberty has fiduciary obligations to Plaintiff that require more than sitting on its

13  hands and withholding its expertise gleaned from analyzing the claim and coming to a

14  decision to deny the claim.
15

16      In this case, Plaintiff concedes that there is an unambiguous grant of discretion.  For

17  evaluation of cases under an abuse of discretion standard, the Ninth Circuit joins a number

18  of other jurisdictions that apply a "sliding scale" approach, although the Ninth Circuit opinion

19  specifically rejects that label.  *Abatie* at 967-968; *and see e.g. Pinto v. Reliance Liberty Life*

20  *Ins.Co.*, 214 F.3d 377, 393((3d Cir. 2000); *Ellis v. Metro Life Ins*. Co. 126 F.3d 228,233 (4th

21  Cir. 1997); *Vega v. National Life Insurance Services*, 188 F.3d 287, 297 (5th C ir. 1997)(*en*

22  *banc*); *Borda v. Hardy, Lewis , Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir. 1998);

23  *Chojancki v, Georgia Pacific Corp.*, 108 F.3d 810,815 (7th Cir. 1997); *Clapp v. Citibank N.A.*
24
25
26
27

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -19

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  *Disability Plan,* 262 F.3d 820, 827 (8th Cir. 2001); *Fought v. UNUM Life Insurance Company,*

2  379 F.3d 997, 1004-05 (10th Cir. 2004) *cert. denied,* 544 U.S, 1026 (2005).

3       The *en banc* Court, in changing the standard of review to be applied, recognized that it

4  was not creating a bright-line standard, so the District Courts will need to apply the new

5  standard on a case-by-case basis:

6

7       **Insofar as those cases recognize that weighing a conflict of interest as a factor**
       **in abuse of discretion review requires a case-by-case balance, we agree.** A

8       district court, when **faced with all the facts and circumstances, must decide in**
       **each case how much or how little to credit the plan administrator's reason for**

9       **denying insurance coverage.** An egregious conflict may weigh more heavily (that

10      is, may cause the court to find an abuse of discretion more readily) than a minor,
       technical conflict might. **But in any given case, all the facts and circumstances**

11      **must be considered and nothing "slides," so we find the metaphor unnecessary**
       **and  potentially confusing.** A straight forward abuse of discretion analysis allows

12      a court to tailor its review to all the circumstances before it. *See Woo*, 144 F.3d at
       1161 ("The abuse of discretion Liberty is inherently flexible, which enables

13      reviewing courts to simply adjust for the circumstances."). **The level of skepticism**
       **with which a court views a conflicted administrator's decision may be low if a**

14      **structural conflict of interest is unaccompanied, for example, by any evidence**
       **of malice, of self-dealing, or of a parsimonious claims granting history.** A court

15      may weigh a conflict more heavily if, for example, the administrator provides
       **inconsistent reasons for denial,** *Lang*, 125 F.3d at 799; **fails adequately to**

16      **investigate a claim or ask the plaintiff for necessary evidence,** *Booton*
       *v. Lockheed Med. Benefit Plan,* 110 F.3d 1461, 1463-64 (9th Cir. 1997); **fails to**

17      **credit a claimant's reliable evidence,** *Black & Decker Disability Plan v. Nord,* 538
       U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003); or **has repeatedly**

18      **denied benefits to deserving participants by interpreting plan terms incorrectly**
       **or [*969] by making decisions against the weight of evidence in the record.**

19

20      **We recognize that abuse of discretion review, with any "conflict . . . weighed**
       **as a factor,"** *Firestone,* 489 U.S. at 115, is indefinite. We believe, however, that

21      trial courts are familiar with the process of weighing a conflict of interest. For
       example, in a bench trial the court must decide how much weight to give to a

22      witness' testimony in the face of some evidence of bias. **What the district court is**
       **doing in an ERISA benefits denial case is making something akin to a**

