# EXHIBIT I

PAMELA E. COGAN (SBN 105089)
KATHRYN C. CURRY (SBN 157099)
JENNIFER A. WILLIAMS (SBN 244707)
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street, Suite 300
Redwood City, CA 94063
Telephone:  (650) 364-8200
Facsimile:  (650) 780-1701
Email:  pcogan@ropers.com
        kcurry@ropers.com
        jwilliams@ropers.com

Attorneys for Defendant
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

IN RE ARBITRATION OF:

ANITA CARR,

　　　　　Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, a Massachusetts corporation; PROVIDIAN BANCORP SERVICES, a domestic corporation,

　　　　　Defendants.

Case No. 1100048706

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON'S OPENING ARBITRATION BRIEF**

Date: March 31, 2008

The Honorable Eugene Lynch

RC1/5056427.1/KCC

LIBERTY'S OPENING ARBITRATION BRIEF - CASE NO. 1100048706

# TABLE OF CONTENTS

Page

- I. INTRODUCTION ..................................................................................................1
- II. STATEMENT OF FACTS .....................................................................................2
    - A. PLAINTIFF'S BACKGROUND, TRAINING, AND EXPERIENCE ..........2
    - B. PROVIDIAN TERMINATES PLAINTIFF'S EMPLOYMENT..................2
        1. Plaintiff Acknowledges She Will Release Any Claim for Disability Benefits If She Signs the Release ...................................4
        2. Plaintiff Signs the Severance Agreement and Release Without Modification.......................................................................6
    - C. PLAINTIFF SUBMITS A CLAIM FOR DISABILITY ................................8
        1. Plaintiff's Treating Physician Reports to Liberty that She is Not Disabled ..................................................................................8
        2. Plaintiff Admits She Can Return to Work But For the Layoff................8
        3. Plaintiff Does Not Tell Liberty That She Was Laid Off, Instead Claiming She Stopped Working Because of an Alleged Disability ............9
        4. Liberty Denies The Claim and Plaintiff Appeals......................................10
    - D. PLAINTIFF SUBMITS ANOTHER CLAIM TO LIBERTY .....................12
        1. Dr. Holbrook Conducts A Medical Records Review ...............14
        2. Dr. Brown Conducts A Medical Record Review ......................14
        3. Plaintiff's Claim for Long Term Disability Benefits is Denied.................15
        4. Liberty Obtains Plaintiff's Personnel File and Surveillance .....................20
        5. Amy Hopkins, M.D. Performs A Medical Record Review .......................21
        6. Liberty Upholds The Denial ...................................................................21
    - E. THE LIBERTY GROUP DISABILITY INCOME POLICY .......................22
- III. LEGAL ARGUMENT..........................................................................................24
    - A. PLAINTIFF'S ACTION AGAINST LIBERTY MUST BE DISMISSED BECAUSE AN ERISA ACTION CANNOT BE BROUGHT AGAINST THE CLAIMS ADMINISTRATOR OR THE INSURER......................24
    - B. PLAINTIFF'S ACTION IS BARRED BY THE SEVERANCE AGREEMENT AND RELEASE..........................................................25
        1. Plaintiff Released Her Claim for Disability Income Benefits and Her Right to Bring An Action For Such Benefits................................26
        2. Plaintiff Released Her Claim Against The Plan and Liberty.....................27
        3. Plaintiff Knowingly and Voluntarily Waived Her Claim for Disability Benefits .......................................................................29
    - C. EVEN IF PLAINTIFF DID NOT RELEASE HER CLAIMS, DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR BECAUSE LIBERTY DID NOT ABUSE ITS DISCRETION BY DENYING PLAINTIFF'S CLAIM.....................................................31

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 1. | Liberty's Decision To Discontinue Benefits Is Subject To The Abuse Of Discretion Standard Of Review | 31 |
| 2. | The Limited Exceptions For Applying De Novo Review Do Not Apply Here | 32 |
| 3. | Liberty's Decision is Entitled to Significant Deference | 32 |
| 4. | Liberty Did Not Abuse Its Discretion Because Its Decision was Reasonable and Supported By Substantial Evidence | 35 |

- 1. Liberty's Decision To Discontinue Benefits Is Subject To The Abuse Of Discretion Standard Of Review..........31
- 2. The Limited Exceptions For Applying De Novo Review Do Not Apply Here..........32
- 3. Liberty's Decision is Entitled to Significant Deference..........32
- 4. Liberty Did Not Abuse Its Discretion Because Its Decision was Reasonable and Supported By Substantial Evidence..........35
- D. PLAINTIFF CANNOT PROVE THAT SHE WAS CONTINUOUSLY "DISABLED" THROUGHOUT THE ELIMINATION PERIOD AS DEFINED IN THE POLICY..........39
- E. IF THE COURT DETERMINES THAT PLAINTIFF'S DISABILITY AROSE AFTER AUGUST 31, 2001 IT IS NOT COVERED UNDER THE POLICY..........41
- IV. CONCLUSION..........42

DEF LIBERTY LIFE'S RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FO

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Austin v. CCC Information Services, Inc. Benefit Plan*,
  225 Fed.Appx. 671, 2007 U.S.App.LEXIS 6980 (9th Cir. 2007) ..............28

