1  On October 3, 2002, Liberty sent the claim file to its Managed Disability Services
2  ("MDS") department for a medical review and assessment. (AR-818, AR-5, Note 14.)

### 1. Dr. Holbrook Conducts A Medical Records Review

On October 20, 2003, Liberty received a report from John Holbrook MA, M.D., FACEP, board certified in internal medicine. (AR-811 to AR-817.) Dr. Holbrook identified the following diagnoses: xerophthalmia and xerostomia with parotid enlargement, most likely on the basis of primary Sjögren's syndrome with positive ANA; fibromyalgia; stomach polyps and esophageal ulceration, Helicobacter caloric positive; rosacea; mitral valve prolapse; hypertension; herpes genitalis; anosmia; history of hepatitis A; multiple stress fractures; and hormone replacement. (AR-811.) He also prepared a comprehensive summary of the medical documentation. Based on his review of the medical information, Dr. Holbrook concluded plaintiff had functional capacity for full-time sedentary work as of August 29, 2001. (AR-811.) In his report, Dr. Holbrook noted:

> The positive ANA and fibromyalgia are not portrayed as sufficiently severe to preclude full-time sedentary work despite these problems. For example, in a clinical note six days prior to 10/24/2001, the claimant is reported to be running 15 minutes and walking 45 minutes for exercise. In August 2001, the claimant reports that her symptoms improved with Lodine and that she exercises regularly and sleeps well. An APS several months later, on 1/2/2002, opined that the claimant was capable of full-time work with no restrictions. (AR-811.)

Dr. Holbrook also noted that although Dr. Dixit reported a variety of diagnoses in his October 24, 2001 clinical note, he did not identify any impairments, limitations, or restrictions. (AR-811.) Dr. Holbrook further noted that there had been multiple normal physical exams by doctors other than Dr. Dixit since August 29, 2001 and it would be expected that if plaintiff had been substantially impaired on August 29, 2001, others would have noted exam findings consistent with this impairment. (AR-812.)

### 2. Dr. Brown Conducts A Medical Record Review

Liberty also sent the claim file and medical records to Gale G. Brown, Jr., M.D., board certified in physical medicine and rehabilitation as well as internal medicine, for a medical review and assessment. (AR-5, Note 19.) On November 19, 2003, Dr. Brown prepared a report identifying the following diagnosis: GERD/hiatal hernia, Sjögren's syndrome; Fibromyalgia,

Menopause, Hypertension, anxiety, Depression, Degenerative cervical and lumbar spine disease, Hypercholesterolemia, Osteopenia, History of H. Pylori infection (treated), genital HSV (treated p.r.n.), childhood jaundice, seasonal rhinitis, tonsillectomy, Rosacea, and Mitral valve prolapse. (AR-801.) Dr. Brown concluded plaintiff did not have any medical impairments precluding her from performing the essential duties of her own sedentary occupation full-time as of August 29, 2001. (AR-801 to AR-808.) Dr. Brown's report detailed the reasons for her conclusions. Dr. Brown also noted the documentation in the file indicated plaintiff stopped working for non-medical reasons (job termination) rather than any specific medical condition. (AR-801.)

### 3. Plaintiff's Claim for Long Term Disability Benefits is Denied

On November 17, 2003,[11] Liberty sent plaintiff a letter denying her new claim for long-term disability benefits. (AR-794 to AR-799.) Based on its investigation and review of all of the information plaintiff submitted in support of her claim, Liberty had concluded plaintiff did not meet the definition of "disability" throughout the entire 90 day elimination period as required under the policy. (AR-794 to AR-799.) Liberty provided a summary of plaintiff's claim and the medical information received and advised her how to appeal the denial. (AR-794 to AR-799.)

On February 23, 2004, Liberty received a letter from plaintiff's new attorney, Steven P. Krafchick, appealing Liberty's decision to deny her claim for long term disability benefits. (AR-787 to AR-789.) Attorney Krafchick stated he wished to submit additional medical information in support of plaintiff's appeal and requested 180 days from the date he received the administrative record to submit the additional records, which Liberty granted. (AR-721.) He also asked for a copy of the claim file and policy, which were sent to him on March 26, 2004. (AR-788 to AR-789, AR-720 to AR-721.)

