### 3. Plaintiff Knowingly and Voluntarily Waived Her Claim for Disability Benefits

Plaintiff knowingly and voluntarily waived her claim for disability benefits. To determine whether there has been a knowing and voluntary relinquishment, the courts examine the totality of the circumstances in light of the following seven factors: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience, (3) the amount of time plaintiff had for deliberation about the release before signing it, (3) whether plaintiff knew or should have known his or her rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received advice of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was *already entitled to by contract or law*. (Torrez v. Pub. Serv. Co. of N.M., 908 F.2d 687-690 (10th Cir. 1990); Finz v. Schlesinger, 957 F.2d 78, 82 (2nd Cir. 1992); Smart, supra, 70 F.3d at 181, fn. 3.)

Under the factors set forth above, plaintiff knowingly and intentionally released her claim for disability benefits when she signed the Severance Agreement and Release. The Severance Agreement and Release are clear—by signing the release plaintiff was releasing any and all claims arising out of her employment or her benefits, including her claim for disability benefits. Plaintiff is college educated (with some post graduate courses and certificates) and commercially sophisticated as evidenced by her position as Director of Data Services at Providian and her past employment history. Indeed, plaintiff averred in her complaint that she was a very capable and successful business woman, working her way up into a Director level position at several companies. (Ex. 1 to Cogan Decl., ¶ 68.) Plaintiff had twenty-one days to consider the release and seven days after signing to revoke it if she so desired. Plaintiff acknowledged above her signature that she had carefully reviewed and considered the severance agreement; that she understood the terms of the agreement, and that she voluntarily agreed to them. (AR-108.) Plaintiff also testified that before signing the Release she read and understood paragraph 9 of the Severance Agreement and Release, which stated that the terms of the Notice of Eligibility set

1 forth all of the terms of the agreement and that she was not relying on any oral or written promise
2 not contained in Agreement. (Ex. 3 to Cogan Decl., pp. 71:10 to 72:2.) Plaintiff even wrote to
3 Providian acknowledging she would be releasing any claims for disability income benefits if she
4 signed the release as written. (Ex. 10 to Cogan Decl.)

5       Although it is unclear whether plaintiff obtained legal advice before signing the
6 agreement, she was advised to consult with an attorney prior to signing the release. (AR-109.)
7 Plaintiff also received substantial consideration for the execution of the release – three months of
8 additional salary (worth approximately $33,750), continued health care coverage, and 401(k)
9 employer contributions, as well as, the cost of outside placement consultant services up to three
10 months. (AR-106 to AR-107.) Although plaintiff alleges her claim for disability income benefits
11 was worth significantly more than the consideration she received, no benefits were due and owing
12 under the Plan at the time she signed the Release. Thus, the seventh factor outlined in Torrez is
13 satisfied. Moreover, plaintiff's claim for disability income benefits was of questionable value at
14 the time she entered into the Release because she was able to and worked until she was laid off,
15 and thus, she was not "disabled" within the meaning of the policy. Furthermore, at the time she
16 signed the Release, no doctor had certified that she was disabled or unable to work. In January
17 2002, her treating physician reported to Liberty that she was able to work full-time without
18 restrictions and she applied for reinstatement to Providian. As the Fifth Circuit has stated:

> "Plaintiffs were given a choice: to accept severance benefits at the time of their termination and sign a Release, or to wait and dispute their eligibility under the 1995 plan. Without exception, plaintiffs chose to take the severance benefits when offered at the time of their termination. They cannot complain now that the severance package they freely accepted in lieu of protracted litigation over plan benefits is inadequate consideration." (Chaplin v. Nations Credit Corp., 307 F.3d 368, 375 (5th Cir. 2002); see also, Martino-Catt, 317 F.Supp.2d at 924.)

24       Finally, although plaintiff had no role in the drafting or negotiating the Severance Plan,
25 that factor alone is insufficient to show that her waiver was involuntary or unknowing, especially
26 in light of the other factors and plaintiff's deposition testimony that she read and understood the
27 terms of the Release. Thus, the totality of the circumstances demonstrates plaintiff knowingly
28 and voluntarily released her claim for disability insurance benefits under the Providian Plan.