23

24

25

26

27

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -20

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1    **credibility determination about the insurance company's or plan
2    administrator's reason for denying coverage under a particular plan and a
     particular set of medical and other records.** We believe that district courts are
3    well equipped to consider the particulars of a conflict of interest, along with all the
     careful, case-by-case approach that we adopt also alleviates the unreasonable burden
4    *Atwood* placed on ERISA plaintiffs. Under *Atwood*, we would consider the
5    influence of the plan administrator's conflict only if the plaintiff brought forth
     evidence of a "serious conflict of interest," triggering de novo review. *Gatti v.*
6    *Reliance Liberty Life Ins. Co.*, 415 F.3d 978, 985 (9th Cir. 2005) (as amended). If
     the plaintiff could not make that threshold showing, we would uphold an
7    administrator's decision so long as it was "grounded on *any* reasonable basis."
8    *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th
     Cir. 2004) (internal quotation marks omitted). **Going forward, plaintiffs will have
9    the benefit of an abuse of discretion review that always considers the inherent
10   conflict when a plan administrator is also the fiduciary, even in the absence of
     "smoking gun" evidence of conflict.** Moreover, a conflicted administrator, facing
11   closer scrutiny, may find it advisable to bring forth affirmative evidence that any
     conflict did not influence its decision making process, evidence that would be
12   helpful to determining whether or not it has abused its discretion.
13
     *Abatie, 458 F.3d* at 968-969 (emphasis added).  Clearly the court jettisons the "any reasonable
14
     basis" defense set out in *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d
15
     869, 875 (9th Cir. 2004) that has long been the klaxon call of ERISA defendants.  With this
16
     analysis, the Court, applying an abuse of discretion standard, must temper that review by
17
     skepticism. *Abatie 458 F.3d* at 967-68. This eliminates the "grounded in any reasonable basis"
18
     approach to evaluating an administrator's decision, *Abatie, 458 F.3d* at 969. This approach
19
     invites the Court to decide whether the claimant's evidence is more reliable than the
20
     company's.
21
22         In applying the abuse of discretion standard, the Court should consider evidence of bias
23
     or conflict along with evidence of procedural violations.  Procedural violations remain a
24
25
26
27   PLAINTIFF'S INITIAL ARBITRATION BRIEF -21
28

**KRAFCHICK LAW FIRM**
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370  Fax (206) 374-7377
klf@krafchick.com

potential basis for applying de novo review even when there is an unambiguous grant of discretion:

> *When an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review de novo the administrator's decision to deny benefits.* We do so because, under *Firestone* a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract. 489 U.S. at 111. *Firestone* directs, consistent with trust law principles, that "a deferential standard of review [is] appropriate when a trustee *exercises* discretionary powers." *Id.* (emphasis added). **Because an administrator cannot contract around the procedural requirements of ERISA, decisions taken in wholesale violation of ERISA procedures do not fall within [*972] an administrator's discretionary authority. In general, we review de novo a claim for benefits when an administrator fails to exercise discretion.** See *Jebian*, 349 F.3d at 1106 (holding that an administrator failed to exercise its discretion when it did not make a benefits decision within the 60 days specified by the terms of the plan and the applicable regulation, so that the ultimate decision rendered was "undeserving of deference"). Other circuits have also held that review is de novo when the plan administrator fails to exercise discretion. *See Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005)(holding that a "deemed denied" claim, in which the administrator did not issue a decision within the time required by the regulations, constituted "inaction," which was not an exercise of discretion and which therefore was entitled to no deference; de novo review applied); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 632 (10th Cir. 2003) (noting that "[d]eference to the administrator's expertise is inapplicable where the administrator has failed to apply his expertise to a particular decision"); *Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002) ("Where a trustee fails to act or to exercise his or her discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion . . . ."). Similarly, when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted.

*Abatie* at 971-972.   Procedural violations also affect claims subject to abuse of discretion review to assist the Court in determining the degree of deference to give the decision by the

PLAINTIFF'S INITIAL ARBITRATION BRIEF -22

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  ERISA insurer.

2      As noted, a procedural irregularity in processing an ERISA claim does not usually

3  justify de novo review. *See Gatti*, 415 F.3d at 985 (concluding that the district court
   had erred by allowing "de novo review any time a benefits administrator violates the
4  procedural requirements in ERISA's regulations, no matter how small or
5  inconsequential the violation"). **That generalization does not mean, however, that**
   **procedural irregularities are irrelevant to the court's analysis. As noted, a**
6  **procedural irregularity, like a conflict of interest, is a matter to be weighed in**
7  **deciding whether an administrator's decision was an abuse of discretion.** *See*
   *Fought*, 379 F.3d at 1006 (concluding that an inherent conflict of interest, a proven
8  conflict of interest, or a serious procedural irregularity reduces the deference owed
9  to an administrator's decision to deny benefits); *Woo*, 144 F.3d at 1160 (noting that
   a conflict of interest or a procedural irregularity can heighten judicial scrutiny).
10  When an administrator can show that it has engaged in an "'ongoing, good faith
   exchange of information between the administrator and the claimant,'" the court
11  should give the administrator's decision broad deference notwithstanding a minor
   irregularity. *Jebian*, 349 F.3d at 1107 (quoting *Gilbertson*, 328 F.3d at 635); *see also*
12  *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392- 93 (5th Cir. 2006) (applying a
13  substantial compliance Liberty to alleged procedural violations under ERISA). A
   more serious procedural irregularity may weigh more heavily.
14