*Abatie v. Alta Health & Life Insurance Co.*,
  458 F.3d 955 (9th Cir. 2006) ..............31, 32, 33

*Bendixen v. Standard Insurance Co.*,
  185 F.3d 939 (9th Cir. 1999) ..............32, 36

*Bennett v. CNA Insurance Cos.*,
  2001 U.S. Dist. LEXIS 107 (N.D. Cal. 2001) ..............28

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822, 155 L. Ed. 2d 1034, 123 S. Ct. 19865 (2003) ..............34

*Brae Transportation v. Coopers & Lybrand*,
  790 F.2d 1439 (9th Cir. 1986) ..............26

*Butts v. Continental Casualty Company*,
  357 F.3d 835 (8th Cir. 2004) ..............38

*Chaplin v. Nations Credit Corp.*,
  307 F.3d 368 (5th Cir. 2002) ..............30

*Clark v. Wash. Teamsters Welfare Trust*,
  8 F.3d 1429 (9th Cir. 1993) ..............35

*Dowden v. Blue Cross & Blue Shield of Texas, Inc.*,
  126 F.3d 641 (5th Cir. 1997) ..............35

*Evans v. Safeco Life Insurance Co.*,
  916 F.2d 1437 (9th Cir. 1990) ..............25

*Everhart v. Allmerica Financial Life Insurance Co.*,
  275 F.3d 751 (9th Cir. 2001) ..............24

*Finz v. Schlesinger*,
  957 F.2d 78 (2d Cir.), cert. denied, 113 S.Ct. 72 (1992) ..............25, 29

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989) ..............31

*Ford v. MCI Communications Health & Welfare*,
  399 F.3d 1076 (9th Cir. 2005) ..............24

*Frost v. Met Life Insurance Co., et al.*,
  470 F. Supp. 2d 1101 (C.D. Cal 2007) ..............35

*Gatti v. Reliance Standard Insurance Co.*,
  415 F.3d 978 (9th Cir. 2005) ..............32

Ropers Ma...ki Kohn & Bentley
A Professional Corporation
Redwood City

*Hamilton v. State Farm Fire & Casualty Company,*
  270 F.3d 778 (9th Cir. 2001) ...................................................................... 28

*Horton v. Reliance Standard Life Insurance Co.,*
  141 F.3d 1038 (11th Cir. 1998) .................................................................. 39

*Jebian v. Hewlett Packard,*
  349 F.3d 1098 (9th Cir. 2003) ..................................................................... 32

*Jordan v. Northrup Grumman Corp. Welfare Benefit Plan,*
  370 F.3d 869 (9th Cir. 2004) ........................................................ 18, 34, 35, 36, 38

*Kaiser v. Standard Insurance Co. et al.,*
  2007 U.S. Dist. LEXIS 2239 (N.D. Cal. 2007) ................................................ 35, 36

*Kearney v. Standard Insurance Co.,*
  175 F.3d 1084 (9th Cir. 1999) ..................................................................... 32

*Lanoik v. Advisory Committee of Brainerd Manufacturing Co. Pension Plan,*
  935 F.2d 1360 (2d Cir. 1991) ...................................................................... 25

*Lawless v. Northwestern Mutual Life Insurance Co,*
  360 F. Supp. 2d 1046 (N.D. Cal. 2005) ......................................................... 34

*Leavitt v. Northwestern Bell Telephone Co.,*
  921 F.2d 160 (8th Cir. 1991) ....................................................................... 25

*Martino-Catt v. E.I. duPont de Nemours & Co.,*
  317 F. Supp. 2d 914 (S.D. Iowa 2004) ......................................................... 30

*McDaniel v. The Chevron Corp.,*
  203 F.3d 1099 (9th Cir. 2000) ..................................................................... 32

*Patrick v. Hewlett-Packard Company Employee Benefits Organization Income
Protection Plan,* 2007 U.S. Dist. LEXIS 80565 (S.D. Cal. 2007) ........................... 24

*Piehl v. Metropolitan Life Insurance Co.,*
  2005 U.S. Dist. LEXIS 4619 (D.C. Or. 2005) ............................................... 27, 28

*Pilot Life Insurance Co. v. Dedaux,*
  481 U.S. 41, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987) ...................................... 25

*Raithaus v. UNUM Life Insurance Co. of America,*
  335 F. Supp. 2d 1098 (D. Haw. 2004) ......................................................... 40

*Richardson v. Pension Plan of Bethlehem Steel Corp.,*
  112 F.3d 982 (9th Cir. 1997) ....................................................................... 25

*Rodriguez-Abreu v. Chase Manhattan Bank,*
  986 F.2d 580 (1st Cir. 1993) ....................................................................... 25

*Estate of Shockley v. Alyeska Pipeline Serv. Co.,*
  130 F.3d 403 (9th Cir. 1997) ....................................................................... 36

*Smart v. The Gillette Company Long Term Disability Plan,*
    70 F.3d 173 (1st Cir. 1995) .................................................................... 25, 26, 27, 28, 29

*Snow v. Standard Insurance Co.,*
    87 F.3d 327 (9th Cir. 1996) .......................................................................................... 39

*Stratton v. E.I. Dupont De Nemours & Co.,*
    363 F.3d 250 (3rd Cir. 2004) ........................................................................................ 34