On September 3, 2004, near the end of the 180-day extension, Attorney Krafchick sent Liberty a letter stating that a formal appeal letter would be following shortly and enclosing 185 pages of <u>articles</u> from various sources relating to fibromyalgia. (AR-524 to AR-718.) On September 9, 2004, Attorney Krafchick asked Liberty for another four to six week extension, which was granted. (AR-520, AR-523.)

---

[11] This date should be November 21, 2003 (AR-4, Note 22) given the date of Dr. Brown's report. (AR-801.)

On December 14, 2004, <u>more than one year after the denial</u>, plaintiff's counsel sent a letter formally appealing Liberty's November 17, 2003 decision. (AR-170 to AR-185.) In the letter, Attorney Krachick contended plaintiff's health began deteriorating in January 2001 – seven months before her last day of work -- when she began to suffer from "severe headaches;" neck, arm and hand pain; "incredible fatigue;" mental confusion; and weakness. (AR-171.) He also wrote that plaintiff had brought a sexual harassment claim against a co-worker and eventually <u>negotiated a paid leave of absence with a termination date of November 28, 2001</u>. (AR-171.)[12] Attorney Krafchick asserted that by August 2001, plaintiff's medical problems had worsened so much so that she could not work. (AR-171.) In his letter, Mr. Krafchick quoted from a recent report written by Dr. Lamb on October 1, 2004:

> "During the period of February to August 2001, I saw her on multiple occasions for varying complaints. ... In retrospect, I believe her condition was such that it did not allow her to do full work duties – I believe that her condition was at least a Class 3 (slight to moderate limitation of functional capacity). I would defer to her rheumatologist's opinion regarding the degree to which her symptoms interfered with her ability to perform her usual job. I do not believe there was a significant change in her symptoms from the time I saw her in August, 2001, until she was seen by Dr. Dixit in October 2001." (AR-172.)

Enclosed with the formal appeal were various medical records and reports from Dr. Lamb, Dr. Dixit, Dr. Bennett, Dr. Becker, Dr. Uomoto, and Mr. Uslan, as well as letters from plaintiff's daughter and friends, including the following:

- A December 11, 2001 letter from plaintiff to Dr. Lamb asking Dr. Lamb to send Liberty her medical information so that Liberty could process her disability claim. (AR-196.) Plaintiff wrote:

  > "I was technically on administrative leave from Providian when I filed the claim.
  >
  > I had just been to see Dr. Dixit and learned of my fibromyalgia and Sjögren's diagnosis.
  >
  > I certainly recall describing to you the pain I was having and how painful it was even after exercise. I believe I even

---

[12] The characterization of plaintiff's termination and negotiation of the settlement of a sexual harassment claim is a complete misrepresentation of the facts. The termination and severance agreement were the result of a workforce reduction.

> described more extreme pain in my right arm, which I believe was due to repetitive stress injury, since I use a computer keyboard a great deal in my job as a Director in Information Technology.
>
> I am still experiencing general muscle pain and other painful areas, some days worse than others.
>
> Also, in discussing with Dr. Dixit my symptoms, I did divulge to him that I had at times experienced excessive tiredness and would have to drive home on my lunch hour to nap...I could not make it through the work day sometimes without that nap. I also experienced nighttime sleeplessness and that exacerbated how I felt at work.
>
> I know that I briefly described to you the situation I was subjected to at the office and I did tell you that Providian wanted me to file Workers Comp several times over the course of the last 18 months and they also tried to force me to take a medical leave. Providian maintained that I was not able to do my job.[13]
>
> I am requesting that you provide medical information to Liberty Mutual as soon as possible. (AR-196.)

This letter was sent to Dr. Lamb almost a month <u>before</u> Dr. Lamb completed the APS form indicating that plaintiff was able to work and had no restrictions and limitations. (AR-1126 to AR-1127.)

- On April 16, 2003, Dr. Lamb completed a Multiple Impairments Questionnaire (apparently for social security). (AR-220 to AR-227.) Her diagnoses were fibromyalgia, Sjögren's Syndrome, depression, GERD, hypertension and osteoporosis. The prognosis was chronic illness. Plaintiff's primary symptoms were chronic arthralgias, myalgias, fatigue, headaches, neck pain and abdominal pain. **In an 8-hour day Plaintiff could sit for 4 hours and stand or walk for 4 hours**. (AR-222.) It would be necessary and/or medically recommended that plaintiff not sit continuously in a work setting. Plaintiff would need to get up and move every hour. Plaintiff could occasionally lift or carry up to five pounds but never anything heavier. Plaintiff had significant limitations in doing repetitive reaching, handling, fingering or lifting. Plaintiff had moderate limitations

---

[13] These statements are not supported by the records in plaintiff's personnel file or the deposition testimony of Terrace Ellis. Indeed, plaintiff's statements are expressly refuted by them.