C.  **EVEN IF PLAINTIFF DID NOT RELEASE HER CLAIMS, DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR BECAUSE LIBERTY DID NOT ABUSE ITS DISCRETION BY DENYING PLAINTIFF'S CLAIM**

  1.  **Liberty's Decision To Discontinue Benefits Is Subject To The Abuse Of Discretion Standard Of Review.**

Before reaching the merits of plaintiff's ERISA claim, the Court must decide the appropriate standard of review. A claims administrator's decision to deny benefits under an ERISA plan must be reviewed de novo by the court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." (Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S.Ct. 948 (1989).) Where, as here, the policy and plan documents unambiguously confer discretionary authority on the claim administrator to construe the terms of the plan and determine eligibility for benefits (Ex. A to McGee Decl., pp. P-035, Ex. 14 to Cogan Decl., pp. PROV00106), the abuse of discretion standard of review applies. (Id. at 115; Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 958 (9th Cir. 2006).) In Abatie, the Ninth Circuit observed that Firestone "appears to provide for only two alternatives" concerning the standard of review. (Abatie, 458 F.3d at 965.) Thus, the Court held, "When a plan confers discretion, abuse of discretion review applies; when it does not, *de novo* review applies." (Id.)

Here, the policy and the Plan expressly confer discretion on Liberty to construe the terms of the Plan and to determine an insured's eligibility for disability benefits. The Plan provides in relevant part:

> "6.03 Delegation of Fiduciary Responsibilities
>
> The Company may delegate or allocate any authority or responsibility with respect to the Plan. The Company (or its delegate) has discretion to construe and interpret the terms, provisions and requirements of the Plan and to make all decision concerning an Employee's or dependent's right to coverage under the Plan. All decision of the Company (or its delegate) with respect to status under the Plan, or the construction and interpretation of the Plan will be given the maximum deference permitted by law." (Ex. 14 to Cogan Decl., p. PROV00106.)

The Policy insuring the long term disability portion of the Plan issued by Liberty provides:

"Interpretation of the Policy

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (Ex. A to McGee Decl., p. P-35.)

The language in the Plan and the Policy is sufficient to overcome the presumption of *de novo* review and merit application of the deferential abuse of discretion standard of review. (Abatie, supra, 458 F.3d at 958, 963; McDaniel v. The Chevron Corp., 203 F.3d 1099, 1107 (9th Cir. 2000); also, Bendixen v. Standard Ins. Co., 185 F.3d 939 (9th Cir. 1999); Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en banc).) Thus, the applicable standard of review to be applied by the Arbitrator is an abuse of discretion.

2. **The Limited Exceptions For Applying *De Novo* Review Do Not Apply Here**

Although the abuse of discretion standard of review will not be applied if the claims administrator engages in wholesale, substantial and flagrant violations of ERISA (Abatie, 458 F.3d at 971-972; Gatti v. Reliance Standard Insurance Co., 415 F.3d 978, 985 (9th Cir. 2005)), or if the administrator fails to exercise discretion (Abatie, 458 F.3d at 971-972; Jebian v. Hewlett Packard, 349 F.3d 1098, 1107 (9th Cir. 2003), neither situation is present here. Liberty properly exercised its discretion and fully complied with ERISA and the regulations promulgated thereunder.

In Abatie, the Ninth Circuit reaffirmed its holding in Gatti v. Reliance Standard Insurance Co., supra, that an administrator's failure to comply with procedural requirements under ERISA does not alter the standard of review, unless the "plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant." (Abatie, 458 F.3d at 972.) Therefore, even if Liberty had committed some procedural errors, which it did not, the abuse of discretion standard of review still applies.

3. **Liberty's Decision is Entitled to Significant Deference**

In Abatie, the Ninth Circuit changed the manner in which the district court applies the abuse of discretion standard of review in an ERISA action when there is a structural conflict of

interest.[21] The Court described the new standard as "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." (Abatie, supra, 458 F.3d at 959.) Under this standard, the court evaluates all of the facts and circumstances to "decide in each case how much or how little to credit the plan administrator's reason for denying coverage." (Id. at 968.) "An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might." (Id.) Additionally, the effect of a conflict "may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or a parsimonious claims-granting history." (Id.)