15  *Abatie* at 972.   Furthermore the Court went on to say extrinsic evidence can be brought in

16  even to address the merits of a claim when procedural violations prevented full development

17  of the record:

18
   **When a plan administrator has failed to follow a procedural requirement** [*973]
19  **of ERISA, the court may have to consider evidence outside the administrative**
   **record.** For example, if the administrator did not provide a full and fair hearing, as
20  required by ERISA, 29 U.S.C. § 1133(2), the court must be in a position to assess
21  the effect of that failure and, before it can do so, must permit the participant to
   present additional evidence. **We follow the Sixth Circuit in holding that, when**
22  **an administrator has engaged in a procedural irregularity that has affected the**
23  **administrative review, the district court  should "reconsider [the denial of**
   **benefits] after [the plan participant] has been given the opportunity to submit**
24  **additional evidence."** *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d
25  610, 617 (6th Cir. 1992)

26
                                              KRAFCHICK LAW FIRM
27                                            100 W. Harrison
                                              SouthTower, Suite 300
28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -23   Seattle, Washington 98119
                                              (206) 374-7370  Fax (206) 374-7377
                                              klf@krafchick.com

As we noted earlier, if the plan administrator's procedural defalcations are flagrant, de novo review applies. And as we also noted, when de novo review applies, the court is not limited to the administrative record and may take additional evidence.

**Even when procedural irregularities are smaller, though, and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.**

*Abatie* at 972-973 (emphasis added).

So, as noted above, no longer is the "any reasonable basis" enough to justify a decision to terminate or deny benefits. If the record is suspect, the Court can take additional evidence to complete the record on review. Sandbagging participants with a new reason for denial, failing to investigate, or by hiding information opens the claims records to enable the claimant to present evidence to rebut the new or previously hidden reason and support the grant of benefits. The failure to exercise discretion or grant unambiguous discretion still leads to de novo review. Discovery, previously routinely denied, can now be considered to determine the extent to which the Court should be skeptical of the plan decision governed by an abuse of discretion *Liberty*.

This point was hammered home even more strongly in the recent Ninth Circuit *Saffon* decision issued January 9, 2008. *Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206 (9th Cir. 2008)*. The Court discusses the failings in the handling of Saffon's claim, reverses the district court and orders the Court to permit the Plaintiff to gather more supporting evidence, permits the defendant insurer MetLife to provide more evidence, and

PLAINTIFF'S INITIAL ARBITRATION BRIEF -24

KRAFCHICK LAW FIRM
100 W. Harrison
SouthTower, Suite 300
Seattle, Washington 98119
(206) 374-7370   Fax (206) 374-7377
klf@krafchick.com

1  concludes, if there is much new evidence, the review must be de novo because the ERISA

2  disability insurer did not ever have a chance to exercise its discretion with respect to the new

3  evidence.  But most importantly *Saffon,* as we discuss below, reaffirmed the obligation of

4

5  Liberty to engage in a meaningful dialogue with Ms. Carr, in a manner calculated to be

6  understood by Ms. Carr.

7

8

   **B.**      **LIBERTY HAD AN OBLIGATION TO PROVIDE FULL AND**
9             **FAIR REVIEW TO MS CARR UNDER APPLICABLE ERISA**
             **LAW DURING BOTH HER SHORT TERM AND LONG TERM**
10            **DISABILITY CLAIMS,**

11

12     Under 29 USC 1133 and ERISA regulations 29 CFR 2560.503-1, as an ERISA plan

13  insurer, Liberty has an obligation to provide full and fair review to claimant, Ms. Carr.

14
   Particularly 29 CFR 2560.503-1 defines what is necessary to provide full and fair review.  29
15
   CFR 2560.503-1(h)  The regulations do not distinguish between a short and long term
16

17  disability claim, and refer only to disability claims governed by ERISA.

18
       The regulations and how they are implemented should be evaluated with the general
19
   requirement firmly set out in *Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511*
20

21  *F.3d 1206 (9th Cir. 2008).*  ERISA regulations call for a meaningful dialogue between ERISA

22  plan administrators (including their fiduciaries) and their beneficiaries in a manner to be

23
   understood by the beneficiaries. *Saffon at 14-18; Booton v. Lockheed Medical Benefit Plan,*
24
   *110 F.3d 1461,1463, (1997); Prado v. Allied Domecq Spirits and Wine Group Disability*
25

26

27  KRAFCHICK LAW FIRM
                                          100 W. Harrison
                                          SouthTower, Suite 300
                                          Seattle, Washington 98119
                                          (206) 374-7370   Fax (206) 374-7377
                                          klf@krafchick.com

28  PLAINTIFF'S INITIAL ARBITRATION BRIEF -25