*Torrez v. Public Serv. Co. of N.M.,*
    908 F.2d 687-690 (10th Cir. 1990) ............................................................................... 29

*United States v. Nunez,*
    223 F.3d 956 (9th Cir. 2000) ........................................................................................ 25

*Wilson Arlington Co. v. Prudential Insurance Co. of America,*
    912 F.2d 366 (9th Cir. 1990) ........................................................................................ 25

## STATE CASES

*Miller v. Elite Insurance Co.,*
    100 Cal. App. 3d 739 (1980) .......................................................................................... 7

# I. INTRODUCTION

This ERISA action against Liberty Life Assurance Company of Boston ("Liberty") and the Providian Employee Disability Plan ("Providian Plan" or the "Plan")[1] arises out of the denial of plaintiff's claim for disability income benefits under an employee benefit plan established by her former employer, Providian Bancorp Services, Inc. The disability income benefit portion of the Providian Plan was insured by a group policy issued by Liberty, the claims administrator.

Plaintiff worked for Providian from October 1998 until August 28, 2001 when she was laid off. She entered into a Severance Agreement and Release with Providian whereby she released all claims against Providian, its agents, and affiliates in exchange for three months of continued pay, health care coverage, and 401(k) contributions. All other employee compensation and benefits were released. After the three month severance pay period ended, plaintiff submitted a claim for disability income benefits directly to Liberty alleging that she became disabled and unable to work on August 29, 2001 – coincidentally, the day after her termination. Plaintiff never told Liberty that she had been terminated or that she had released her claims. Accordingly, Liberty processed her claim but concluded, after its investigation, that plaintiff did not meet the policy's definition of "disability."

Judgment must be entered in favor of Liberty because it is an improper defendant under well established Ninth Circuit case law, which authorizes a claim for ERISA benefits to be brought against the Plan, not the claims administrator or the insurer. Plaintiff's action against defendants, including the Providian Plan, is also barred by the Severance Agreement and Release she signed on September 21, 2001. Even if the claim was not barred by the Release, defendants are still entitled to judgment in their favor because Liberty did not abuse its discretion by denying plaintiff's claim. Liberty's decision was supported by substantial evidence, including numerous doctors' reviews, the medical records, and plaintiff's <u>own treating physician</u> who reported to Liberty in <u>January 2002</u> that plaintiff could work without any restrictions or limitations.

---

[1] By stipulation, defendant Providian Bancorp Services, Inc, the employer and plan administrator, was dismissed from this action.

RC1/5056427.1/KCC

- 1 -

LIBERTY'S OPENING ARBITRATION BRIEF - CASE NO. 1100048706

## II. STATEMENT OF FACTS

### A. PLAINTIFF'S BACKGROUND, TRAINING, AND EXPERIENCE

Plaintiff received a Bachelor of Science degree in biology/microbiology from the University of Nevada. (Ex. B to McGee Decl., AR-847, AR-125.)[2] She obtained 44 credits towards a Master's Degree in Computer Science and Math from Texas Women's University and received an M.T.A.S.C.P. in medical technology from Western Clinical in Reno, Nevada. (AR-847, AR-125.) From 1991 to 1993 and again from 1995 to 1996, plaintiff ran her own consulting company. (AR-847, AR-125.) From 1993 to 1995, plaintiff was a Corporate MIS Manager with Western Medical Services in Walnut Creek, California. (AR-847, AR-125.) From 1996 until 1998, plaintiff was a technical director for Pacific Bell/SBC. (AR-847, AR-125.)

Plaintiff began working at Providian Financial Corporation as a Director of Data Services on October 19, 1998, where she worked until August 28, 2001 when her employment was terminated as part of a workforce reduction. (AR-106 to AR-112.)

### B. PROVIDIAN TERMINATES PLAINTIFF'S EMPLOYMENT

On August 28, 2001, the last day plaintiff worked at Providian, plaintiff received a letter from Providian notifying her of her eligibility to participate in the Providian Financial Corporation Severance Pay Plan. ("Notice of Eligibility.") (AR-106 to AR-112.) The letter provided in part:

> "This letter is your **Notice of Eligibility** in accordance with Section 2.7 of the **Providian Financial Corporation Severance Plan** (the "Plan"). A copy of the Plan is enclosed with this letter. In order to become eligible for the benefits described in this Notice of Eligibility, you must execute and return a copy of (i) this letter, (ii) the General Release, attached to this letter as Exhibit A, and (iii) the Acknowledgement of Confidentiality Agreement, attached to this letter as Exhibit B." (AR-106.)

Pursuant to the letter, if plaintiff elected to participate in the Providian Severance Pay Plan, she could maintain her status as an active employee until November 28, 2001 ("Separation Date"), during which time she would continue to receive (1) her regular base salary; (2) her health care coverage; (3) continue vesting in the employer match and retirement contribution portions of

---

[2] The claim file maintained by Liberty is attached as Exhibit B to the Declaration of Paula McGee and is referred to herein as "AR."

her 401(k) Plan; and (4) payment for services of an outplacement consultant up to three months. (AR-106 to AR-107.) Aside from her continued base salary, health care coverage, 401(k) contribution and payment of services of an outplacement consultant up to three months, <u>plaintiff would not receive any other employee benefits and any and all claims to other employee benefits and compensation were expressly waived</u>. (AR-109.)