RC1/5056427.1/KCC — - 17 - — LIBERTY'S OPENING ARBITRATION BRIEF CASE NO. 1100048706

grasping, turning or twisting objects with her right hand and minimal limitations with her left hand. She had moderate limitations in either hand for using her arms for reaching, including over head. Plaintiff could not do a full-time competitive job that required activity on a sustained basis. Emotional factors did contribute to the severity of Plaintiff's symptoms and functional limitations, including depression. In her best medical opinion, the symptoms and limitations provided in this questionnaire began in <u>July 2001</u> – two months before plaintiff's last day of work. (AR-226.) [**The statement contradicts Dr. Lamb's own statements in the APS Liberty received in January 2002 in which Dr. Lamb stated plaintiff had no restrictions or limitations and could work an eight hour day.**]

- A September 2, 2004, letter from Dr. Dixit <u>to Attorney Krafchick</u> concluding plaintiff was permanently and totally disabled <u>beginning in the summer of 2001, although he had not treated plaintiff prior to October 24, 2001</u>. (AR-258 to AR-259.)

- On November 4, 2004, Dr. Dixit wrote on a prescription slip, "This is to certify that the <u>patient's symptoms</u> related to her disability <u>began in early August of 2001</u>." (AR-261.)[14]

- A medical-legal report from Robert M. Bennett, M.D. to Attorney Krafchick dated <u>April 14, 2004</u>. (AR-267 to AR-288.) Plaintiff had been seen by Dr. Bennett at Attorney Krafchick's request on April 13, 2004 at the <u>Oregon Health Sciences University</u>[15] for the purpose of providing a report regarding plaintiff's "medical problems, her long-term prognosis and ability <u>to continue to work</u>." (AR-267.) Plaintiff had flown up to Oregon from California the evening before her evaluation with Dr. Bennett and arrived at her appointment on time. (AR-271.) In his report, Dr. Bennett erroneously indicated that plaintiff's last day of work was August 7,

---

[14] The fact that plaintiff had symptoms of a medical condition that perhaps rendered her disabled at a later date does not mean she was <u>disabled</u> as of August 2001. (See, Jordan v. Northrup Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004).)

[15] Plaintiff lives in Dublin, California approximately 638 miles from Oregon Health Services University, which is located in Portland, Oregon.

2001 instead of August 28, 2001. (AR-268.) Dr. Bennett concluded plaintiff was presently "disabled from being able to be competitively employed in the demanding and high stress jobs that she had held up to 2001." (AR-274.) According to Dr. Bennett, the major reasons for her disability were constant musculoskeletal pain of fibromyalgia, with its associated cognitive dysfunction and non-restorative sleep with associated fatigability. (AR-274.) He also noted that she had Sjögren's Syndrome which was a chronic autoimmune disorder that itself caused fatigue and varying degrees of disability. (AR-281.)

- On May 4, 2004, at Attorney Krafchick's request, plaintiff also saw Theodore J. Becker, Ph.D. R.P.T., A.T.C., C.E.T., C.D.E., a Human Performance Specialist, in Everett, Washington.[16] (AR-329 to AR-359.) Dr. Becker conducted a number of tests over a two-day period regarding plaintiff's functional abilities. Dr. Becker concluded, based on his testing, that "There is significant physiological restriction, which prohibits her ability to sustain work function. She will <u>at this time</u> be considered work intolerant and unable to sustain the linear and longitudinal applications." (AR-340, emphasis added.)

- On May 7, 2004, Jay M. Uomoto, Ph.D. examined plaintiff in Seattle, Washington, also at the request of her attorney, for a comprehensive neuropsychological evaluation. (AR-372 to AR-383.) Dr. Uomoto concluded plaintiff had problems with complex attention processing, efficiency of cognitive processing, memory impairment and higher-order adaptive reasoning impairment. Dr. Uomoto found plaintiff's <u>current</u> neuropsychological problems would interfere with her prior work tasks and she was not competitively employable on either a full-time or part-time basis in her former position. (AR-382.)