Applying the guidelines set forth in Abatie, Liberty's decision is entitled to significant deference because there is no evidence that Liberty acted with a malicious intent, engaged in self-dealing or parsimonious claims handling practices. The Liberty personnel who handled plaintiff's claim did not have a financial motive to deny plaintiff's claim because they did not receive any financial compensation, promotions, or bonuses based upon the outcome of his or her findings. (Ex. 6 to Cogan Decl., Supplemental Response to Interrogatory No. 4.) Moreover, the extensive administrative record (1139 pages and a surveillance CD) shows that Liberty's claims personnel conducted a timely, careful, objective, and thorough evaluation of plaintiff's claim. The Liberty claims handlers continuously kept plaintiff apprised of the status of her claim; communicated with her regularly; timely requested and reviewed information from plaintiff and her treating providers; and provided plaintiff with explanations for its actions and claims determinations.

Liberty also fully complied with ERISA and it regulations during the claim and on appeal. Liberty sent detailed letters setting forth the reasons for its denial and gave instructions on how to request a review of the denial. Liberty provided plaintiff with all the information necessary to perfect her appeal and all decisions were made within the time frames proscribed by ERISA.

The fact that Liberty considered plaintiff's second claim for long-term disability benefits even though it was untimely and Liberty's denial of her claim for benefits in January 2002 included her claims for short-term and long disability, is further evidence that Liberty was not

---

[21] A structural conflict exists where the claim administer is also responsible for paying the claim.

acting under a conflict of interest. Further, not only did Liberty process the belated second claim, it conducted a full and thorough investigation into plaintiff's eligibility for long-term disability benefits, including obtaining three consulting physician reviews and surveillance. Liberty also gave plaintiff and her counsel, numerous extensions of time (almost an entire year) to submit evidence and information to support her appeal of the second claim.

The various doctors relied upon by Liberty were highly qualified, unbiased, and their opinions were well supported by the administrative record. Contrary to plaintiff's assertions, it is not evidence of a conflict of interest or an abuse of discretion for an insurer to rely on the opinions of the reviewing consulting doctors over the opinions of plaintiff's treating physicians or retained experts. (Jordan, supra, 370 F.3d at 879; Lawless v. Northwestern Mut. Life Ins. Co, 360 F. Supp. 2d 1046, 1057 (N.D. Cal. 2005).) Although the Supreme Court has held that "plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician" (Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 155 L. Ed. 2d 1034, 123 S. Ct. 19865 (2003).), the Court also held that "courts have no warrant to require administrators to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." (Id. at 834.) "Plan administrators are not obliged to accord special deference to the opinions of treating physicians" because there is also bias and conflict of interest on the part of "a treating physician who, in a close case, may favor a finding for the patient." (Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250, 258 (3rd Cir. 2004), citing Black & Decker Disability Plan v. Nord, supra, 538 U.S. 822.) Although an administrator's refusal to consider the opinions of a claimant's physician may constitute a breach of fiduciary duty, its consideration and rejection of those opinions cannot constitute such a breach. (See, Jordan, 379 F.3d at 877.)

Here, the administrative record shows the medical reviewers and Liberty's adjusters fully considered and weighed all of the relevant evidence, objective and subjective, medical and otherwise, in reaching their conclusions. Thus, Liberty did not act under a conflict of interest simply because it ultimately disagreed with plaintiff and the opinions her treating physicians.

(See, Jordan, 370 F.3d at 878.)

Finally, Liberty did not act under a conflict of interest because it did not obtain an independent medical examination. There is no statute or case law that requires a plan's medical consultant to examine a claimant prior to rendering an opinion. (Frost v. Met Life Ins. Co., et al., 470 F. Supp. 2d 1101, 1108 (C.D. Cal 2007); See also, Kaiser v. Standard Ins. Co. et al., 2007 U.S. Dist. LEXIS 2239 (N.D. Cal. 2007) [insurer's use of physician's records review report constitutes reasonable basis for finding plaintiff could perform material duties of his job with reasonable continuity].) Moreover, an independent examination was not warranted or even feasible under the circumstances. When Liberty initially denied plaintiff's claim for disability benefits in January 2002, Dr. Lamb had certified that plaintiff was able to work full-time without restrictions and Dr. Dixit's medical records indicated that plaintiff first became unable to work on or about February 27, 2002 because of severe depression. Because plaintiff's treating physicians did not support a finding of continuous disability throughout the elimination period, there was no need for Liberty to obtain an independent medical examination. There was also no reason for Liberty to obtain an independent medical examination in connection with plaintiff's second claim, because significant time had passed since her last day of work. The relevant inquiry during the second claim was whether plaintiff was continuously disabled from August 29th throughout the elimination period, not whether plaintiff was currently disabled in 2003.