> **4. Other Compensation or Benefits.** You acknowledge that, except as <u>expressly provided</u> in this Notice of Eligibility, you will not receive any additional compensation, separation payments or benefits from the Company.
>
> **5. General Release.** In exchange for the payments and other benefits under this Notice of Eligibility to which you would not otherwise be entitled, you agree to execute and be bound by the General Release attached hereto as Exhibit A. (AR-107, emphasis added.)

The General Release attached as Exhibit A to the Notice of Eligibility provided:

> "1.    I hereby release, acquit and forever discharge Providian Bancorp Services (the "Company"), its parent, subsidiaries and <u>affiliates</u>, and their officers, directors, employees and <u>agents, and all others</u>, of and from any and all claims, liabilities, demands, causes of action, costs, expenses, or otherwise, <u>known and unknown</u>, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the date of this release, <u>including but not limited to all claims or demands directly or indirectly arising out of or in any way connected with my</u> employment, benefits, and/or compensation with the Company, or the termination of my employment, including but not limited to common law claims and/or claims under Title VII of the Civil Rights Act of 1964, the Federal Age Discrimination in Employment Act of 1967, as amended (ADEA"), the Americans with Disabilities Act, the California Fair Employment and Housing Act, <u>and/or any other federal state, or local statute</u>.
>
> * * *
>
> 3.    In giving this release, which includes claims which may be unknown to me at present, I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: '**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**' I hereby expressly waive and relinquish all rights and benefits under that section." (AR-109, underlined emphasis added.)

### 1. Plaintiff Acknowledges She Will Release Any Claim for Disability Benefits If She Signs the Release.

Plaintiff received the severance plan letter and a copy of the Severance Pay Plan during a meeting with Terrace Ellis, an employee in Providian's Human Resources department, on August 28, 2001. (Ex. 3 to Cogan Decl., pp. 16:20-23; 18:20 to 19:1.) Plaintiff has testified she was informed for the first time during this meeting that she was being terminated as part of a companywide employee reduction. (Ex. 3 to Cogan Decl., pp. 19:3-5; 22:22 to 23:19.) Plaintiff also alleges that she asked Terrace Ellis during this meeting whether she would continue to have workers compensation and disability insurance coverage following her termination, and that Terrace Ellis told her both would continue. (Ex. 3 to Cogan Decl., pp. 20:13 to 21:10.) However, plaintiff also testified at her deposition that she did not feel she could rely on the information she received from Terrace Ellis because she had been unreliable and not well informed on such matters in the past. (Ex. 3 to Cogan Decl., pp. 61:17 to 62:16.)

Terrace Ellis was the Director of Employee Relations for the IS Group at Providian at that time. (Ex. 15 to Cogan Decl., p. 4:5-11.) She worked with managers and employees to resolve workplace issues. (Ex. 15 to Cogan Decl., pp. 4:25 to 5:4.) She would meet with employees to go over severance documentation when employees were laid off due to workforce reduction or restructuring of the company, as was the case with Anita Carr. (Ex. 15 to Cogan Decl., pp. 7:9-18; 9:20 to 10:2.) Her job did not involve employee benefits and she was not knowledgeable regarding employee benefits. (Ex. 15 to Cogan Decl., pp. 5:5-6; 58:10-13.) It was her practice to direct employees to the Benefits people in the Human Resources department if questions arose regarding benefits. (Ex. 15 to Cogan Decl., pp. 20:14 to 21:3.) She does not recall having any conversation with plaintiff in which she told plaintiff that her disability benefits would continue following her termination if she signed the severance pay plan agreement. (Ex. 15 to Cogan Decl., pp. 15:14-25; 20:2 to 21:3.) Indeed, she stated she would find it hard to believe since the Severance Agreement says only that healthcare coverage, 401K contributions and base salary would continue for three months by entering into the agreement. (Ex. 15 to Cogan Decl., pp. 51:16 to 52:20; 62:9 to 63:8.)

After the meeting, plaintiff wrote a letter to A.W. Wiggenhorn, Executive Vice President of Human Resources at Providian dated August 29, 2001 that does not reference any alleged representations by Terrace Ellis and <u>acknowledged</u> she understood she would be releasing any claim for disability benefits under the Providian Plan if she signed the release. (Ex. 10 to Cogan Decl.) In her letter, plaintiff demanded five months leave of absence instead of three because she had seen her doctor on August 28, 2001 who found she had high blood pressure and possible carpal tunnel syndrome.[3] (Ex. 10 to Cogan Decl.) Plaintiff claimed her stress and right arm pain was work related due to the retaliation and stress she sustained after she made a sexual harassment claim in spring 2000. (Ex. 10 to Cogan Decl.) Plaintiff wrote:

> "I am worried that if I sign the above document, I will not be able to use Workers Comp, <u>nor now of course my paid disability insurance plans</u>. Will I still be able to use Workers Comp if I sign the above document?
>
> As I stated above, my physician is in the midst of trying to finalize some diagnoses.
>
> Do we have any other alternatives? Such as having me on leave of absence until all tests are done and diagnoses are in <u>and then reinstating me</u> and having me on disability?
>
> * * *
>
> I have been through some significant negative events while working at Providian. Other than that, I enjoyed the nature of the work, was a loyal and hardworking employee, and under the right circumstances would someday like to return to Providian because I feel I can continue to make positive contributions to Providian's success." (Ex. 10 to Cogan Decl., emphasis added.)