- An August 31, 2004 report prepared by Donald Uslan, M.A., M.B.A., a rehabilitation counselor, after conducting a Vocational Rehabilitation Evaluation

---

[16] Plaintiff lives in Dublin, California more than 837 miles from Everett, Washington.

of plaintiff in Seattle, Washington at the request of her attorney.[17] (AR-404 to AR-448.) In his report, Mr. Uslan listed plaintiff's self-reported restrictions, including: an inability to <u>walk, stand or sit for any appreciable period of time</u>; an inability to lift any significant amount of weight; the ability to bend, lift and reach occasionally. She reported she had to stop doing many activities because of her illness, including weaving on a loom, white water rafting, softball, tennis, badminton, bicycle riding, jogging,[18] gourmet cooking, entertaining, dancing, working out at the gym, and gardening. She also reported: she could perform activities for only 10 to 15 minutes before she needed to rest and would require 1 to 3 hours to recover from activity; she could only walk 1 to 2 blocks before she needed to rest; she had to limit her driving due to dizziness but she was able to take public transportation; she had to stay indoors most of the day because of her health; she had trouble walking more than one block or climbing more than one flight of stairs; and she had difficulty bending, lifting or stooping. (AR-413.) <u>Plaintiff rated her ability to work as 0</u>. (AR-415.) She stated she could not concentrate or remember things. She also lacked direction and motivation. (AR-417.) Mr. Uslan concluded, based on plaintiff's self-reported restrictions and limitations that plaintiff was <u>currently</u> totally and completely disabled from any and all employment, both part-time and full-time in any exertional level. (AR-447.)

- Letters from plaintiff, her friends, and her adult daughter. (AR-478 to AR-488.)

### 4. Liberty Obtains Plaintiff's Personnel File and Surveillance

On December 30, 2004, Liberty sent Providian a letter requesting a complete copy of plaintiff's personnel file (AR-99), along with an authorization. (AR-100.) Specifically, Liberty requested information regarding the alleged negotiated settlement that included her paid Leave of Absence and termination date of November 28, 2001; information regarding worker's

---

[17] Plaintiff lives in Dublin, California more than 809 miles from Seattle, Washington.
[18] In Dr. Lamb's office note dated October 18, 2001, plaintiff reported she was exercising more, jogging 15 minutes and walking 45 minutes a day. (AR-998.)

compensation claim; and copies of plaintiff's 2000 and 2001 performance reviews. (AR-99.)

On January 13, 2005, Liberty received a surveillance report from Miles Investigations, Inc. for surveillance conducted on December 29, 2004; December 30, 2004; and December 31, 2004. (AR-76 to AR-83.) Plaintiff was seen leaving her house occasionally to take out the trash, but otherwise she was not observed out of her house during the time the surveillance took place. The investigator noted plaintiff's gait was normal and she showed no signs of pain or discomfort or lack of mobility. (AR-77.)

### 5. Amy Hopkins, M.D. Performs A Medical Record Review

After receiving plaintiff's appeal submission, Liberty referred the claim file to its Managed Disability Services ("MDS") department for a medical review and assessment. (AR-98.) On January 14, 2005, Liberty received a report from Amy Hopkins, MD, MPH, PhD, FACOEM, Board Certified in Internal Medicine and in Occupational and Environmental Medicine. (AR-84 to AR-97.) Dr. Hopkins concluded based on her review that:

> "There were no findings on examinations or diagnostic testing which validated [Dr. Lamb's] change of opinion and established functional impairment which would have precluded the claimant from performing the sedentary work activities of her own occupation as of August 29, 2001. Dr. Lamb's notes did not document any significant physical impairment during the period of 8/28/01 – 1/2/02. She did not document advising the claimant not to work. Abnormal findings and diagnostic test results were minor and not supportive of any impairment. Dr. Lamb wrote a revised opinion almost three years later that the claimant had, indeed, had some functional limitations in 2001, <u>but she stated that the claimant could have performed light level work, which exceeded the physical requirements of the claimant's own sedentary occupation</u>."
> (AR-84 to AR-85, emphasis added.)

Dr. Hopkins provided a very detailed summary and analysis of the medical records and reports in plaintiff's file and found no evidence that plaintiff could not perform her own occupation on August 29, 2001. (AR-85 to AR-97.)