Because there is little, if any, evidence that Liberty's apparent conflict of interest caused it to breach its fiduciary obligations to plaintiff, Liberty's decision to deny benefits is entitled to significant deference by the Court.

### 4. Liberty Did Not Abuse Its Discretion Because Its Decision was Reasonable and Supported By Substantial Evidence

In an ERISA action, the claimant bears the burden of proving that the claim administrator abused its discretion. (Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644 (5th Cir. 1997).) Plaintiff cannot meet that burden here. "The touchstone of arbitrary and capricious conduct is unreasonableness." (Clark v. Wash. Teamsters Welfare Trust, 8 F.3d 1429, 1431 (9th Cir. 1993).) A decision "grounded on any reasonable basis is not arbitrary and

RC1/5056427.1/KCC - 35 - LIBERTY'S OPENING ARBITRATION BRIEF
CASE NO. 1100048706

capricious, and that in order to be subject to reversal, an administrator's factual findings that a claimant is not totally disabled must be clearly erroneous." (Kaiser v. Standard Ins. Co., 2007 U.S. Dist. LEXIS 2239, 11 (N.D. Cal. 2007) quoting Jordan v. Northrup Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004); Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997) [insurer's decision must be upheld if it was "based upon a reasonable interpretation of the plan's terms and was made in good faith."].) Therefore, as long as the record demonstrates that there is a reasonable basis for concluding that the medical condition was not disabling, the Court must defer to the decision of the plan administrator. (Jordan, supra, 370 F.3d at 879.) A court may not substitute its own judgment for that of the administrator unless the administrator relied on clearly erroneous findings of fact, rendered its decision without any explanation, or construed provisions in a way that conflicts with the plain language of the plan. (Bendixen v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999).)

Liberty did not terminate benefits without explanation, it did not misconstrue the Plan, and it did not rely on clearly erroneous findings of fact. The record shows Liberty's investigation yielded specific, credible information demonstrating her ability to perform the material and substantial duties of her own sedentary occupation from August 29, 2001 through February 27, 2002, including but not limited to, the contemporaneous statements and admissions of plaintiff, the medical records, Dr. Lamb's Attending Physician Statement, and the opinions of three medical experts.

Prior to the denial of plaintiff's claim in January 2002, plaintiff admitted that none of her doctors had taken her out of work on August 29, 2001 or certified that she was unable to work (AR-11, Note 20.) Plaintiff's primary treating physician, Dr. Lamb, confirmed with Liberty that she had not taken plaintiff out of work and that although plaintiff had fibromyalgia, she was able to work full-time with no restrictions. (AR-1127.) Although plaintiff subsequently argued that Dr. Lamb did not fully understand her condition or her diagnosis of fibromyalgia, Dr. Lamb completed the Attending Physician's Statement that was part of plaintiff's proof of claim after plaintiff had written a letter to Dr. Lamb describing her condition and the alleged pain she was experiencing (AR-1126 to AR-1127) and after Dr. Dixit had reported his findings to Dr. Lamb

that plaintiff likely had Sjögren's disease and fibromyalgia. (AR-196.) Thus, Dr. Lamb was fully aware of plaintiff's fibromyalgia diagnosis, but did not consider the condition to preclude her from working.