As pre-arranged at their meeting the day before, plaintiff returned to Providian at 6:30 a.m. on August 29, 2001 to meet with Terrace Ellis to retrieve her personal effects. At that time, plaintiff handed Ms. Ellis a copy of her letter to Mr. Wiggenhorn, which they did not discuss and plaintiff does not recall any further discussions regarding the separation plan at that time. (Ex. 3 to Cogan Decl., pp. 24:12 to 25:12.)[4] Plaintiff did not receive a response from Mr. Wiggenhorn

---

[3] Although plaintiff saw Dr. Lamb on August 28, 2001, carpal tunnel syndrome in not referenced or mentioned in the office visit note. (AR-1000.) Moreover, in the Attending Physician Statement submitted in support of plaintiff's claim for disability, Dr. Lamb did **not** even list carpal tunnel syndrome as a diagnosis. (AR-1126.)

[4] Terrace Ellis could not recall ever seeing this letter. (Ex.15 to Cogan Decl., pp. 16:21 to 17:7.) She also testified she would have taken notes of any conversations following the termination and Providian has no such notes. (Cogan Decl. ¶ 5 and Ex.15, pp. 35:23 to 36:23.)

RC1/5056427.1/KCC — 5 — LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706

to her letter, nor did she have any communications with him, either orally or in writing. (Ex. 3 to Cogan Decl., pp. 28:1-6.)

On September 6, 2001, plaintiff sent a letter to Mary Ellen Richey, Counsel & Vice Chairman at Providian, describing in detail the alleged actionable harassment and retaliation she had experienced at Providian since April 2000. (Ex. 12 to Cogan Decl.) In her letter, plaintiff <u>demanded reinstatement</u> or 18 months of severance pay under the Severance Plan in order to resolve the matter without formal legal action. (Ex. 12 to Cogan Decl.) Plaintiff did not receive a response to her letter and did not have any written or oral communications with Ms. Richey after she sent the letter. (Ex. 3 to Cogan Decl., pp. 28:7-19.)

Plaintiff testified at her deposition in this action that some time between August 29, 2001 and the date she signed the Severance Agreement and Release that she spoke to Terrace Ellis, this time by telephone. During this call, Terrace Ellis allegedly told plaintiff that she would continue to have coverage for workers compensation and disability insurance benefits during her leave of absence if she signed the severance agreement. (Ex. 3 to Cogan Decl., pp. 25:18 to 27:12.) Plaintiff, however, does not have any notes of this conversation and never received any written statements from Terrace Ellis or anyone else at Providian to substantiate this alleged representation. (Ex. 3 to Cogan Decl., pp. 26:6-7; 63:11-21.) Terrace Ellis does not recall having a telephone conversation with Anita Carr, and testified it has "highly improbable" that she would have told plaintiff her disability benefits or workers compensation would continue after signing the release, because it was outside her "ballpark" or area of expertise. (Ex. 15 to Cogan Decl., pp. 20:2-22; 51:16 to 52:8.) She also testified that she understood that the severance pay plan agreement did not extend all benefits, only healthcare coverage and 401K contributions. (Ex. 15 to Cogan Decl., pp. 62:9 to 63:8.)

2. **Plaintiff Signs the Severance Agreement and Release Without Modification**

On September 21, 2001, twenty four days after receiving them, plaintiff signed the Notice of Eligibility and the General Release <u>without any modifications</u> to either document. (AR-108, AR-109.) The agreement she signed contains the following provision:

"9. **Miscellaneous.** This Notice of Eligibility, including Exhibits A

and B, constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to its subject matter. It is entered into without reliance on any promise or representation written or oral other than those expressly contained herein and it supersedes any other such promises warranties or representations. This notice of Eligibility may not be modified or amended except in a writing signed by both you and a duly authorized officer of the Company...." (AR-107 to AR-108.)

Additionally, the following paragraph immediately preceding plaintiff's signature on the Notice of Eligibility provided:

"By my signature below, I acknowledge that I have carefully reviewed and considered this Notice of Eligibility; that I understand the terms of the Notice of Eligibility; and that I voluntarily agree to them." (AR-108.)

Plaintiff testified at her deposition that she <u>carefully read this agreement</u>, including the statements in paragraph 9 before signing it and understood its meaning. (Ex. 3 to Cogan Decl., pp. 71:10 to 72:2.)

> Q. Did you read Exhibit 4, that's the August 28th letter. Did you read that carefully before you signed it?
> A. Yes.
> Q. So at the bottom of AR-107, did you read the line the sentence that says, "It is entered into without reliance on any promise or representation written or oral other than those expressly contained herein and it supersedes any other such promises warranties or representations?"
> A. Yes, I read that.
> Q. And you read that before you signed it?
> A. Yes.
> Q. And after you talked to Terrace Ellis?
> A. Yes.
> Q. And did you understand that that meant that what is written in the agreement is what was binding on you?
> A. Yes. (Ex. 3 to Cogan Decl., pp. 71:10 to 72:2.)