### 6. Liberty Upholds The Denial

On January 24, 2005, the appeal review consultant again reviewed and analyzed all the medical records, reports and information, prepared a detailed summary and analysis, and concluded the medical records did not support a finding of disability. (AR-26 to AR-32.) Dr.

Lamb's records showed no impairment as of August 29, 2001. Although Dr. Dixit diagnosed plaintiff with fibromyalgia in November 2001, the medical records did not show the presence of any severe physical impairment or musculoskeletal conditions from August 29, 2001 to November 27, 2001 that prevented her from performing her occupation. Although Dr. Dixit felt that plaintiff was disabled from February 2002 and after, he did not document findings on examinations and testing to support the conclusion. There was also no documented impairment due to cervical or lumbar degenerative disease, carpal tunnel syndrome, or overuse syndrome from August 29, 2001 through November 27, 2001.

On January 28, 2005, Liberty sent a letter to plaintiff upholding its denial, providing a detailed explanation for its decision. (AR-34 to AR-41.)

### E. THE LIBERTY GROUP DISABILITY INCOME POLICY

Liberty issued a Group Disability Income Policy to Providian Bancorp Services, policy number GD3-860-038942-01/GF3-860-038942-01, effective January 1, 2000 to January 1, 2002.[19] The policy provided short and long term disability coverage to eligible employees of Providian. The Policy provides the following coverage promise:

> **Disability Benefit**
>
> When Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty proof of continued:
>
> 1. Disability; and
>
> 2. regular attendance of a Physician.
>
> The proof must be given upon Liberty's request and at the Covered Person's expense. For the purpose of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Disability. (Ex. A to McGee Decl., p. P-023.)

The policy defines "**Disability**" or "**Disabled**" with respect to Long Term Disability Coverage as:

---

[19] The policy is attached as Exhibit A to the Declaration of Paula McGee and referred herein with a "P" prefix.

RC1/5056427.1/KCC           - 22 -           LIBERTY'S OPENING ARBITRATION BRIEF
                                              CASE NO. 1100048706

i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "**Disability**" or "**Disabled**" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity. (Ex. A to McGee Decl., p. P-009.)

To be in "**Active Employment**," the Employee must be "<u>actively at work</u> for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits and either perform such work:

   a. at the Sponsor's usual place of business; or

   b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled days of work);

2. holidays (except when such holiday is a scheduled work day);

3. paid vacations;

4. any non-scheduled work day;

5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and

6. an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition). (Ex. A to McGee Decl., p. P-008.)

The policy provides:

"**Termination of Covered Person's Insurance**

A Covered Person will cease to be insured on the earliest of the following dates:

\* \* \*

5. the date employment terminates. . . .

**Lay off or Leave of Absence**

"The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is:

(1) temporarily laid off; or

(2) given leave of absence.

The Covered Person's coverage <u>will not continue beyond the end of the policy month in which the lay-off or leave of absence begins.</u> In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally." (Ex. A to McGee Decl., P-033, emphasis added.)

The policy also provides:

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. (Ex. A to McGee Decl., p. P-035.)

## III. LEGAL ARGUMENT

A. **PLAINTIFF'S ACTION AGAINST LIBERTY MUST BE DISMISSED BECAUSE AN ERISA ACTION CANNOT BE BROUGHT AGAINST THE CLAIMS ADMINISTRATOR OR THE INSURER**

Judgment must be entered in favor of Liberty because it is an improper defendant. Under well established Ninth Circuit law, "ERISA authorizes actions to recover benefits against the Plan as an entity, 29 U.S.C. §1132(d)(1), and against the Plan's administrator. See 29 U.S.C. § 1132(a)(1)(B)." (Ford v. MCI Communications Health & Welfare, 399 F.3d 1076, 1081 (9th Cir. 2005); see also, Everhart v. Allmerica Financial Life Ins. Co., 275 F.3d 751, 754 (9th Cir. 2001).) ERISA claims, however, may not be brought against an insurer or a claims administrator. (Id. at 1083; see also, Patrick v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan, 2007 U.S. Dist. LEXIS 80565 (S.D. Cal. 2007) [granting the claims administrator's motion for summary judgment].) Because Liberty's only role in plaintiff's claim was as a claims administrator, judgment must be rendered in its favor.[20]

---

[20] Although it is not a proper defendant to this action, Liberty acknowledges that it is responsible for the payment of any judgment against the Plan that is covered under the Policy.