Liberty's decision to deny benefits was also supported by three medical records reviews from the following highly qualified consulting physicians: John Holbrook, M.D., M.A., FACEP, Board Certified in Internal Medicine and Emergency Medicine (Ex. 7 to Cogan Decl,); Gale Brown, Jr., M.D., Board Certified in Internal Medicine, Physical Medicine and Rehabilitation, and Certified with the American Board of Independent Medical Examiners (Ex. 8 to Cogan Decl); and Amy Hopkins, M.D., Board Certified in Internal Medicine, as well as Occupational and Environmental Medicine (Ex. 9 to Cogan Decl.) Dr. Holbrook opined that plaintiff's positive ANA and diagnosis of fibromyalgia were not sufficiently severe to preclude full-time sedentary work on August 29, 2001. (AR-811.) Dr. Brown opined that plaintiff did not have any medical impairment as of August 29, 2001 supporting physical restrictions or her inability to perform the essential duties of her own sedentary occupation. (AR-801.) Dr. Brown found that the physical restrictions recommended by Dr. Dixit on May 30, 2003 did not correlate with any specific physical pathology or any objective functional data. (AR-803.) Dr. Hopkins opined that the medical evidence did not demonstrate a functional impairment precluding plaintiff from performing the sedentary work of her own occupation as of August 29, 2001. (AR-84.)

The reports and opinions of plaintiff's retained experts in Oregon and Washington in <u>2004</u> did not support a finding that plaintiff was continuously disabled throughout the elimination period beginning on August 29, 2001. Dr. Becker concluded only that <u>at that time</u> – May 2004 – plaintiff was work intolerant (AR-340); Mr. Uslan, relying on plaintiff's self-reported limitations, opined only that she was <u>currently</u> disabled from working (AR-404 to AR-448); and Dr. Uomoto concluded plaintiff's <u>current</u> neuropsychological problems would interfere with her ability to perform her prior job. (AR-372.)

Dr. Dixit's subsequent opinion in September 2004 that plaintiff' had been disabled beginning in the "summer of 2001" (AR-258 to AR-259) is inexplicably vague and contradicts the <u>contemporaneous</u> medical records of Drs. Lamb and Dixit from August 28, 2001 until

February 27, 2002. Indeed, on August 28, 2001 – plaintiff's last day of work – plaintiff reported to Dr. Lamb that she was feeling better, she slept well, and was exercising regularly. (AR-1000.) Dr. Lamb did not indicate, and plaintiff did not report, that she was unable to work that day. (AR-1000.) The next time plaintiff saw Dr. Lamb on October 18, 2001, she reported she was doing well, exercising more, including running up to 15 minutes and then walking 45 minutes at a time. (AR-998.) On October 24, 2001, plaintiff saw Dr. Dixit and although he opined that plaintiff likely had Sjögren's syndrome and fibromyalgia, he did not indicate that plaintiff was unable to work and recommended only that she begin weight reduction and aerobic conditioning and to take Tylenol or Advil as needed. (AR-1080.) On November 29, 2001, the day plaintiff submitted a claim for disability, plaintiff reported to Dr. Lamb that she was feeling better and having less headaches. (AR-997.) Again, Dr. Lamb did not indicate that plaintiff was unable to work. (AR-997.) On February 27, 2002, after plaintiff had been hospitalized for a suicidal incident, Dr. Dixit noted plaintiff was depressed and **for the first time** indicated that plaintiff was disabled and unable to work. (AR-1084.)

Dr. Dixit and Dr. Lamb's later opinions that plaintiff's <u>diagnoses</u> and <u>symptoms</u> existed as of July and August 2001 is not evidence of "disability" within the meaning of the policy, especially since plaintiff was continuing to work at that time. The fact that plaintiff had a medical diagnosis or symptoms are not evidence that the symptoms precluded her from working as required under the policy. As the Ninth Circuit held in a factually similar case:

> That a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working…It is not for an appellate court to decide that [a medical condition] should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence. (Jordan, supra, 370 F. 3d at 880.)

This case is also factually similar to <u>Butts v. Continental Casualty Company</u>, 357 F.3d 835 (8th Cir. 2004), wherein the Eighth Circuit affirmed the District Court's judgment in favor of the defendant employer and insurer in an ERISA action. In <u>Butts</u>, plaintiff's treating physician released plaintiff to return to work with no restrictions during the elimination period although

plaintiff was experiencing pain and was on medications at the time he was been released to work. Plaintiff's medical condition subsequently took a turn for the worse 19 days later, requiring surgery. Although noting plaintiff's situation was unfortunate, the court held the insurer's decision to deny benefits was reasonable because as soon as he was released to work he was no longer disabled within the meaning of the policy.