After plaintiff signed the Severance Agreement and Release on September 21, 2001, Providian placed plaintiff back on payroll and inadvertently continued to take deductions not only for continued health care benefits and 401(k) contributions in accordance with the Severance Pay Plan, but for all the Providian sponsored employee benefits she had received during her employment, including long-term disability. This administrative payroll error does not modify or amend the terms of the Severance Agreement and Release, nor the terms of the Liberty policy. (AR-107 to AR-108; See, Miller v. Elite Ins. Co., 100 Cal. App. 3d 739 (1980).)

RC1/5056427.1/KCC

LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706

C. **PLAINTIFF SUBMITS A CLAIM FOR DISABILITY**

On or around November 29, 2001, three months after her employment was terminated and in violation of the Severance Agreement and Release, plaintiff submitted a telephonic claim directly to Liberty for disability income benefits under the Providian Group Disability Income policy. (AR-13, AR-1137 to AR-1139.) Plaintiff told Liberty she had carpal tunnel syndrome of the right wrist, elbow, arm, shoulder and neck pain; autoimmune rheumatoid disorder; and high blood pressure. (AR-13, Note 2.) Plaintiff told Liberty her claim was work-related and that she had filed a claim for workers' compensation benefits. (AR-13, Note 1.) Her primary care physicians were identified as Carol Lamb, M.D. and Rashmi Dixit, M.D. (AR-1138.) <u>Plaintiff, however, did not tell Liberty that she had been laid off</u> or that she had entered into a severance agreement releasing her claim for disability income benefits. (AR-13, AR-1137 to AR-1138.) Because Liberty was unaware that plaintiff had been terminated by Providian on August 28, 2001 or that she had entered into the Severance Agreement and Release, it processed the claim.[5] (AR-13, AR-1137 to AR-1139.)

1. **Plaintiff's Treating Physician Reports to Liberty that She is Not Disabled**

On December 11, 2001, plaintiff told Liberty that <u>Dr. Lamb was her treating physician and had taken her out of work</u>. (AR-1114, Note 9.) On January 3, 2002, Liberty received a completed Attending Physician's Statement ("APS") from Dr. Lamb. (AR-1126 to AR-1127.) Dr. Lamb listed diagnoses of gastroesophageal reflux disease (GERD), hypertension, <u>fibromyalgia</u>, and anxiety. (AR-1126.) Significantly, Dr. Lamb indicated plaintiff <u>had **not** been advised to stop working, she had **no** work restrictions, **no** limitations of functional capacity, and was capable of performing work</u>. (AR-1126 to AR-1127.) Dr. Lamb also noted on the APS that plaintiff had no mental restrictions or cardiac impairment. (AR-1127.)

2. **Plaintiff Admits She Can Return to Work But For the Layoff**

On January 7, 2002, plaintiff sent a letter to Joseph Saunders, CEO of Providian, regarding an employment advertisement she saw in the San Francisco Chronicle on January 6th for all levels and positions in Management IT. (Ex. 4 to Cogan Decl.) Plaintiff wrote that she

---

[5] Liberty did not receive a copy of the Severance Agreement until January 19, 2005. (AR-106.)

had been laid off in August 2001 and demanded that she be contacted and recalled back to work, noting her 18 years of experience in IT. (Ex. 4 to Cogan Decl.)

### 3. Plaintiff Does Not Tell Liberty That She Was Laid Off, Instead Claiming She Stopped Working Because of an Alleged Disability

After Liberty received the APS form from Dr. Lamb indicating that plaintiff had no restrictions or limitations and could work, Liberty called plaintiff on January 22, 2002 to discuss her claim. (AR-11, Note 19.) During the conversation, plaintiff again confirmed that her last day of work was August 28, 2001 and her first missed day of work was August 29, 2001. Plaintiff admitted <u>none of her doctors had told her to stop working or that she was disabled</u>. (AR-11, Note 20.) When asked what happened on August 28th that did not allow her to return to work the next day, plaintiff falsely stated to Liberty that she was just "too sick" to return to work on August 29, 2001 because of excessive fatigue; nausea; pain in the muscles and joints of her hands, arms and legs; high blood pressure; gastric reflux; and anxiety. (AR-11, Notes 19 and 20.) Plaintiff did <u>not</u> tell Liberty that she had been laid off on August 28th or that she had returned to Providian on August 29th to retrieve her personal belongings. Instead, plaintiff told Liberty she was a senior executive and her troubles began when she filed a sexual harassment complaint against a peer executive. (AR-11, Note 19.) Her superiors did not respond in accord with the Providian Sexual Harassment Guidelines and from the moment she filed the complaint, she began to be reprimanded for failing to meet her job requirements. (AR-11, Note 19.) Her career was put "in a downward spiral," which she claimed caused physical reactions such as high blood pressure and GERD.[6] (AR-11, Note 19.) Plaintiff told Liberty that although he did not tell her to stop working, Dr. Wong, her gastroenterologist, had told her to look for other work.[7] (AR-11, Note 20.) Plaintiff also told Liberty she thought Dr. Lamb may not have been aware of how bad she was feeling during that time and that <u>on November 26, 2001, her rheumatologist, Dr. Dixit, diagnosed her with fibromyalgia</u>. (AR-11, Note 20.) Dr. Lamb, however, specifically listed

---

[6] The medical records document that plaintiff has a long-standing history of GERD which preceded her harassment claim. (AR-1098.)
[7] There are no statements in Dr. Wong's medical records to verify plaintiff's statement. In fact, plaintiff had not seen Dr. Wong at all in the three months before she was terminated from Providian and Dr. Wong's last office note in April 2001 noted that plaintiff's GERD was controlled with medications. (AR-1088 to AR-1104.)