B.  **PLAINTIFF'S ACTION IS BARRED BY THE SEVERANCE AGREEMENT AND RELEASE**

Plaintiff's action against the Plan (and Liberty) is also barred because she released her claim for disability income benefits pursuant to the Severance Agreement and Release she signed on September 21, 2001. Although Congress, in enacting and amending ERISA, has indicated a strong interest in preserving the rights enumerated within the statute (See, Lanoik v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1367 (2d Cir. 1991)), a person's ability to release his or her rights under ERISA is also well established. (See, Leavitt v. Northwestern Bell Telephone Co., 921 F.2d 160 (8th Cir. 1991); Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580 (1st Cir. 1993); Finz v. Schlesinger, 957 F.2d 78 (2d Cir.), cert. denied, 113 S.Ct. 72 (1992); Lanoik, supra, 935 F.2d 1360.)

Because the Severance Agreement and Release pertained to the extension and surrender of various employee benefits provided by Providian, which in part are subject to ERISA, the interpretation of the agreement is subject to interpretation in accord with the tenets of federal common law. (Pilot Life Ins. Co. v. Dedaux, 481 U.S. 41, 56, 95 L.Ed.2d 39, 107 S.Ct. 1549 (1987); Smart v. The Gillette Company Long Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995).) Under federal common law, the terms of a contract are interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." (Richardson v. Pension Plan of Bethlehem Steel Corp., 112 F.3d 982, 985 (9th Cir. 1997), quoting Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir. 1990).) Under the parol evidence rule, a court looks to, and enforces, the plain language of a contract and does not look to extrinsic evidence to interpret the terms of an unambiguous written instrument. (United States v. Nunez, 223 F.3d 956, 958 (9th Cir. 2000); Wilson Arlington Co. v. Prudential Ins. Co. of Am., 912 F.2d 366, 370 (9th Cir. 1990).)

Here, the terms of the Severance Agreement and General Release are clear and unambiguous. Pursuant to the contract, plaintiff was entitled to receive only her salary, health care coverage and 401(k) contribution benefits for an additional three months, <u>while all other employee benefits were terminated and expressly released</u>. (AR-106 to AR-109.) In exchange

for the additional salary and the limited benefits provided, plaintiff voluntarily released "Providian..., its parent, subsidiaries and affiliates, and their officers, directors, employees and *agents, and all others*, of and from *any and all claims, liabilities, demands, causes of action*...known or unknown...arising out of or any way related to *agreements*, events, acts or conduct at any time prior to and including the date of this release, including but not limited to claims or demands directly or indirectly arising out of or any way connected with my *employment, benefits*...or claims under...any other federal, state, or local statute." (AR-109, emphasis added.)

### 1. Plaintiff Released Her Claim for Disability Income Benefits and Her Right to Bring An Action For Such Benefits

Plaintiff's claim for disability income benefits clearly and unambiguously falls within the claims, demands, and causes of action released by plaintiff when she signed the Severance Agreement and Release on September 21, 2001. (AR-109.) Plaintiff's claim for disability income benefits arises out of and is connected to her employment and is an employment benefit and has, therefore, been released. Indeed, in granting plaintiff's motion to compel Liberty to arbitration, plaintiff argued and the Court found that plaintiff's claim for disability benefits was a benefit of her employment that arose out of her employment agreement with Providian. (Ex. 2 to Cogan Decl., p. 6:13-19.) Thus, plaintiff's claim and the present action fall within the language of the release and are barred by the explicit terms of the Release and Settlement Agreement. (See, Smart, 70 F.3d 173; Brae Transportation v. Coopers & Lybrand, 790 F.2d 1439 (9th Cir. 1986).)

In Smart, supra, plaintiff entered into a severance agreement with her employer, Gillette, whereby she agreed to release all federal and state claims against Gillette, in exchange for severance pay and other assorted benefits. Plaintiff later applied for long-term disability benefits, claiming she had become totally disabled during the severance period. After the claim was denied, she filed suit against the Gillette Long Term Disability Plan for wrongful denial of benefits in violation of ERISA. The district court dismissed plaintiff's complaint, finding she had waived her right to benefits when she entered into the severance agreement which effectively

extinguished her claim because it terminated her right to further participation in the plan. The First Circuit upheld the dismissal, finding that once plaintiff was no longer a participant, she no longer possessed a substantive right protected by ERISA. The court also held plaintiff had knowingly waived her rights under the Gillette Long Term Disability Plan by signing a severance agreement wherein she released Gillette from "any and all claims, charges, complaints, or causes of action ...including but not limited to...claims arising from alleged violations of ... any ... local, state, or federal law, regulation or policy or any other claim relating to or arising out of your employment with [Gillette] or termination thereof..." (Smart, 70 F.3d at 178-179.)