Likewise here, plaintiff's treating physician opined that plaintiff was able to work full-time without restrictions during the elimination period and, thus, although Dr. Dixit opined plaintiff was disabled as of February 27, 2002 and plaintiff's retained experts opined that plaintiff was unable to work in 2004, even if such opinions were true, plaintiff was not continuously disabled throughout the elimination period and Liberty's denial was reasonable as a matter of law.

Finally, even if the subsequent opinions of Dr. Dixit supported plaintiff's claim for disability, which it does not, it does not prove that Liberty's decision was clearly erroneous. "The mere fact that the plan administrator's decision is directly contrary to some evidence in the record does not show that the decision is clearly erroneous. Rather, review under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed. That standard certainly does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." (Snow v. Standard Ins. Co., 87 F.3d 327, 331-332 (9th Cir. 1996) (citations omitted).)

### D. PLAINTIFF CANNOT PROVE THAT SHE WAS CONTINUOUSLY "DISABLED" THROUGHOUT THE ELIMINATION PERIOD AS DEFINED IN THE POLICY

Even if little weight is accorded to Liberty's decision, defendants are still entitled to judgment in their favor because plaintiff cannot prove that she was continuously disabled throughout the elimination period. In an ERISA action, plaintiff has the burden of proving she was disabled under the plan. (Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).) Plaintiff cannot meet her burden here, because the administrative record shows she was able to perform the material and substantial duties of her own sedentary occupation.

1  Therefore, she was not "disabled" within the meaning of the plan.

2  The evidence shows plaintiff stopped working on August 28, 2001 because that was the date her employment ended, not because she was too sick to work. A claim for disability benefits may properly be viewed with suspicion where, as here, the claimant's alleged date of disability coincides with the date of termination. (See, Raithaus v. UNUM Life Ins. Co. of Am., 335 F.Supp.2d 1098 (D. Haw. 2004).) Here, plaintiff was able to work and worked until her termination on August 28, 2001. She even went back to Providian at 6:30 a.m. on August 29, 2001 to retrieve her personal belongings. Immediately after her termination and again in January 2002, plaintiff wrote letters to Providian requesting to be reinstated at her position.

Plaintiff's assertion that she stopped working because she was too sick to continue is also refuted by the contemporaneous medical records and her statements to Liberty. There are no doctors' visits prior to her termination that state or demonstrate her inability to work and plaintiff admitted no doctor ever told her to stop working. In fact, plaintiff's primary care physician Dr. Lamb specifically reported to Liberty that plaintiff could work. (AR-1126 to AR-1127.) Moreover, Dr. Lamb's opinion that she was not disabled and could work without restrictions was given to Liberty after plaintiff had sent a letter to Dr. Lamb asking her to certify disability based on Dr. Dixit's diagnosis of fibromyalgia and her complaints of pain. (AR-1126 to AR-1127.) The first time Dr. Dixit (who began treating plaintiff on October 24, 2001) indicates in his medical records that plaintiff is disabled and unable to return to work was February 27, 2002. (AR-1084.) Three consulting physicians concluded that plaintiff's medical condition based on diagnoses of fibromyalgia, Sjögren's Syndrome, and GERD, and her complaints of pain, did not prevent her from returning to sedentary work. (AR-84, AR-801, AR-803, AR-811.)

The only alleged evidence of disability as of the date she stopped working and prior to February 27, 2002 are the conclusory opinions of Dr. Dixit rendered after the claim was denied, which are inconsistent with and contradict the contemporaneous medical records, observations, and medical opinions rendered during the relevant time period. Plaintiff's retained experts also do not support a finding that plaintiff was disabled on the day she stopped working or continuously thereafter throughout the elimination period, because they only gave opinions as to

plaintiff's current medical condition in 2004 -- more than two and a half years after she stopped working. Finally, the belated opinions of plaintiff's doctors and retained experts were based solely on plaintiff's subjective reports of pain and self-reported limitations, which are simply not credible. Accordingly, plaintiff did not and cannot prove that she was disabled and entitled to benefits.