RC1/5056427.1/KCC — 9 — LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706

fibromyalgia as a diagnosis on the APS form she sent to Liberty in which she stated that plaintiff was not prevented from work, so this diagnosis had been taken into consideration. (AR-1126.)

### 4. Liberty Denies The Claim and Plaintiff Appeals

Because Dr. Lamb stated on the APS form that plaintiff had no limitations and was able to work, and plaintiff confirmed that none of her doctors had told her to stop working, Liberty denied her claim for disability benefits on January 22, 2002. (AR-1124 to AR-1125.) Plaintiff appealed the denial on or about March 15, 2002 and asked Liberty to obtain records from Dr. Lamb, Dr. Dixit and Dr. Wong because their records would support her disability. (AR-1121.)

Liberty then sent letters to Drs. Wong, Lamb, and Dixit requesting medical records from October 2000 to the present. (AR-1118 to AR-1120.) The records received from Dr. Wong documented five visits between May 3, 2000 to April 13, 2001. (AR-1088 to AR-1104.) Plaintiff first saw Dr. Wong on May 3, 2000 after an emergency room visit to the hospital for chest pain. (AR-1101.) Dr. Wong was consulted at that time to determine whether there was a gastrointestinal cause of her symptoms (AR-1101) because the cardiac evaluations and stress tests were normal. (AR-1102.) Dr. Wong concluded plaintiff's symptoms were most likely gastrointestinal in nature and recommended: antacids; follow-up with Dr. Lamb; and, after cardiac causes were eliminated, to return to his office for follow-up and to schedule an upper endoscopy. (AR-1102.) An upper endoscopy was subsequently performed on October 25, 2000, which showed no significant complications from plaintiff's gastroesophageal reflux disease. (AR-1092 to AR-1093.) On February 2, 2001, plaintiff was seen by Dr. Wong for constipation. (AR-1096.) A colonoscopy was performed on April 13, 2001 and a benign polyp was found. (AR-1094 to AR-1095.) There were no records for treatment received from Dr. Wong after April 13, 2001. (AR-1088 to AR-1104.)

The records Liberty received from Dr. Dixit documented office visits from October 24, 2001 through February 27, 2002. (AR-1065 to AR-1087.) Plaintiff saw Dr. Dixit for the first time on October 24, 2001 for an initial rheumatology consultation. After the consultation, Dr. Dixit opined that plaintiff most likely had primary Sjögren's syndrome and that fibromyalgia was also indicated. (AR-1080, AR-1077.) Dr. Dixit ordered labs and gave plaintiff educational

RC1/5056427.1/KCC                           - 10 -                LIBERTY'S OPENING ARBITRATION BRIEF
                                                                  CASE NO. 1100048706

materials regarding fibromyalgia and Sjögren's syndrome. He also recommended that she begin weight reduction and aerobic conditioning and to take Tylenol or Advil as needed. He did not indicate hat she was unable to work. (AR-1080.) Plaintiff saw Dr. Dixit again on November 27, 2001, for complaints of <u>some fatigue and a recent cold</u> and he prescribed Prozac. (AR-1082.) Plaintiff did not see Dr. Dixit again until February 4, 2002 -- <u>after</u> Liberty had denied her claim – at which time she reported an exacerbation of her fibromyalgia symptoms, which she attributed to her prior job where there was a stressful situation. (AR-1083.) <u>On February 27, 2002</u>, after plaintiff had been hospitalized for a suicidal incident, Dr. Dixit noted plaintiff was depressed and **for the first time** indicated that plaintiff was <u>disabled and unable to work</u>. He stated she should refrain from working until April 30, 2002. (AR-1084.)

The records Liberty received from Dr. Lamb documented treatment received from January 7, 2000 through March 25, 2002. (AR-989 to AR-1064.) On July 3, 2001, plaintiff saw Dr. Lamb for a lesion on her chest that she noticed after a recent vacation to the Bahamas. (AR-1060.) Dr. Lamb noted that plaintiff was also having headaches and complained of swelling in her legs, achy lumps, and soreness in her neck. (AR-1060.) Dr. Lamb ordered an ANA blood test, which was positive. (AR-1031.) On August 28, 2001 – plaintiff's last day of work – plaintiff presented with complaints of weakness and aches in her arms, which were better with Lodine. (AR-1000.) <u>Plaintiff reported she slept well, awoke feeling rested, and exercised regularly</u>. (AR-1000.) During this visit, <u>plaintiff asked Dr. Lamb about fibromyalgia</u>. (AR-1000.) Dr. Lamb noted a possible rheumatoid disorder and referred plaintiff to a rheumatologist for consultation. (AR-1000.) Plaintiff saw Dr. Lamb again on August 31, 2001 for panic attacks she was experiencing <u>since being laid off</u> three days earlier. (AR-999.) No other complaints were noted and plaintiff was given Xanax. (AR-999.) <u>On October 18, 2001, plaintiff reported she was doing well, she was exercising more and her anxiety symptoms were better. She had lost ten pounds and was running for 15 minutes and then walking 45 minutes at a time</u>. (AR-998.) On October 26, 2001, Dr. Lamb received Dr. Dixit's letter concluding that plaintiff likely has Sjögren's syndrome and fibromyalgia. (AR-1012; AR-1080 to AR-1081.) On November 29, 2001, the day plaintiff submitted a claim for disability, plaintiff reported to Dr. Lamb that <u>she was</u>

feeling better and having less headaches. (AR-997.) She told Dr. Lamb, however, that she intended to file a workers' compensation claim for her abdominal pain and gastrointestinal symptoms due to harassment by her bosses. (AR-997.)