In another factually similar case, Piehl v. Metro. Life Ins. Co., 2005 U.S. Dist. LEXIS 4619 (D.C. Or. 2005) the court granted summary judgment in favor of defendants, the claims administrator and plan, in connection with the employee's complaint demanding long term disability benefits under ERISA. Piehl alleged he became disabled and did not return to work because of a bipolar disorder. He had signed a settlement agreement and release with his employer. He later presented a claim for short-term disability and long-term disability to the administrator. Two years after it initially denied the employee's claim, the administrator upheld the denial because it was barred by the settlement agreement and because it was not timely filed. The court held the employee could not seek recovery for disability benefits from the claims administrator because they were released in his settlement with the employer. The employee agreed to relinquish all compensation and make no claims for ERISA benefits against the employer in exchange for limited participation in certain company-sponsored benefit plans. The long and short-term disability plans were not among the benefits expressly preserved or waived, though the employee did waive his right to bring an ERISA claim against the employer. The court held that although the employee did not bring its ERISA claim against the employer, he was seeking an employer benefit explicitly waived in the settlement agreement.

### 2. Plaintiff Released Her Claim Against The Plan and Liberty

The Severance Agreement and Release expressly released all claims against Providian, its affiliates, agents and all others. (AR-109.) The Providian Plan unambiguously falls within the list of entities that are released by the Severance Agreement and Release and, thus, all claims

against it are barred. (See, Austin v. CCC Information Services, Inc. Benefit Plan, 225 Fed.Appx. 671, 2007 U.S.App. LEXIS 6980 (9th Cir. 2007) [release of the employer, its agents, and all others acting under, by or through the employer barred plaintiff's action against the Plan for benefits]; See also, Smart, supra, 70 F.3d 173, and Piehl v. Metro. Life Ins. Co., 2005 U.S. Dist. LEXIS 4619 (D.C. Ore. 2005) [release of the employer, released the Plan].)

Likewise, Liberty also unambiguously falls within the list of entities released by plaintiff, because Liberty, as the insurer and claims administrator of the Plan, was the agent of Providian. (Bennett v. CNA Ins. Cos., 2001 U.S. Dist. LEXIS 107 (N.D. Cal. 2001).) In Bennett, the Northern District Court held plaintiff had released her claim for long-term disability benefits when she settled a sexual harassment claim and signed a Settlement Agreement and Mutual Release releasing plaintiff's employer, its "agents, servants, employees, officers, directors and shareholders, or any other person or persons, firm, corporation, association, partnership or entity acting on their behalf." (Id. at *7.) Before signing the Settlement, plaintiff had received disability benefits from defendant Continental Casualty Company. The Court found that although Continental was not a party to the Settlement Agreement, it was acting on behalf of the company by providing a group disability insurance policy to her employer in exchange for premiums paid her employer. Thus, "Under this arrangement, Continental is an 'agent' of and an 'entity acting on behalf' of [plaintiff's employer.]. Therefore, Continental is released under the plain language of the Settlement." (Bennett, 2001 U.S. Dist. LEXIS at *13.) Likewise, here, the Plan and Liberty are agents, affiliates, or assigns of Providian and are included in the Release.

Moreover, in granting its motion to compel Liberty to arbitration, plaintiff argued and the court held that Liberty was the agent of Providian. (Ex. 2, p. 5:1-10; p. 6:17-19.) Thus, plaintiff is judicially and equitably estopped from arguing in this arbitration that Liberty is not Providian's agent. Judicial and equitable estoppel applies when a party seeks to take inconsistent positions in prior court proceedings. (See, Hamilton v. State Farm Fire & Casualty Company, 270 F.3d 778, 782 (9th Cir. 2001).) Accordingly, plaintiff's claims against Providian, the Providian Plan, and Liberty, including her claim for disability income benefits, were released.