E. **IF THE COURT DETERMINES THAT PLAINTIFF'S DISABILITY AROSE AFTER AUGUST 31, 2001 IT IS NOT COVERED UNDER THE POLICY**

Pursuant to the policy, a person ceases to be insured on the date his or her employment terminates. The policy also provides, "For the purpose of determining Disability, the Injury must occur and the Disability must begin while the Employee is insured for this coverage." (Ex. A to McGee Decl., p. P-023.) Here, plaintiff's employment was terminated on August 28, 2001 and thus, her coverage under the policy ended at that time. (AR-106 to AR-107.) Pursuant to the Severance Agreement, plaintiff was entitled to only specifically identified employee benefits after August 28, 2001, which did not include disability benefits. (AR-106, ¶ 2.) Although Providian mistakenly deducted premiums for disability insurance from plaintiff's paycheck after August 28, 2001, this does not create coverage for the claim after August 28, 2001, because coverage can only be extended under the Policy until the end of August 2001, not for the entire three month severance period. The policy provides:

> "The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is: (1) temporarily laid off; or (2) given leave of absence. The Covered Person's coverage will not continue beyond the end of the policy month in which the lay-off or leave of absence begins. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally." (Ex. A to McGee Decl., p. P-033.)

Therefore, even if plaintiff had not released her claim for disability benefits under the Release, at most, coverage could be extended only until August 31, 2001. It is fundamental that "ERISA affords no rights or protections to those who are not participants" in a benefit plan. (Cooke, ERISA Practice and Procedure § 2.08, at 2-28 (1995).) Accordingly, if plaintiff's claim arose after she was no longer covered, she is not entitled to benefits. For the reasons set forth herein, the administrative record does not support a finding of disability as of August 29, 2001 let

1  alone before September 1, 2001.

## IV. CONCLUSION

For the reasons set forth above, defendants Liberty Life Assurance Company of Boston and the Providian Employee Disability Plan are entitled to judgment as a matter of law.

Dated: February 29, 2008

ROPERS, MAJESKI, KOHN & BENTLEY

By: /s/ Kathryn C. Curry
PAMELA E. COGAN
KATHRYN C. CURRY
JENNIFER A. WILLIAMS
Attorneys for Defendant
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

| | |
|---|---|
| 1 | CASE NAME: Anita Carr v. Liberty Life Assurance Company of Boston |
| 2 | ACTION NO.: 1100048706 |

### PROOF OF SERVICE

I am a citizen of the United States. My business address is 1001 Marshall Street, Redwood City, CA 94063. I am employed in the County of San Mateo where this service occurs. I am over the age of 18 years, and not a party to the within cause. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On the date set forth below, following ordinary business practice, I served a true copy of the foregoing document(s) described as:

**LIBERTY OIFE ASSURANCE COMPANY OF BOSTON'S OPENING ARBITRATION BRIEF;**

**DECLARATION OF PAMELA E. COGAN IN SUPPORT OF DEFENDANT LIBERTY LIFE ASSURANCE COMPANY OF BOSTON'S OPENING ARBITRATION BRIEF.**

☐ (BY FAX) by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☒ (BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Redwood City, California.

☐ (BY PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand this date to the person(s) listed below

☒ (BY ELECTRONIC DELIVERY) I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

| | |
|---|---|
| Steven P. Krafchick<br>KRAFCHICK LAW FIRM<br>100 W. Harrison, South Tower<br>Suite 300<br>Seattle, WA 98119<br>Telephone: 206-374-7370<br>Facsimile: 206-374-7377<br>klf@krafchick.com | Attorneys for Plaintiff<br>ANITA CARR |
| Dipanwita Amar<br>Howard, Rice et al.<br>3 Embarcadero Center, #700<br>San Francisco, Ca 94111<br>Telephone: (415)434-1600<br>Facsimile: (415) 217-5910 | Attorneys for<br>PROVIDIAN BANCORP SERVICES |

RC1/5004720.1/RL1

PROOF OF SERVICE

☒   (*Federal*) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on March 4, 2008, at Redwood City, California.

                                     /s/ Rose Love
                                       Rose Love

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City