After reviewing all of the medical records obtained from Drs. Lamb, Wong, and Dixit, Liberty concluded the medical records did not support a finding that plaintiff was continuously disabled throughout the elimination period as required under the policy. Therefore, Liberty sent a letter to plaintiff on April 29, 2002 upholding its denial. (AR-987 to AR-988.)

### D. PLAINTIFF SUBMITS ANOTHER CLAIM TO LIBERTY

On July 28, 2003, almost two years after the termination of her employment and 15 months after Liberty had upheld the denial of her claim on appeal, plaintiff, through an attorney, submitted another disability claim to Liberty based on the same conditions and the same date of disability – August 29, 2001. (AR-964 to AR-967.) Counsel asserted that although plaintiff's claim for short-term disability had been denied on January 22, 2002, she was entitled to submit a separate claim for long-term disability benefits. (AR-964.) Plaintiff's attorney also alleged that "at the time you last rejected Ms. Carr's application for benefits on April 29, 2002, you were not in possession of Dr. Dixit's most recent records and findings concerning Ms. Carr and his diagnosis of fibromyalgia." (AR-966.) Plaintiff's attorney claimed Dr. Dixit was plaintiff's current primary treating physician and that at the time plaintiff applied for benefits in November 2001, her then primary care physician, Dr. Lamb, did not diagnose fibromyalgia as plaintiff's primary medical problem.[8] (AR-966.)

In support of her claim, plaintiff submitted a questionnaire prepared by her attorney and completed by Dr. Dixit on May 30, 2003 (AR-981 to AR-986), as well as, a report prepared by Dr. Dixit on March 26, 2003. (AR-980.) Dr. Dixit wrote that plaintiff's main complaints were widespread aches, pains and fatigue, and that she had multiple medical problems including severe fibromyalgia and primary Sjögren's Syndrome. (AR-980, AR-981.) She also suffered from cervical disc disease and osteoporosis, as well as stomach polyps with gastroesophageal reflux, rosacea, mitral valve prolapse, hypertension, anosmia, and symptoms of carpal tunnel syndrome.

---

[8] Dr. Lamb, however, had listed fibromyalgia as a diagnosis on the January 2001 APS form. (AR-1126.)

RC1/5056427.1/KCC  - 12 -  LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706

(AR-980, AR-981.) Dr. Dixit opined that plaintiff had been disabled for "a prolonged period of time" and her prognosis was poor. (AR-980, AR-981.) He concluded she was "totally and permanently disabled" and was unlikely to be able to return to any form of employment. (AR-980.) Dr. Dixit also wrote that plaintiff's fibromyalgia was markedly exacerbated by physical activity. (AR-980.)[9] Dr. Dixit indicated plaintiff currently could sit two hours in an eight hour day and stand/walk for up to one hour, and was incapable of even a low stress job. (AR-984.) Without any explanation, Dr. Dixit opined in the questionnaire that the "symptoms and limitations" provided in his report applied as early as August 2001. (AR-986.)[10]

After acknowledging receipt of plaintiff's second claim for long term disability and requesting plaintiff to explain why the claim was submitted late (AR-961 to AR-963), Liberty sent letters to plaintiff's doctors requesting updated medical records from March 2002 to the present. Liberty also requested a job description from Providian, which it received on August 29, 2003. (AR-940 to AR-941.) Because the job description did not identify the physical demands of plaintiff's prior position, Liberty requested an occupational analysis by a vocational expert. (AR-6.) The analyst concluded the demands of plaintiff's job would be consistent with a Vice President of a financial institution, which was sedentary in nature and required occasional reaching, handling, and fingering, and frequent talking, hearing, and near acuity. (AR-6, Note 8.)

On October 1, 2003, Liberty received completed forms from plaintiff as well as additional medical records. (AR-832 to AR-914.) In the Activities Questionnaire, plaintiff reported she could sit for only two hours a day and walk and stand for one hour. (AR-845.) She stated she could not do any computer work and spent 12 hours a day in bed. (AR-845 to AR-846.) On October 3, 2003, plaintiff's counsel sent Liberty a copy of plaintiff's social security award letter (AR-825 to AR-830), finding plaintiff disabled as of August 27, 2001 –the day **before** her last day of work and two days before her alleged date of disability began as she had reported to Liberty. (AR-826.)

---

[9] On October 18, 2001, Dr. Lamb noted that plaintiff had reported that she was doing well and <u>able</u> to exercise. (AR-998.)
[10] The finding contradicts Dr. Dixit's and Dr. Lamb's medical records from that time period, as well as the APS from Dr. Lamb, which found no restrictions or limitations.

RC1/5056427.1/KCC    - 13 -    LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706