**FILFP**

1 | Anita B. Carr, TR pro se
2 | 11801 Bloomington Way
Dublin, CA 94568

*E-filing*

FEB 2 ∂ 2009

3 | Telephone: 310-425-6224

RICHARD W. ᴡⁱᴇᵏⁱ ⱼ
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

4 | Plaintiff, pro se

5 | IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

6 | CALIFORNIA
450 Golden Gate Avenue

7 | 16ᵗʰ Floor
San Francisco, CA 94102

8

9

10 | ANITA B. CARR
Plaintiff,

CASE No: C 05-3190 TEH

11 | Vs.

ANITA B. CARR'S (PLAINTIFF'S)
MOTION FOR LEAVE TO FILE

12 | LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON, a Massachusetts corporation

MOTION FOR RECONSIDERATION;
MOTION TO SET ASIDE

13 | AND
PROVIDIAN BANCORP SERVICES (aka

JUDGEMENT
AND MOTION TO VACATE

14 | WASHINGTON MUTUAL AND aka JP
MORGAN CHASE), all DOMESTIC

ARBITRATION AND MOTION FOR
DISCOVERY

15 | CORPORATIONS, PROVIDIAN
FINANCIAL HEALTH PLAN an ERISA

16 | employee health plan,
Defendant(s)

17

18

19 | This matter comes before the Court on the decision made on January 29, 2009.

20 | The motion to leave complies with the requirements of Civ. L.R. 7-9.

21 | **BACKGROUND**

22 | Anita B. Carr became employed at Providian Financial, a Credit Card Banking Company, in

23 | Pleasanton, CA on October 18, 1998. She elected each year from a flex plan of benefits offered

24 | by her employer to purchase, after tax, disability insurance which would help her take care of her

25 | mortgage as she was a single person homeowner in the East Bay & a single mother with a

26 | daughter at UC Berkeley. Since she was a highly paid Director, she chose to obtain 60% of her

27 | base salary as a disability insurance option. She paid for the disability insurance for 3 years until

her last day of employment of 11/28/2001. Ms. Carr also paid for all of her medical insurance.

28

1    CARR

Anita B. Carr applied for and obtained California State Disability Insurance and then Federal Social Security Disability, which she continues to receive. The Social Security Administration deemed the disability started August 28, 2001.

Anita B. Carr became ill & disabled starting in the early months of 2001. Her illness/disability includes, among other serious symptoms, **a documented brain impairment & cognitive dysfunction.** Ms. Carr cannot process information, respond or make decisions as quickly as other normal individuals. In fact, some days her pain is considerable and that makes it difficult to concentrate. Additionally, pain medications interfere with normal functioning.

Prior to her illness onset Ms. Carr received outstanding job performance evaluations and received, in one year, a $26,000 cash bonus along with restricted stock shares and options. One of her salary bumps was a raise of $15,000 in one year. Ms. Carr was termed 'Queen of Data' by the CIO (Chief Information Officer).

Throughout 2001, Ms. Carr kept her employer's management and Human Resources personnel apprised of some of her health issues and continued to do due diligence by going to her physician with various symptoms. Physicians sometimes take up to 7 years to make the diagnosis on the syndromes which Ms. Carr has been diagnosed with. Ms. Carr continued to work, albeit with pain & excessive tiredness, which forced her to run home on her lunch hour to rest. *Lang v Long-Term Disability Plan of Sponsor Applied Remote Tech. (9th Cir. 1997) 125 F.3d 794*, the Ninth Circuit Court of Appeals found that the plaintiff was entitled to receive disability benefits as a result of suffering from fibromylagia. In *Lang*, the court recognized that "it is often difficult to diagnose fibromyalgia, and 'often people with fibromylagia have undergone many tests and have seen many different specialists while in search of an answer.'" This scenario is precisely the unfortunate situation that has been faced by Ms. Carr. She experienced severe pain for several years and underwent numerous tests and doctor visits before the specific primary diagnosis of severe fibromyalgia was ultimately made by Dr. Rajiv Dixit.

At one point in Feb. of 2001, Human Resources personnel at Providian, were processing paperwork to place Ms. Carr on medical leave of absence. Ms. Carr indicated that her physician had not yet gotten a main diagnosis and had been focusing heavily on controlling her Blood Pressure, which if too high can cause stroke. Ms. Carr continued to try to work. In August of 2001, Ms. Carr was laid off. Providian, throughout these proceedings, have stated that Ms. Carr was laid off as part of a 'massive' company layoff, when in fact it was only Ms. Carr and one other lower level employee who had been laid off in several months. It wasn't until Oct. 2001 when the shareholders learned of the massive Insider Trading and Accounting Fraud by Providian executives that mass layoffs occurred at Providian. Until that point the company was I high growth mode, even doubling the total number of employees during the 3 years Ms. Carr was employed at Providian.

From August 28, 2001 until November 28, 2001, Ms. Carr was on the payroll and on paid administrative leave with her benefits. This was a salary continuation. Ms. Carr was told to stay home on administrative leave.

It was indeed, Ms. Carr who, due to the nature of her Director of Data, a Sr. Management position at Providian, discovered the 'secret' accounting system software change that was the 'Accounting Fraud' that allowed the Providian executives *to complete* their Insider Trading and reap millions and millions of dollars.

Ms. Carr reported her findings to the corporate auditors at Providian prior to being laid off.

Providian, instead of continuing to retain Ms. Carr and work with her and her doctor on the medical leave of absence, found a convenient way to eliminate her from working. Additionally, Ms. Carr had started to file a Worker's Comp case while still at work at Providian & had repeatedly asked HR for the W. Comp forms. One claim was for what Ms. Carr thought was carpal tunnel syndrome and one was for stress related issues. Ms. Carr, after her layoff, was finally mailed the Workers Comp forms and did open two claims which were settled several years back.

Providian constructed an Employment Agreement, signed by Ms. Carr as a condition to being employed at Providian, which is in direct conflict with what their First Flex Employee Handbook states on its very last page *'If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.'* The Employee Handbook was provided to Ms. Carr after she signed the employment agreement and several weeks after she started to work at Providian in October of 1998. There also was nothing in the Employee Handbook explaining JAMS or arbitration or even when that forum should be used. Ms. Carr looked to her attorney of record to ensure a proper course of legal action would be taken. In fact, Ms. Carr was ignorant of what ERISA even meant in relation to benefits, plans etc. as she had never encountered ERISA at any point prior in her life. The same applies to the terms arbitration and JAMS. Again, Ms. Carr retained counsel whom she expected to be competent and experienced in these complex law areas. After the fact, Mr. Krafchick finally admitted he had never done an arbitration before.

On Page 6 Section 19 (b) of the 'Providian Financial Severance Pay Plan' document it states *'if you have a claim which is denied or ignored, in whole or in part, you may file suit in a state or federal court'*. This is identical to what was stated in the First Flex Employee Handbook provided to Ms. Carr when she first became employed.

In summary of this confusing situation: Employee Handbook & Severance Pay Plan document both saying that employee can sue in court for a claim with no mention of JAMS. With ONLY the employment contract stipulating Binding Arbitration and JAMS and this statement 'The arbitrator may award the prevailing party his, her or its reasonable attorney's fees, costs and expenses incurred in the arbitration, consistent with applicable law, including the fees, costs and expenses charged by the arbitrator and JAMS. By agreeing to this provision, you acknowledge and agree that you are waiving any right you may have to a jury trial of all disputes or disagreements described above and that you are giving up your rights to discovery and appeal except to the extent that they are specifically provided for.'

Ms. Carr finds the stipulation for Binding Arbitration highly intimidating & oppressive when one considers the statements about all the fees, costs and expenses that could be assigned to her.

4    CARR

1

2    Now, over 7 ½ years have elapsed since the disability started & not one judicial official, NOR has

3    the arbitrator reviewed the massive medical file & test results provided in this case. The arbitrator

4    even stated he was 'only going to review the contracts'. This is evident throughout the

5    Arbitrator's Opinion & Decision document of April 29, 2008.

6    Ms. Carr points out that the arbitrator, by failing to review any portion of the medical

7    documentation, has failed in his duty to provide a *full & fair review of the record* and has failed to

8    note, with proof by extensive medical testing results, that Ms. Carr had a brain impairment which

9    could effect her decision making and the signing of any documents. Additionally, since Ms. Carr

10   lived alone, she relied solely upon herself, all the while very ill, to handle any of the early

11   paperwork until she finally retained the first attorney.

12

13   Liberty Life Assurance refused to send their Disability Evaluation Form to Ms. Carr's
     Rheumatologist, a Board Certified Doctor who specializes in the syndromes which Ms. Carr has.

14   This Rheumatologist continues even now in 2009 to treat Ms. Carr. He is the expert. Instead,

15   Liberty Life Assurance sent the form to the wrong doctor then pressured her to conform to their

16   'date deadlines' and return the completed form. This doctor did complete the form, but without

17   seeing Ms. Carr, nor contacting the expert Rheumatologist, nor doing any disability evaluation on

18   Ms. Carr. Her office normally schedules a 1.5 hour visit for disability evaluations. In fact, the

19   doctor who did complete the form only treated Ms. Carr for her High Blood Pressure and anxiety

20   plus routine illnesses, such as colds or allergies. A denial was made by Liberty Life Assurance

21   based on a non-expert doctor who did not do a disability evaluation on Ms. Carr prior to sending

22   in the form, nor had that MD recently seen Ms. Carr. Dr. Lamb did not diagnose fibromyalgia as

23   Ms. Carr's primary medical problem. Unlike Dr. Rajiv Dixit, Dr. Lamb is not a Board Certified

     Rheumatologist and she lacks Dr. Dixit's expertise in analyzing, diagnosing and, ultimately,

24   understanding the severe impairments caused to Ms. Carr as a result of contracting a disease as

25   complex as fibromyalgia.

26

27   It should be noted that Ms. Carr had a positive ANA test at the end of June 2001, indicating a

28   **serious rheumatologic** disorder & that was what triggered Ms. Carr's primary care physician to

refer her to the rheumatologist. The rheumatologist also ordered and ANA test and it came back positive and with a higher titer. This is strong proof that Ms. Carr's disability/illness started prior to June 2001.

Liberty Life Assurance, again after almost 4 years of administrative appeals, stated in one of their denial letters that 'Liberty had not had time to have any of their physicians' examine Ms. Carr. Ms. Carr was always available to their physicians.

Liberty Life Assurance also has trained their personnel to **_only_** grant a maximum of 2 weeks disability benefits for a fibromyalgia case. This is a major bias!

Repeatedly, Liberty Life Assurance has acted in bad faith. Even at the JAMS mediation, for which Ms. Carr was charged $2400 by JAMS, Liberty Life Assurance sent their representative with only an authorization to negotiate to $100,000 on a case worth close to 1.5 million dollars in benefits. By 2PM Pacific Time when negotiations reached a number over 100K, the east coast office of Liberty Life Assurance was already closed and no authorization could be obtained. No settlement was reached.

Ms. Carr believes that this is a classic 'conflict of interest case' with a Fortune 500 Company, Liberty Life Assurance which sells disability insurance to employees, and then makes the decision(s) on denials of benefits. Clearly, in order to maintain profitability & the status of a Fortune 500 company ranked 94th in 2008 of the largest companies and 6th in insurers, it would behoove them to deny benefits for the insurance they sold to customers.

Liberty Life Assurance administrative appeal decisions were arbitrary and capricious in multiple respects when it systematically and inexplicably ignored critical evidence (positive ANA tests etc.), reversed positions, failed to give their disability evaluation form to the correct treating physician of Ms. Carr so he could complete it and submit it, stated after 4 years that they had not had time to have any of their physicians examine Ms. Carr, favored their highly paid medical consultants who only reviewed 'cold' records and never examined Ms. Carr, nor ordered a single medical test for Ms. Carr. The consultants 'cherry picked' the medical data from Ms. Carr's

medical charts, such as 'doing well' & failed to evaluate 'the totality' of the claimants medical condition.

The consultants for Liberty Mutual lacked any Board Certification in Rheumatology and had no clinical background in Fibromyalgia or Sjogren's Syndrome.

This insurer has a history of biased claims administration which should be important in weighing a conflict of interest.

Even at the start of the process Liberty Life Assurance denied the benefits saying initially that Ms. Carr had not filed a claim timely enough. At that point is when Ms. Carr retained her first attorney.

It must be noted that Liberty Life Assurance, even though only claiming to learn of Ms. Carr's termination once the case was filed in Federal Court, actually was in possession of a document they provided to Ms. Carr to be completed, entitled 'Claimant Supplementary Statement'. Ms. Carr completed this form and signed it on 9/29/03 and on this form, Ms. Carr lists her 'separation pay' information and the dates it began and ended. Ms. Carr submitted this form to Liberty Life Assurance along with other documents requested by Mary Ellen Smith, including 'Claimant Information' & A Social Security Administration 'FACT' consent for release form.

One only has to review each of Liberty Life Assurances general letters to Ms. Carr and each of their denial letters to note their 'abuse of discretion'. In one instance Liberty Life Assurance contacted Ms. Carr and asked her to send them some information, but instead of waiting for that medical information, they, within hours, issued and sent the denial letter!

Liberty Life Assurance is a 'dual role' insurer and involved in fraud, abuse of discretion, having a conflict of interest & improperly denying Ms. Carr's STD & LTD. *Metropolitan Life Ins. (MetLife) v Glenn, 554 U.S. ____ 128 S. Ct. 2342 (June 19, 2008)* Liberty Life Assurance, by utilizing their dual role power, knowingly & willfully extended this case to the point that the disabled insurance purchaser had to file in federal court instead of correctly evaluating the

disability and making the benefits award to Ms. Carr. It is well known in the insurance industry that these large insurance carriers wish to see the insured 'die' so that the insurance carrier never has to pay any benefits. It is also a known insurance industry practice to try to 'wear' down the insured financially, so that they can no longer continue to fight the legal battles over benefits.

# ISSUES

### A. ATTORNEY MALPRACTICE

1. Anita B. Carr has recently discovered the fact that Mr. Steve Krafchick, of the Krafchick Law Firm of Seattle Washington, who was representing her pro-hac vice when the suit was filed on August 5, 2005 in this court, was not in compliance with *Rule 9.43 Code of Civil Procedure 1282.4* and was illegally representing Ms. Carr during the arbitration at JAMS. This is attorney malpractice. carrD EXHIBIT & carrE EXHIBIT

2. Anita B. Carr never signed any agreement to go to arbitration. Only Krafchick signed.

3. Anita B. Carr has recently discovered the fact that the JAMS Arbitrator, the Ret. Honorable Judge Lynch was never served the Certificate of 'Out-of-State Arbitration Counsel' and failed to review, sign and approve Mr. Krafchick, as an out of state counsel appearing in an arbitration in the State of California. *Rule 9.43 Code of Civil Procedure 1282.4*

4. Ms. Carr has recently discovered the fact that Mr. Krafchick did not comply with paying a $50 fee for the filing of the certificate, nor did he serve all parties in the matter with a copy of the certificate. He also failed to serve the State Bar of California with the certificate with the signed approval of the JAMS arbitrator. *Rule 9.43 Code of Civil Procedure 1282.4*

5. Mr. Krafchick was not eligible to appear as an out of state counsel in a California arbitration. *To be eligible to appear as an out-of-state attorney arbitration counsel, an attorney must comply with all of the applicable provisions of Code of Civil Procedure section 1282.4 and the requirements of this rule and the related rules and regulations adopted by the State Bar of California.*

## B. MORE ATTORNEY MALPRACTICE

6. Mr. Steve Krafchick was the attorney of record for Anita B. Carr from Dec. 2004 to Oct. 29, 2008 when Judge Henderson terminated Steve Krafchick as attorney of record for Anita B. Carr.

7. On August 11, 2008 Anita B. Carr emailed Mr. Krafchick to inquire about any statute of limitations that there might be for filing a motion to vacate the arbitration. His response was 'I have absolutely no idea.' Exhibit 'carrB EXHIBIT'. Upon further checking Ms. Carr learned that the deadline was missed by several days.

8. Anita B. Carr remains disabled and ill and had retained Mr. Krafchick to represent her and relied upon him to perform appropriate legal actions. In the Jan. 29, 2009 order there is a statement 'Carr did not file a timely opposition to Liberty's motion'. Anita B. Carr should not be penalized for the malpractice of her attorney since it was he who was not cognizant of the statute of limitations for filing a Motion to Vacate Arbitration, nor did he file a timely opposition to Liberty's motion. Steve Krafchick was Carr's attorney of record & under contract with her until Oct. 29, 2008.

## C. VIOLATIONS OF 29 CFR 2560.503-1 - Claims procedure. Section 2560.503.1

(a) Scope and purpose. In accordance with the authority of sections 503 and 505 of the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants). Except as otherwise specifically provided in this section, these requirements apply to every employee benefit plan described in section 4(a) and not exempted under section 4(b) of the Act.
    (b) Obligation to establish and maintain reasonable claims procedures.
Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations (hereinafter collectively referred to as claims procedures). The claims procedures for a plan will be deemed to be reasonable only if--......

(v) No fees or costs are imposed on the claimant as part of the voluntary level of appeal.
    (4) The claims procedures do not contain any provision for the mandatory arbitration of adverse benefit determinations, except to the extent that the plan or procedures provide that:
    (i) The arbitration is conducted as one of the two appeals described in paragraph (c)(2) of this section and in accordance with the requirements applicable to such appeals; and
    (ii) The claimant is not precluded from challenging the decision under section 502(a) of the Act or other applicable law.

9    CARR

(d) Plans providing disability benefits. The claims procedures of a
plan that provides disability benefits will be deemed to be reasonable
only if the claims procedures comply, with respect to claims for
disability benefits, with the requirements of paragraphs (b), (c)(2),
(c)(3), and (c)(4) of this section...........

(l) Failure to establish and follow reasonable claims procedures.
In the case of the failure of a plan to establish or follow claims
procedures consistent with the requirements of this section, a claimant
shall be deemed to have exhausted the administrative remedies available
under the plan and shall be entitled to pursue any available remedies
under section 502(a) of the Act on the basis that the plan has failed
to provide a reasonable claims procedure that would yield a decision on
the merits of the claim.

The court has initially erred with respect to allowing the parties to even consider 'mandatory
binding arbitration' in the employment contract with respect to an ERISA disability denial of
benefits claim which had exhausted the ERISA administrative appeals process. Especially since
the Providian plan & Employee manual had specific wording under the section General
Information-Enforce Your Rights (Document 76-3 Filed 12/31/2008 page 57 & 58 of 104) "If your
claim for a benefit is denied or ignored, in whole or in part, you have a right to know why the
claim was denied or ignored, to obtain copies of documents......

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a
state or federal court." (court to note: this document was filed 12/31/2008, but was also earlier
filed with the federal court. Ms. Carr does not know the number of that document). The court
failed to resolve this contradiction and ambiguity prior to allowing the parties to exit federal court
and move to JAMS. The court, in all its wisdom, should have been very well aware that in a
'denial of disability benefits' ERISA case that the employment agreement forcing mandatory
binding arbitration was a violation of *29 CFR 2560.503-1 Claims Procedure*. In particular v4-4.i
& 4.ii.

The court, in violation of 29 CFR 2560.503-1, v4i, allowed an arbitration even after two
administrative appeals with Liberty Mutual had been completed.

The court has allowed Providian Financial, now JP Morgan Chase, to violate their obligation to
establish and maintain reasonable claims procedures for their insured employees under ERISA.

This court also erred with allowing the case to move to JAMS when one of the attorneys
representing Liberty Mutual Life Assurance deliberately marked out the word 'binding' from the

10   CARR

documents signed for agreement to go to JAMS.  So there was one document in disagreement with and different from the others.

The court has been completely insensitive to the plaintiff's debilitating condition and the financial terrorism inflicted by protracted proceedings in this matter.  A disabled person's physical & mental health is compromised by the stress accompanying these protracted and illogical proceedings gyrating through the administrative appeals, the courts and JAMS and back again, all the while wreaking financial havoc on the poor person who bought some insurance at work thinking she would have some financial security if anything happened.  Had Ms. Carr known that when she elected to buy some disability insurance at work it would result in complete and total financial exhaustion in attempts to collect the insurance, I seriously doubt she would buy it.

**D. ARBITRATOR ETHICS & JAMS DISCLOSURES & 'REPEAT BUSINESS BIAS'**
*The Judicial Council Ethics Standards for Neutral Arbitrators in Contractual Arbitrations imposes on neutral arbitrators a continuing duty to make disclosures of relevant information that comes to their attention after appointment and throughout the proceedings. Standards 4(a), 7(f).*

*Disclosure requirements of C.C.P. §§170.1, 1281.6, 1281.85, 1281.9, 1297.121; JAMS Ethical Guidelines for Arbitrators, and California Rules of Court Ethics Standards for Neutral Arbitrators in Contractual Arbitration.*

JAMS is the largest private, *for profit* alternative dispute resolution company in the world.  JAMS handles on the average of 10,000 cases per year.

Even though the JAMS arbitrator disclosures were provided to Mr. Krafchick, Ms. Carr never received a copy until Mr. Padway (most recent counsel) provided it to her in late Dec. 2008.  This is newly discovered.

9.  The arbitrator Lynch failed to sign and date the 'Supplemental Arbitrator Disclosure For Consumer Arbitrations' form.   carrC EXHIBIT

10. EVIDENT PARTIALITY This is particularly relevant as Ms. Carr has now learned that JAMS had 'repeat business bias' in that there are/were contracts and/or agreements with the companies Providian Financial and Washington Mutual for the handling of those company's credit card **consumer arbitrations**.

Additionally, the printout provided or attached to the JAMS disclosure provided to Mr. Krafchick only provides data to 2002, but not prior. The printout is also **not consistent with data** which under California law, *Corbett Bill 1281.96*, is published on the JAMS website. Since JAMS is a nationwide company it is necessary to review national data to evaluate the impact of 'repeat business bias' or sometimes termed 'repeat player bias'. Both companies, Providian Financial and Washington Mutual provided credit cards to millions of consumers nationwide and specifically they utilized JAMS in consumer disputes. The San Francisco JAMS website, albeit the data still is not complete to conform to the Corbett Bill, lists roughly over 275 cases for Providian and Washington Mutual going back to only 2005. These are all consumer cases ruled primarily in favor of the two companies. There is no published data prior to 2005.

Faced with the loss of all that income to JAMS from the repeat consumer credit card arbitrations, why would any arbitrator really be 'neutral' and rule in favor of a person who has a consumer dispute for a benefit? See 'carrF EXHIBIT'

11. The JAMS Arbitrator failed to disclose his previous involvement with Providian cases (SEC)
12. The JAMS Arbitrator failed to disclose that earlier in his career, as an attorney, he consistently represented Disability Insurers.
13. The JAMS Arbitrator failed to disclose the number, type, dispositions and dollar amounts involved in any prior Providian or Washington Mutual JAMS arbitrations.

Repeat player bias or repeat business bias refers to the simple fact that companies/employers use the same arbitration company, and sometimes even the very same arbitrator, over and over again. This means that the employee's case is being decided by a company or person that regularly receives income, often perhaps hundreds of thousands of dollars on a yearly basis--from the company/employer whose case is being decided. This is especially notable with this case in that

JAMS handles thousands of credit card consumer arbitrations across the United States each year for Providian and Washington Mutual.

As a matter of human nature, how many times would an company/employer continue to use an arbitrator that continually handed decisions in favor of employees with stiff damages awards and penalties attached to them? Not long.

In contrast, how many times will the employee bringing the claim have occasion to use or recommend that arbitration company or arbitrator in the future? Not many, if ever.

So it is not difficult to understand that this repeat player bias works to the employee's disadvantage, whereas jury trials do not.

This repeat player bias has been directly noted and observed by courts and discussed at length by legal scholars (for example, see (Bingham, Employment Arbitration: The Repeat Player Effect (1997) 1 Employee Rts. & Employment Poly. J. 189; Schwartz, supra, 1997 Wis. L.Rev. at pp. 60-61.); *Mercuro v. Sup.Ct. (Countrywide Secur. Corp.)* (2002) 96 Cal.App.4th 167, 178, 116 Cal.Rptr.2d 671, 678).

Quite notably, the California Supreme Court may have even indirectly noted such bias when it observed that damages awards in favor of a plaintiff were generally lower in arbitrations than those in court. *Armendariz. v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 111 ["Although it is true that the costs of arbitration are on average smaller than those of litigation, it is also true that amount awarded is on average smaller as well"], citing, Schwartz, Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration, 1997 Wis. L.Rev. 33, 60-61.)


14. The arbitrator and JAMS as a company failed to disclose: investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include Providian Financial, PayPal, VISA, Mastercard, TSYS (Total Systems), Washington Mutual, EXPERIAN, Transunion & Equifax, Fair Isaacs, E-Loan & Getsmart.com. Providian Financial had an ownership interest in PayPal. VISA & Mastercard are included because the credit card businesses at Providian Financial and Washington Mutual could not be conducted without the contracts & processing with VISA &

Mastercard.  EXPERIAN, Transunion & Equifax are credit bureaus and Providian Financial and Washington Mutual are wholly reliant on these businesses and have contracts with these businesses in order to market & provide credit cards to consumers.  TSYS is a credit card processing company which also has contracts with Providian Financial and Washington Mutual and both companies require TSYS processing to exist.  Fair Isaacs provides FICO scoring to Providian and Washington Mutual.  Providian had a signed agreement with E-LOAN.  Providian bought Getsmart.com.

The arbitrator and JAMS failed to disclose: any investment vehicles available to any JAMS employee or consultant or arbitrator; specifically investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include Liberty Mutual or any of its subsidiaries and list the total dollars invested.

The arbitrator and JAMS failed to disclose:  any investment vehicles available to any JAMS employee or consultant or arbitrator; specifically investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include any disability insurance carrier and the total dollars invested.

The above disclosures are important as JAMS is a for-profit company and offers its employees, consultants and/or arbitrators 401Ks.  Additionally, the company itself might invest its profits into investment vehicles which would produce a 'conflict of interest' and support preferential treatment or a bias toward the other companies which the investment is in.

The Supreme Court adopted 'the simple' requirement that arbitrators disclose to the parties any dealings that *might* create an impression of *possible* bias.'  *Commonwealth Coatings Corp v Continental Cas. Co., 393 U.S. 145, 149 (1968) (emphasis added)*

E.   ARBITRATOR ISSUES & MISCONDUCT & MANIFEST DISREGARD OF THE LAWS

14   CARR

15. The arbitrator stated at the arbitration hearing that he had not read any of the materials and he was only going to look at the contracts. The arbitrator's written opinion clearly represents that statement. *Uniform Arbitration Act Section 12(a)(4) Upon application of a party, the court shall vacate an award where: (4) the arbitrators refused to ....consider evidence material to a controversy....*

The arbitrator has deprived Ms. Carr of a 'fair arbitration and due process.' Had the arbitrator considered the extensive Medical Information finding in this ERISA disability benefit case, he would have determined that Ms. Carr indeed had a significant disability and that it included 'brain impairment' and 'brain malfunctions' which could have influenced any of her document interpretation, decision making and document signing at or around the time of her layoff. This would include said 'Severance Agreement' or contract.

The arbitrator would have also learned that the Fibromyalgia illness/disability extended back in time prior to Ms. Carr's layoff on August 28, 2001. By the very diagnosis of fibromyalgia, widespread pain has to exist in all four quadrants of the body for at least 3 months. The arbitrator would have learned that by receiving a positive ANA test in late June of 2001, Ms. Carr already had a serious rheumatologic illness.  Through all the pain Ms. Carr continued to try to work.

In fact, the arbitrator has denied Ms. Carr a full and fair review for denial of disability benefits under the ERISA laws.

A company cannot deduct from an employee's paycheck for 3 years disability insurance payments and then not let the employee use the benefits or sue to obtain the benefits. This is common sense. It is a breach of fiduciary duty for a plan administrator/company to write a confusing and unconscionable severance agreement that prevents, in any way, for the employee to be able to fully attempt to collect the benefits. This should apply to benefits paid for and the insurance coverage provided during the days of 'going to work' and also to the days Ms. Carr was 'on paid administrative leave' with the salary continuance. Ms. Carr is entitled to use her benefits.

The arbitrator failed to render a decision/award that definitely & finally decided the issues submitted to the arbitrator.

Citing Judge Henderson's own determination of Jan. 29, 2009 on page 3 'Feb. 1, 2006 Joint Status Report at 2. Carr (Krafchick) continued by stating that she 'agrees to submit to binding arbitration all issues regarding benefits denied by Liberty and the Plan, giving up all right of appeal in exchange for some limited discovery provided for under California law.....

This states....issues regarding *benefits denied* by Liberty and the Plan .....and since the arbitrator never considered the medical information & test results, which amounted to thousands of pages, we have a faulty, ineffective and illegal arbitration which should not be binding at all. The arbitrator went off on an ILLOGICAL contract law tangent involving an ambiguous, poorly written severance agreement which he completely mis-understood and which had no basis in reality. Ms. Carr has been denied her congressionally mandated ERISA rights to fully attempt to obtain her disability benefits.

The arbitrator decided an issue which was not submitted to the arbitrator. It was outside the scope of the ERISA 'benefits denied' after all the ERISA administrative appeals had been completed to be making a determination on issues related to Ms. Carr's pay, deductions, withholdings and the severance agreement. *Westerbeck Corp. v Daihatsu Motor Co., 304 F.3d 200, 220 (2d Cir. 2002)* "When determining whether the arbitrator exceeded his powers, the focus is on the issue submitted by the parties."

16. WILLFUL DISCOVERY VIOLATION – WITHOLDING THE EVIDENCE The arbitrator failed to force Providian Financial to produce the 'Employee Relations File' on Ms. Carr, even though, I believe, Judge Henderson had previously ordered Providian Financial to produce it and Mr. Krfachick kept asking for it. The attorney representing Providian Financial consistently stated that there was no such thing. The 'Employee Relations File' was separate and distinct from the 'personnel file'.

A week or so prior to the Arbitration hearing, Ms. Carr wrote a letter to the CEO of Washington Mutual, which purchases Providian Financial and insisted the production of the 'Employee Relations File'. Ms. Carr indicated it would be at the Human Resources Department at the Pleasanton campus.

The late afternoon prior to the Arbitration hearing, a portion of that 'Employee Relations File' was produced for the attorneys, but Providian (now Washington Mutual) stated they had destroyed portions of the file. Ms. Carr still never got to see what was in the file. Ms. Carr did know that all of Terrace Ellis's notes were in that file and they related to the numerous meetings between Ms. Ellis and Ms. Carr regarding Ms. Carr's health, possible disability leave and benefits etc.. Ms. Ellis was the former HR representative for Providian. She had been deposed around Jan. 2008 and that file would have been very relevant to the deposition & her recall of events.

The omitted information 'might have drastically altered the outcome of the arbitration' and warrants a finding that the award herein was procured by corruption and fraud. *Hakala v Deutsche Bank AG, et al., 2004 WL 1057788, \*2-3 (S.D.N.Y. May 11, 2004)*

17. With regards to the Certificate of 'Out-of-State Arbitration Counsel', the arbitrator failed to review, sign and approve Mr. Krafchick, as an out of state counsel appearing in an arbitration in the State of California. *Rule 9.43 Code of Civil Procedure 1282.4*

## 18. MANIFEST DISREGARD OF THE LAW

The arbitrator, in direct violation of *29 CFR 2560.503-1 Claims Procedure,* has manifestly disregarded the law and allowed the parties to proceed with a 'mandatory binding arbitration' in the employment contract with respect to an ERISA disability denial of benefits claim which had exhausted the ERISA administrative appeals process. Especially since the Providian plan & Employee manual had specific wording under the section General Information-Enforce Your Rights (Document 76-3 Filed 12/31/2008 page 57 & 58 of 104) "If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why the claim was denied or ignored, to obtain copies of documents......

17    CARR

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court." (court to note: this document was filed 12/31/2008, but was also earlier filed with JAMS. Ms. Carr does not know the number of that document). The arbitrator failed to resolve this contradiction and ambiguity prior to allowing the parties to proceed to conclusion at JAMS. The arbitrator, very well experienced in ERISA, should have been very aware that in a 'denial of disability benefits' ERISA case that the employment agreement forcing mandatory binding arbitration was a violation of *29 CFR  2560.503-1 Claims Procedure*.

The exact same wording was placed within the Providian Severance Pay Plan under ERISA rights, as was in the Providian plan and employee manual: "If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court." Again, the arbitrator deliberately ignored that statement in the Severance Pay Plan with his irrational analysis of the contracts. ERISA, an act by Congress, trumps any state laws, especially with respect to contracts or releases.

The arbitrator, in violation of 29 CFR 2560.503-1, v4i, allowed a binding arbitration to proceed even after two administrative appeals with Liberty Mutual had been completed.

The arbitrator has allowed Providian Financial, now JP Morgan Chase, to violate their obligation to establish and maintain reasonable claims procedures for their insured employees under ERISA. It is irrelevant whether one considers Ms. Carr's benefit coverages up until Aug. 28, 2001 or with the salary continuance until November 28, 2001. Ms. Carr had paid for benefits for 3 years and the MDs have stated she became ill/disabled in mid-summer of 2001.

Take note of the fact that one should consider it a 'breach of fiduciary duty' and also a violation of 29 CFR 2560.503-1 when Providian's legal department wrote such conflicting and ambiguous documents such as the Employment Agreement, Employee Handbook, Severance Pay Plan and Severance Agreement which state ERISA rights to sue in court in some places, but in other places state the disputes must go to JAMS. The Employee Handbook completely lacked a single statement or description about JAMS or arbitration, nor is JAMS or arbitration listed in the glossary. Providian had an obligation to establish and maintain reasonable claims procedures.

18   CARR

(a) Scope and purpose. In accordance with the authority of sections 503 and 505 of the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants). Except as otherwise specifically provided in this section, these requirements apply to every employee benefit plan described in section 4(a) and not exempted under section 4(b) of the Act.

(b) Obligation to establish and maintain reasonable claims procedures.

Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations (hereinafter collectively referred to as claims procedures). The claims procedures for a plan will be deemed to be reasonable only if....

.....(v) No fees or costs are imposed on the claimant as part of the voluntary level of appeal.

(4) The claims procedures do not contain any provision for the mandatory arbitration of adverse benefit determinations, except to the extent that the plan or procedures provide that:

(i) The arbitration is conducted as one of the two appeals described in paragraph (c)(2) of this section and in accordance with the requirements applicable to such appeals; and

(ii) The claimant is not precluded from challenging the decision under section 502(a) of the Act or other applicable law.

(d) Plans providing disability benefits. The claims procedures of a plan that provides disability benefits will be deemed to be reasonable only if the claims procedures comply, with respect to claims for disability benefits, with the requirements of paragraphs (b), (c)(2), (c)(3), and (c)(4) of this section........

....l) Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

The arbitrator violated Ms. Carr's ERISA rights by manifestly disregarding the law.

19. In the arbitrator's opinion and decision he cites from a Notice of Eligibility letter 3. Severance Benefits....your severance benefit under Section 4.1 of the Plan shall be as follows: (a) Providian will continue to pay your regular base salary, in accordance with its regular payroll period, for three (3) months following your eligible termination date, subject to *standard* payroll deductions & withholdings......

(b) the Company will continue to pay the costs of your current health care coverage for a period of three (3) months following your eligible termination date, in accordance with the same terms and conditions as you are currently entitled.....

1  The arbitrator refused to see reality by examining the actual pay stubs provided by Ms. Carr which
2  clearly show:

3  • Providian NEVER had paid for medical benefits, these were always deducted from Ms.
4    Carr's pay & it unequivocally shows that on the paystubs (Medical Plan under Pre-Tax
5    Deductions). If Providian had paid for any Medical Insurance it would be listed under
6    'EARNINGS'. There is no evidence anywhere on the paystub that Providian ever paid for the
     medical benefits, either prior to the layoff date of Aug. 28, 2001 nor afterwards during the
7    salary continuance. Thus if they claim to have paid for Ms. Carr's medical benefits in
8    exchange for her signing the severance agreement, then Providian is in breach of contract and
9    the Severance Agreement is NULL & VOID!

10  • The paystubs always showed under 'deductions', the after tax deduction for both STD &
11    LTD payments. These were considered 'standard' deductions and clearly separated from any
12    'witholdings'.

13  • Proof positive that Providian wanted me to have all my benefits was provided as evidence
14    called 'Employee Action Request' form (EAR) which was signed by two executives and one
      HR representative. The two executives, who were required by company policy to sign an
15    EAR, were Vic Cozzoli, a VP and Ms. Carr's direct manager, and his boss Tanni Graichen,
16    the CIO-Chief Information Officer. Ms. Carr at one time had reported directly to Ms.
17    Graichen. The HR representative was Terrace Ellis. Ms. Ellis wrote clearly on the EAR
18    'continue all benefits'....

19  • The EAR was a direct order/authorization after Ms. Carr signed the Severance Agreement,
20    that Ms. Carr will have her full salary, benefits, 401K and that Ms. Carr will have these until
21    her separation date of Nov. 28, 2001. There is no other method that the company utilized to
      restart pay & benefits after the employee had been initially laid off. An EAR was also used
22    to stop Ms. Carr's pay etc. upon the layoff date of August 28, 2001. So, essentially Ms. Ellis
23    had to consciously complete an EAR to stop pay/benefits and then once Ms. Carr signed the
24    Severance Agreement, Ms. Ellis had to do the second EAR to restart pay/benefits and to
25    provide the new separation date.

26  • The arbitrator failed to understand this and insisted somebody made a mistake. Clearly, with
27    two very senior executives and one HR representative signing both EARs....there was no
28

     20   CARR

1    mistake. Both executives were Ms. Carr's direct upline management. NO EAR was ever
2    processed without two direct management executives signatures.

3    • On Page 6 Section 19 (b) of the 'Providian Financial Severance Pay Plan' document it states
4    *'if you have a claim which is denied or ignored, in whole or in part, you may file suit in a
5    state or federal court'*. Thus even the Severance Pay Plan is contradictory & ambiguous
     when it states something like that and then later states Ms. Carr cannot sue to obtain her
6    benefits. The Severance Pay Plan implodes on itself.

7    • The arbitrator also erroneously decided, and this is in his opinion, that Ms. Carr could not
8    have known her disability case could be worth close to 1.5 million dollars. But indeed the
9    Employee Manual demonstrated how to calculate out 60% of salary to age 65, thus Ms. Carr
10   did know. What Ms. Carr did NOT know or realize was that she was getting 3 month of
11   salary (roughly $30,000) in exchange for giving up or forfeiting her disability benefits by
12   signing the ambiguous severance agreement.

13

14   Thus, either Ms. Carr has her benefits and she should be able to fully exercise her rights to obtain
15   those benefits, *or there is a breach of contract on Providian's part* for not fulfilling their part of
16   the severance agreement by paying for Ms. Carr's medical insurance as they state they will do in
17   exchange for Ms. Carr signing the ambiguous document.

18

19   Why would a company provide an employee with benefits but then trick them and not allow them
20   to pursue obtaining those benefits? What if I was trying to use my health benefits and had to sue
21   for one reason or another. Providian is acting with fraud, deceit and malice and it is a breach of
     their fiduciary duty. This would also indicate that Ms. Carr paid for benefits while fully employed
22   and should be able to use those benefits & claim those benefits while employed, but through the
23   trickery of Providian's severance agreement, she would not be able ever to obtain those benefits
24   which she paid for 3years in a row. This is a catch-22.
25

26   Providian, by way of Terrace Ellis from HR, knew that Ms. Carr was having health issues, started
27   to process her out on Medical Disability Leave in Feb. of 2001, knew she was concerned about her
28   coverages, knew she was filing Workers Comp. and yet by deceit wrote a severance agreement that

        21   CARR

1
2
3
4

was supposed to be understood by any employee and effectively violated ADA laws by 'streamlining Ms. Carr' out of the company when they knew she was having health issues. Providian knew Ms. Carr was under duress from her health and her reporting on the accounting fraud by executives to the corporate auditor.

5
6
7
8
9
10
11
12
13

20. Additionally, during the arbitration hearing Ms. Cogan, attorney for the defendant Liberty Life Assurance, made a fabricated lie to the arbitrator. She stated that Ms. Carr had been taken away to a 72 hour psychiatric lockup. Ms. Cogan did not check facts. Ms. Carr was evaluated and released in 3 hours and the problem was due to medications. So, Ms. Cogan effectively 'prejudiced' the arbitrator by making him think that Ms. Carr was some sort of a 'nut case'. Ms. Cogan was standing up at the time she was stating this lie to the arbitrator and was waving her hands around for effect. Ms. Amar, the Providian attorney agreed with Ms. Cogan! Ms. Carr was not allowed to speak per instructions from her out of state attorney Mr. Krafchick.

14

F.   LIBERTY LIFE ASSURANCE

15
16
17
18
19
20

Liberty Life Assurance is in breach of contract & acted fraudulently & with bad faith since they accepted all payments for 3 years of disability insurance from Ms. Carr while knowingly scheming to 'limit' and 'control' the number of approvals for cases for disability benefits, even prior to Ms. Carr's becoming disabled and the submission of her claim. *Metropolitan Life Ins. (MetLife) v Glenn, 554 U.S. ____ 128 S. Ct. 2342 (June 19, 2008.)*

21
22
23
24
25
26
27

Liberty Life Assurance acted in bad faith again by taking Ms. Carr's money for the premiums, conducting inaccurate claims-processing, never raising any issue regarding 'binding arbitration in employment contract' or 'severance agreement' during the administrative determinations & then hiding behind the Providian Severance Pay Plan to escape having to 'own' up to paying disability benefits due Ms. Carr. This is like a little child who hides behind it's mothers apron. What a novel way to get out of their obligation. This is just more of the same abuse of discretion.

28

22   CARR

The United States Supreme Court in *Cleveland v. Policy Management Systesm Corp. (1999) 526 U.S. 795.* found that a person who was receiving SSDI benefits is presumed to be totally disabled. Given the SSA's determination of Ms. Carr's total disability in this case, Liberty's contention that she is not disabled is unsupportable and contrary to law.

In *Farrow v. Montgomery Ward Long Term Disability Plan (1986) 176 Cal. App. 3d 648*, the California Court of Appeal held that where a claimant has proved a *prima facie* case of disability, the burden is on the plan administrators to show that she is not entitled to benefits. Under the *Farrow* decision, in order to meet this burden, the plan administrators must specify particular jobs that it contends the claimant can perform. Ms. Carr's medical ailments have rendered her totally disabled from all gainful activity since August of 2001 and thus establishes her *prima facie* case of eligibility for LTD benefits under the Liberty Mutual plan.

Ms. Carr does not agree with the estoppel decision, which was not argued before this court, and does not believe that Liberty Life Assurance will have an unfair detriment since clearly Ms. Carr has been treated unfairly since the filing of the claim and Ms. Carr's ERISA rights have been violated.

Ms. Carr wishes the court to take note that because of her brain impairment and cognitive dysfunction she cannot sometimes respond as quickly as others, nor process information efficiently or meaningfully. On certain days when Ms. Carr's pain is high, she cannot do much of anything but rest.

Ms. Carr prays for immediate relief and the granting of these motions and for the Honorable Judge Thelton Henderson to order that Liberty Life Assurance should begin to start monthly payments to Ms. Carr as stipulated by their policy with her and any other relief deemed appropriate. Ms. Carr is entitled to a benefit o $6750 per month until she reaches age 65 and that amount should be adjusted up with the Cost of Living annual adjustments. Ms. Carr has never

been paid any benefits from Liberty Mutual. From Dec. 2001 to Dec. 2008, a total of 84 months has elapsed, bringing the total amount due to Ms. Carr to $567,000 plus any cost of living adjustments and interest.

Ms. Carr also prays for Providian Financial (now JP Morgan Chase) to reimburse her the $2400 she had to pay for the JAMS Mediation. Additionally, Ms. Carr had to pay $100 to JAMS for arbitration and this amount should be reimbursed to Ms. Carr.

Dated    2/24/2009
Anita B. Carr
pro-se

24    CARR

**Anita Carr**

**From:** Steve Krafchick [steve@Krafchick.com]
**Sent:** Monday, August 11, 2008 6:08 PM
**To:** ab-carr@att.net
**Cc:** klf

**Subject:** RE: what is statute of ....

I have absolutely no idea. I am not sure there is any basis to appeal a binding arbitration award. There are very limited grounds as I understand it. I remain very sad over the result in your case. Please recognize that I am eating significant out of pocket costs (over 12K that I expect I am unable to recoup and will need to write off).

**Steven P. Krafchick**
**Krafchick Law Firm**
*Legal Services for Injured People*

**100 W. Harrison, South Tower**
**Suite 300,**
**Seattle WA 98119**

**206-374-7370**
**(fax) 206-374-7377**
**klf@krafchick.com**
**www.krafchick.com**

( CARRB Exhibit

**From:** Anita Carr [mailto:ab-carr@att.net]
**Sent:** Monday, August 11, 2008 3:48 PM
**To:** Steve Krafchick
**Cc:** klf
**Subject:** what is statute of ....

Steve
What is statute of limitations if I wanted to file a 'motion to vacate' in federal court? Do I have 6 months or years or what?

Anita

2/19/2009

CARR C

**MEMORANDUM**

THE RESOLUTION EXPERTS

FEB 1 4 2007

KRAFCHICK LAW FIRM

TO:        All parties (see attached service list):
FROM:      JAMS
DATE:      February 12, 2007
RE:        **Carr, Anita B. vs Liberty Life Assurance Company, et al.**
           **JAMS Ref. #: 1100048706          Panelist: Eugene F. Lynch**

Your confidence in selecting JAMS to arbitrate this matter is appreciated. In accordance with the disclosure requirements of C.C.P. §§ 170.1, 1281.6, 1281.85, 1281.9, 1281.95, and 1297.121; JAMS Ethical Guidelines for Arbitrators, and California Rules of Court Ethics Standards for Neutral Arbitrators in Contractual Arbitration the following information is submitted.

Based upon the arbitrator's own knowledge as well as a good faith search of records available to the arbitrator and JAMS personnel and, further based on the information supplied concerning the names of the parties and their counsel, we attach a disclosure report and checklist listing any prior or pending cases involving the parties, counsel or counsels' firms. The attached report was prepared by JAMS personnel and reviewed by the arbitrator. Nothing in this report would, in the arbitrator's opinion, prohibit the arbitrator from impartially serving in this case.

The nominated or appointed arbitrator has made a reasonable effort to inform him/herself of any matters that could cause a person aware of the facts to reasonably entertain a doubt that as the proposed arbitrator s/he would be able to be impartial. In addition, s/he has disclosed all such matters to the parties to the best of his/her knowledge according to statutory and ethical guidelines. CRC Ethics Standards 7(b). With respect to any service commenced prior to July 1, 2002 by the arbitrator as a dispute resolution neutral other than as an arbitrator in another pending or prior case involving a party or lawyer in the current arbitration or a lawyer who is currently associated in the private practice of law with a lawyer in the arbitration, the arbitrator has sought the information from the dispute resolution provider organizations administering those prior services and has disclosed all required information within the arbitrator's knowledge pertaining to those services/relationships. CRC Ethics Standards 7(b)(5)(D).

Each participant in this arbitration is asked to advise all parties and JAMS of any information that is inconsistent with or not included in the provided disclosure, such as any matters that may affect the arbitrator's ability to be impartial. Please advise the arbitrator's Case Manager Claire Vranicar at 415-774-2613 if you know of any additional information that should be in the disclosure report to all parties. The Case Manager can arrange a conference call to discuss any supplemental information or disclosure questions. JAMS and the arbitrator will rely upon the parties' disclosure to us of information which is inconsistent with or not included in the disclosure provided.

Please be advised that if item 16 of the Arbitrator Disclosure Checklist is checked "yes," the arbitrator will entertain offers of employment or new professional relationships in any capacity other than as a lawyer, expert witness, or consultant from a party, lawyer in the arbitration, or lawyer or law firm that is currently associated in the private practice of law with a lawyer in the arbitration while that arbitration is pending, including offers to sere as a dispute resolution neutral in another case. In non-consumer arbitrations, this disclosure satisfies the arbitrator's continuing obligation pursuant to Ethics Standards 7(e), and constitutes a waiver of any further requirement to disclose subsequent employment involving the same parties or lawyers or law firms.

Any request to disqualify an arbitrator after appointment shall be governed by JAMS Comprehensive Rule 15(i), which provides, "At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties who may respond within seven (7) days of service of the challenge. JAMS shall make the final determination on such challenge. Such determination shall take into account the materiality of the new information and any prejudice to the parties. That decision will be final.

This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved.



THE RESOLUTION EXPERTS

## JAMS ARBITRATION ADMINISTRATIVE POLICIES

### I. Fees for the Arbitration

The Parties and their attorneys agree to pay JAMS for the arbitration as set forth in the Fee and Cancellation Policy attached to and incorporated in this Agreement. JAMS' agreement to render services is jointly with the Party and attorney or other representative of the Party in Arbitration.

Unless otherwise agreed by JAMS, the Parties agree that they are liable for and agree to pay their portion of JAMS' fees and expenses and for all time spent by the arbitrator, including any time spent in rendering services before or after the arbitration hearing. The Parties agree to pay all invoices received prior to the hearing in advance of the arbitration hearing. If such fees have not been paid prior to the arbitration hearing, the Party or Parties that have not paid remain liable for such fees. The Parties agree that JAMS may cancel an arbitration hearing and will not deliver the arbitrator's decision to any Party without full payment of all invoices.

### II. Records

JAMS does not maintain a duplicate file of documents filed in the Arbitration. If the parties wish to have any documents returned to them, they must advise JAMS in writing within 30 days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing and JAMS reserves the right to impose an additional fee for such special arrangements.

### III. Disqualification of the Arbitrator and JAMS as Witness/Limitation of Liability

The Parties have agreed or hereby agree that they will not call the arbitrator or any employee or agent of JAMS as a witness or as an expert in any proceeding involving the Parties and relating to the dispute which is the subject of the arbitration, nor shall they subpoena any notes or other materials generated by the arbitrator during the arbitration. The Parties further agree to defend the arbitrator and JAMS and its employees and agents from any subpoenas from outside Parties arising out of this Agreement or arbitration.

The Parties agree that neither the arbitrator nor JAMS, including its employees or agents, is a necessary Party in any proceeding involving the participants and relating to the dispute which is the subject of the arbitration. The Parties further agree that the arbitrator and JAMS, including its employees or agents, shall have the same immunity from liability for any act or omission in connection with the arbitration as judges and court employees would have under federal law.

### IV. Party

The term "Party" as used in these Policies includes Parties to the Arbitration and their counsel or representative.



## DISCLOSURE CHECKLIST FOR ALL ARBITRATIONS AND COURT REFERENCE MATTERS

**Arbitrator Disclosure Checklist pursuant to:**
• CCP §§ 170.1, 1281.6, 1281.85 1281.9, 1281.95, 1297.121
• JAMS Ethical Guidelines for Arbitrators
• California Rules of Court Ethics Standards for
Neutral Arbitrators in Contractual Arbitration
(hereinafter "CRC Ethics Standards")

Case Title: Carr, Anita B. vs Liberty Life Assurance
Company, et al.
JAMS Ref. #: 1100048706
Panelist Name: Eugene F. Lynch
Checklist supplements disclosure reports 16A & 16C

**Yes    No**

1. Arbitrator or member of arbitrator's Immediate or Extended Family [The term "member of the arbitrator's 'Extended Family'" includes the members of arbitrator's Immediate Family (The term "member of arbitrator's 'Immediate Family'" includes the arbitrator's spouse or domestic partner, as defined in Family Code section 297, and a minor child living in arbitrator's household ) and the parents, grandparents, great-grandparents, children, grandchildren, great-grandchildren, siblings, uncles, aunts, nephews, or nieces of the arbitrator or the arbitrator's spouse or domestic partner or the spouse of such person.] is a party, a party's spouse or domestic partner, an officer, director, or trustee of a party? CRC Ethics Standards 7(d)(1).    ( )  ( ᴧ )

2. Arbitrator, or the spouse, former spouse, domestic partner, child, sibling, or parent of the arbitrator or the arbitrator's spouse or domestic partner is:
   (A) A lawyer in the arbitration?    ( )  ( ᵧ )
   (B) The spouse or domestic partner of a lawyer in the arbitration?    ( )  ( ᵧ )
   (C) Currently associated in private practice of law with a lawyer in the arbitration?    ( )  ( ᴧ )
   CRC Ethics Standards 7(d)(2).

3. Arbitrator or a member of arbitrator's Immediate Family has or has had a significant personal relationship with any party or lawyer for a party? CRC Ethics Standards 7(d)(3).    ( )  ( ᵧ )

4. Arbitrator is serving or within preceding 5 years has served:
   (A) As a neutral arbitrator in another arbitration involving a party to the current arbitration
   or lawyer for a party?
   (B) As a party-appointed arbitrator in another arbitration for either a party to the current
   arbitration or lawyer for a party?    ( )  ( )
   (C) As a neutral arbitrator in another arbitration in which s/he was selected by a person
   serving as a party-appointed arbitrator in the current arbitration?    ( )  ( )

*see attached*

If the combined total of the cases disclosed under (A), (B) or (C) is greater than 5, arbitrator must state the total number of cases in which arbitrator served in each capacity and the number of cases in which the party to the current arbitration or the party represented by the lawyer for a party in the current arbitration was the prevailing party. CRC Ethics Standards 7(d)(4)(C).

5. Arbitrator is serving or has served as a dispute resolution neutral other than an arbitrator in another pending or Prior Case involving a party or lawyer in the current arbitration or a lawyer who is currently associated in the private practice of law with a lawyer in the arbitration?

   (A) For purposes of this question "Prior Case" means any case in which the arbitrator concluded his/her service as a dispute resolution neutral within 2 years prior to the date of the arbitrator's proposed nomination or appointment, but does not include any case in which the arbitrator concluded his/her service before January 1, 2002.

*see attached*

This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003 All rights reserved.

(B) If the arbitrator is serving or has served in such capacity, s/he must disclose:

    (i)    the names of the parties in each prior or pending case and, where applicable, the name of the
                attorney in the current arbitration who is involved in the pending case, who was involved in the
                prior case, or whose current associate is involved in the pending case or was involved in the prior
                case;

    (ii)   the dispute resolution neutral capacity (mediator, referee, etc.) in which the arbitrator is serving or
                served in the case; and

    (iii)  in each such case in which the arbitrator rendered a decision as a temporary judge or referee, the
                date of the decision, the prevailing party, the amount of monetary damages awarded, if any, and the
                names of the parties' attorneys.

(C) If the total number or cases disclosed under this question is greater than 5, the arbitrator must provide
a summary of the cases that states (i) the number of pending cases in which the arbitrator is currently
serving in each capacity; (ii) the number of prior cases in which the arbitrator previously served in each
capacity; (iii) the number of prior cases in which the arbitrator rendered a decision as a temporary judge
or referee; and (iv) the number of such prior cases in which the party to the current arbitration or the
party represented by the lawyer for a party in the current arbitration was the prevailing party. CRC Ethics
Standards 7(d)(5)(c).

**This information is set forth in the attached Disclosure Reports. For confidentiality reasons, JAMS does not
disclose the names of the parties in prior or pending mediations who are not parties in the current matter.**

6. Arbitrator has or has had an attorney-client relationship with a party or lawyer for a party to the current
arbitration, including:

(A) An officer, a director, or trustee of a party is or, within the preceding 2 years, was
a client of the arbitrator in the arbitrator's private practice of law or a client of a lawyer with whom
the arbitrator is or was associated in the private practice of law?                       ( )  (L)
(B) In any other proceeding involving the same issues, the arbitrator gave advice to a party or a
lawyer in the arbitration concerning any matter involved in the arbitration?             ( )  (¬)
(C) The arbitrator served as a lawyer for or as an officer of a public agency which is a party and
personally advised or in any way represented the public agency concerning the factual or legal issues
in the arbitration. CRC Ethics Standards 7(d)(7).                             ( )  (→)

7. Arbitrator or arbitrator's Immediate Family has or has had any other professional relationship with a party
or lawyer for a party, including:

(A) Arbitrator or a member of his/her Immediate Family is or, within the preceding 2 years, was an
employee of or expert witness or consultant for a party in the arbitration?             ( )  (4)
(B) Arbitrator or a member of his/her Immediate Family is or, within the preceding 2 years, was an
employee of or expert witness or consultant for a lawyer in the arbitration?          ( )  (¬)
(C) Arbitrator is, or, within preceding 2 years, was associated in the private practice of law with a
lawyer in the arbitration?  ? CRC Ethics Standards 7(d)(8).                   ( )  (¬)

8. Arbitrator or member of arbitrator's Immediate Family has a Financial Interest in a party?      ( )  (¬)
CRC Ethics Standards 7(d)(9).

The term "Financial Interest" according to Calif. Code of Civil Procedure § 170.5 means ownership of more
than a 1% legal or equitable interest in a party, or a legal or equitable interest in a party of a fair market value
in excess of $1,500, or a relationship as director, advisor or other active participant in the affairs of a party except
as follows: (1) Ownership in a mutual or common investment fund that holds securities is not a "financial interest"
in those securities unless the judge participates in the management of the fund. (2) An office in an educational,
religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization.
(3) The proprietary interest of a policyholder in a mutual insurance company, or a depositor in a mutual savings
association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the
proceeding could substantially affect the value of the interest.

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or
used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved*

Yes    No

9. Arbitrator or member of arbitrator's Immediate Family has a financial interest in the subject matter of the arbitration?  CRC Ethics Standards 7(d)(10).    ( )  (✓)

10. Arbitrator or member of arbitrator's Immediate Family has an interest that could be substantially affected by the outcome of the arbitration?  CRC Ethics Standards 7(d)(11).    ( )  (✓)

11. Arbitrator or member of arbitrator's Immediate or Extended Family has personal knowledge of disputed evidentiary facts relevant to the arbitration?  A person likely to be a material witness in the proceeding is deemed to have personal knowledge of disputed evidentiary facts.  CRC Ethics Standards 7(d)(12).    ( )  ( ✓ )

12. Is the arbitrator a member of an organization that practices invidious discrimination on the basis of race, sex, religion, national origin, or sexual orientation?
Membership in a religious organization, official military organization of the United States, or a nonprofit youth organization need not be disclosed unless it would interfere with the arbitrator's proper conduct of the proceeding or would cause a person aware of the fact to reasonably entertain a doubt concerning the arbitrator's ability to act impartially.  CRC Ethics Standards 7(d)(13).    ( )  (✓)

13. Is there any other matter that:
    (A) Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial?    ( )  (✓)
    (B) Leads the proposed arbitrator to believe there is a substantial doubt as to his or her capacity to be impartial, including, but not limited to, bias or prejudice toward a party, lawyer, or law firm in the arbitration?    ( )  (✓)
    (C) Otherwise leads the arbitrator to believe that his or her disqualification will further the interests of justice?  CRC Ethics Standards 7(d)(14).    ( )  (✓)

14. Is the arbitrator not able to properly perceive the evidence or properly conduct the proceedings because of a permanent or temporary physical impairment?  CRC Ethics Standards 7(e)(1).    ( )  (✓)

15. Are there any constraints on the arbitrator's availability known to the arbitrator that will interfere with his or her ability to commence or complete the arbitration in a timely manner?  CRC Ethics Standards 7(e)(2).    ( )  (✓)

16. Will the arbitrator entertain offers of employment or new professional relationships in any capacity other than as a lawyer, expert witness, or consultant from a party, lawyer in the arbitration, or lawyer or law firm that is currently associated in the private practice of law with a lawyer in the arbitration while that arbitration is pending, including offers to serve as a dispute resolution neutral in another case?  CRC Ethics Standards 7(b)(2).
**This disclosure constitutes a waiver of any further requirement to disclose offers of subsequent employment involving the same parties or lawyers or law firms.  (CRC Ethics Standards 12(b).)**    (X)  ( )

17. Does the arbitrator have any current arrangement with a party concerning prospective employment or other compensated service as a dispute resolution neutral or is he or she participating in or, within the last two years, has he or she participated in discussions regarding such prospective employment or service with a party?  CRC Ethics Standards 7(d)(6).
The arbitrator is a full-time dispute resolution neutral, working exclusively through JAMS.  You can assume that over the past two (2) years, the neutral or JAMS has been contacted by one or more of the attorneys in this case regarding prospective employment on another matter which may or may not have resulted in his or her selection.    (X) ( )

18. Has or will the arbitrator at any time, without the informed written consent of a party, enter(ed) into any professional relationship or accept(ed) employment in another matter in which information that s/he has received in confidence from a party by reason of serving as an arbitrator in a case is material?  CRC Ethics Standards 12(d)(2).    ( )  (✓)

19. In a binding arbitration of any claim for more than three thousand dollars ($3,000) pursuant to a contract for the construction or improvement of residential property consisting of one to four units, the arbitrator shall, within 10 days following his or her appointment, provide to each party a written declaration under penalty of perjury disclosing the following:    N/A _____

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved.*

(A) Whether the arbitrator or his/her employer or arbitration service had or has a personal or
professional affiliation with either party?

(B) Whether the arbitrator or his/her employer or arbitration service has been selected or designated
as an arbitrator by either party in another transaction?   CCP § 1281.95.

20. Has the arbitrator sought information about relationships or other matters involving his or her Immediate
Family, Extended Family living in his or her household, and former spouse? CRC Ethics Standards 9(b).       (X )   ( )
**Unless otherwise disclosed below, the arbitrator has made a general inquiry of his or family members
about their potential connection to matters that may be handled by the arbitrator. Those family
members have indicated they do not intend to provide the arbitrator with specific information or
answer specific inquiries. The arbitrator will advise the parties of any connections of which s/he is
independently aware by virtue of his/her direct knowledge and will make specific inquiries where so
warranted or specifically requested by a party. Otherwise, this satisfies the disclosure requirements of
Ethics Standard 9(b) and constitutes a waiver of any further requirement to make specific inquiry of family
members.**

**If the arbitrator has answered "yes" to any of the above questions, except questions 16, 17 and 20, s/he will explain
below and/or see attached rider:**

Question #:        Explanation:

-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------
-------------        -------------------------------------------------------------------------------------------------------------

**Declarations of Arbitrator:**

1. Having been nominated or appointed as an arbitrator, I have made a reasonable effort to inform myself of any matters that
could cause a person aware of the facts to reasonably entertain a doubt that as the proposed arbitrator I would be able to be
impartial. In addition, I have disclosed all such matters to the parties. CRC Ethics Standards 7(d).

2. With respect to any service commenced prior to July 1, 2002 by me as a dispute resolution neutral other than as an arbitrator
in another pending or prior case involving a party or lawyer in the current arbitration or a lawyer who is currently associated in
the private practice of law with a lawyer in the arbitration, I have sought the information from the dispute resolution provider
organizations administering those prior services and have disclosed all required information within my knowledge pertaining to
those services/relationships. CRC Ethics Standards 9.

3. I practice in association with JAMS. Each JAMS neutral, including me, has an economic interest in the overall financial
success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other
neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the
parties, counsel or insurers in this case and may do so in the future.

4. My responses to the questions above are true and correct to the best of my knowledge, and I realize that my response to
question # 19 above is declared under penalty of perjury.

Date: _____        Signature of Arbitrator: _____

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or
used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved.*

**Important Note Regarding Consumer Arbitration:**

Based on the parties' written submissions it is the arbitrator's and JAMS' understanding that this:

IS <u>NOT</u> a Consumer Arbitration     ( )

<u>IS</u> a Consumer Arbitration     (X)
See "Supplemental Arbitrator Disclosure for Consumer Arbitrations."

**As defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):**

      "Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

(1)     The contract is with a consumer party, as defined below;

(2)     The contract was drafted by or on behalf of the non-consumer party; and

(3)     The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

(1)     An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

(2)     An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

(3)     An individual with a medical malpractice claim that is subject to the arbitration agreement; or

(4)     An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

3/31/03

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved.*



**THE RESOLUTION EXPERTS**

## SUPPLEMENTAL ARBITRATOR DISCLOSURE FOR CONSUMER ARBITRATIONS

**Supplemental Arbitrator Disclosure Checklist pursuant to:**
• California Rules of Court Ethics Standards for
Neutral Arbitrators in Contractual Arbitration
(hereinafter "CRC Ethics Standards"), Standard 7(b)(12)

Case Title: Carr, Anita B. vs Liberty Life Assurance
Company, et al.
JAMS Ref. #: 1100048706
Panelist Name: Eugene F. Lynch
Checklist supplements disclosure reports 16A & 16C.

"Consumer Arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed as (1) through (3) below. Specifically excluded from this definition are arbitration proceedings conducted under or arising out of public or private sector labor-relation laws, regulations, charter provisions, ordinances, statutes or agreements.

    (1) Contract is with a consumer party
    (2) Contract was drafted by or on behalf of the non-consumer party; and
    (3) Consumer party was required to accept the arbitration provision in the contract. CRC Ethics Standards 2(d).

"Consumer party" is a party to an arbitration agreement who is any of the following:

    (1)  Individual who seeks or acquires, included by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in Cal. Civil Codes § 1761.
    (2) Individual who is an enrollee, subscriber, or insured in a health-care service plan within the meaning of Cal. Health & Safety Code § 1345 or health-care insurance plan within the meaning of Cal. Insurance Code § 106.
    (3) Individual with a medical malpractice claim that is subject to the arbitration agreement; or
    (4) Employee or applicant for employment in a dispute arising out of or relating to the employee's employment or applicant's prospective employment that is subject to the arbitration agreement.  CRC Ethics Standards 2(e).

|  | Yes | No |
|---|---|---|
| 1. Is a party, a lawyer in the arbitration or law firm with which a lawyer in the arbitration is currently associated a member of the provider organization? CRC Ethics Standards 8(b)(1)(A). | ( ) | (X) |
| 2. Within the preceding 2 years has the provider organization received a gift, bequest, or favor from a party, lawyer in the arbitration, or law firm with which a lawyer in the arbitration is currently affiliated? CRC Ethics Standards 8(b)(1)(B). | ( ) | (X) |
| 3. Has the provider organization entered into, or does the arbitrator currently expect that the provider organization will enter into, an agreement or relationship with any party or lawyer in the current arbitration or a law firm with which a lawyer in the current arbitration is currently affiliated under which the provider organization will administer, coordinate, or provide dispute resolution services in other matters or will provide other consulting services for that party, lawyer or law firm? CRC Ethics Standards 8(b)(1)(C).<br>**JAMS is a nationwide provider of ADR services and is often written into contracts and agreements as an ADR provider. You may assume that one or more of the parties or lawyers involved in this case currently names or has named JAMS as an ADR provider in contracts.** | (X) | ( ) |
| 4. Is the provider organization coordinating, administering, or providing dispute resolution services or has the provider organization coordinated, administered, or provided such services in another pending or prior case in which a party or lawyer in the current arbitration was a party or lawyer? CRC Ethics Standards 8(b)(1)(D). | (X) | ( ) |

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved*

5. If a relationship or affiliation is disclosed above, the arbitrator must also provide information about the following:

(A) Any financial relationship or affiliation the arbitrator has with the provider organization other than receiving referrals of cases? CRC Ethics Standards 8(c)(1).
Please be advised that some JAMS panelists are shareholders of JAMS, Inc., a nationwide ADR provider. All JAMS panelists share in the professional fees paid to JAMS for the cases over which the panelist presides. Is the arbitrator a shareholder panelist?                    ( )  ( )

(B) JAMS' process and criteria for recruiting, screening, and training the panel of arbitrators from which the arbitrator in this case is to be selected involves the following: CRC Ethics Standards 8(c)(2).
JAMS seeks to recruit full time ADR neutrals who have a reputation in their local legal communities as experienced, fair professionals. All JAMS neutrals practice exclusively with JAMS. They are required to take internal mediation and arbitration skills workshops, presented on at least a semi-annual basis. In addition, JAMS offers regular training sessions for its neutrals on developments in the law, ethical issues and mediation and arbitration skills. Instruction is provided by experienced JAMS neutrals, law professors and experienced ADR trainers.

(C) JAMS' process for identifying, recommending, and selecting potential arbitrators for specific cases involves the following: CRC Ethics Standards 8(c)(3).
JAMS employs Case Managers in each of its offices. They handle each arbitration by first gaining an understanding of the nature of the case, either by reviewing the submission documents, or by speaking with counsel for the parties to the dispute. Based on the nature of the case, they recommend neutrals who have the skill and experience in the subject matter presented, have the time and geographical availability and who meet any other qualification defined by the parties. To aid their recommendations, Case Managers provide biographical material concerning each neutral, solicit feedback from other clients concerning the neutral's effectiveness in particular case types, and review the recommendations with their local managers. In some cases, they consult with members of JAMS National Arbitration Committee to ensure that the best qualified neutrals are recommended for each arbitration.

(D) JAMS' National Arbitration Committee from time to time may be called upon by parties in ruling on requests for disqualification of the arbitrator. In such instances, all parties are requested to submit their arguments in writing to JAMS' National Arbitration Committee prior to determination. CRC Ethics Standards 8(c)(4).

6. If the total of the cases disclosed under question 5 (pursuant to CRC Ethics Standard 8(b)(1) is greater than 5, the arbitrator must state (i) the number of pending cases in which the provider organization is currently providing each type of dispute resolution services; (ii) the number of prior cases in which the provider organization previously provided each type of dispute resolution services; (iii) the number of such prior cases in which a neutral affiliated with the provider organization rendered a decision as an arbitrator, a temporary judge, or a referee; and (iv) the number of prior cases in which the party to the current arbitration or the party represented by the lawyer in the current arbitration was the prevailing party. CRC Ethics Standards 8(b)(1)(D)(3).

**Declarations of Arbitrator:**

With respect to the above consumer arbitration disclosure questions, I have sought the required information from the dispute resolution provider organization administering those services and have disclosed all information within my knowledge pertaining to the relationships between the provider organization and the parties and lawyers in the arbitration. CRC Ethics Standards 9(c)(1) and (2). I was not able to obtain the following category of information from the provider organization:

----------------------------------------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------------------------------------

Date:_____        Signature of Arbitrator:_____

*This Disclosure Checklist and related material are the copyrighted property of JAMS. They cannot be copied, reprinted or used in whole or in part in any way without written permission of JAMS. © JAMS 2003. All rights reserved.*



# THE STATE BAR
# OF CALIFORNIA

**OFFICE OF SPECIAL ADMISSIONS & SPECIALIZATION**

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA 94105-1639

TEL.: (415) 538-2100

CARED Exhibit

## OUT-OF-STATE ATTORNEY ARBITRATION COUNSEL
## THE STATE BAR OF CALIFORNIA
## CERTIFICATE REGISTRATION VERIFICATION

This is to certify that the undersigned is the Custodian of Out-of-State Attorney Arbitration Counsel Records of the State Bar of California's Office of Special Admissions and Specialization; has made a diligent search of the records and has failed to find any record showing that any person by the name of Steven P. Krafchick, has served, The State Bar of California's Office of Special Admissions and Specialization with a Certificate of Out-of-State Attorney Arbitration Counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: February 19, 2009          By: 

Aurora V. Meredith
Custodian of Records



The State Bar of California
**Office of Special Admissions/Specialization**
180 Howard Street · San Francisco, CA 94105-1639
(415) 538-2111 · osaac@calbar.ca.gov

CARE 

FOR OFFICIAL USE ONLY

File No. _____

9.43

## Certificate of Out-of State Attorney Arbitration Counsel (OSAAC)
## California CCP §1282.4 and California Rules of Court Rule 9.43

There are two steps to this process and all fields <u>must</u> be completed.

---

**Instructions.** (1) <u>**One**</u> Certificate must be completed and signed by <u>**each**</u> out-of-state attorney ("Applicant"). This Certificate must be served on all parties and counsel in the arbitration whose addresses are known to the Applicant, the arbitral forum and the State Bar of California (at the address above together with a non-refundable processing fee of $50 in the form of a check made payable to the State Bar of California.) (2) If the Arbitral forum or arbitrator(s) approve(s) the appearance of the Applicant, the Applicant must serve a copy of this Certificate bearing such written approval on all other parties and counsel in the arbitration whose addresses are known to the Applicant and file the <u>original</u> Certificate with the State Bar of California at the address above. Service must comply with California Code of Civil Procedure Section 1013a.

---

## I. APPLICATION FOR CERTIFICATE

1. Arbitral Forum (or name of arbitrator(s)): _____

2. Address of Arbitral Forum (or arbitrators(s)): _____

   City: _____ State: _____ Zip: _____ + _____

3. a) Arbitration Case Number: _____ ; <u>and</u>

   b) Arbitration Name (or names of parties): _____

4. Street Address of Arbitration Hearing Site in <u>California</u>: _____

   City: _____ State: _____ Zip: _____ + _____

5. Name of Out-of-State Attorney ("Applicant"): _____

6. Applicant's Firm Name: _____

   Applicant's Office Address: _____

   City: _____ State: _____ Zip: _____ + _____

   Phone: (_____) _____-_____ Fax: (_____) _____-_____ E-mail: _____

7. Applicant's Residence Address: _____

   City: _____ State: _____ Zip: _____ + _____

8. a) Bar Number of Active State Bar of California Attorney of Record Associating with Applicant: _____

   b) Name of California Attorney of Record: _____

9. Address of California Attorney of Record: _____

   City: _____ State: _____ Zip: _____ + _____ Phone: (_____) _____-_____

OSAAC Certificate 2008-3

10. All courts before which Applicant has been admitted to practice and is in good standing. Attach additional sheets if necessary.

| Date Admitted | State/Court (e.g. Ohio, 9th Circuit, etc.) | Status (e.g. Active) |
|---|---|---|
| | | |
| | | |

11. All applications by Applicant to appear in California courts as counsel pro hac vice or out-of-state arbitration counsel in the last 2 years from the date of this application. Attach additional sheets if necessary.

| Date | Case Name (or Names of Parties) | Court or Forum | Result (Granted/Denied) |
|---|---|---|---|
| | | | |
| | | | |

12. If Applicant has made repeated appearances, list any special circumstances warranting Applicant's appearance in this arbitration. _____

_____

13. Applicant represents that Applicant: (i) is not currently on suspension or disbarred from the practice of law before any court; (ii) is not a resident of the State of California, (iii) is not regularly employed in the State of California; and (iv) is not regularly engaged in substantial business, professional or other activities in the State of California.

14. Applicant agrees to be subject to the jurisdiction of the courts of the State of California with respect to the law of the State of California governing the conduct of attorneys to the same extent as a member of the State Bar of California.

***Applicant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this certificate is executed on:***

Date: _____        Applicant's Signature: _____

*(CERTIFICATE BEARING ORIGINAL SIGNATURE IS REQUIRED – COPY WILL NOT BE ACCEPTED)*

## II. APPROVAL/DISAPPROVAL OF ARBITRAL FORUM/ARBITRATOR

*(Certificate bearing original signature must be returned to Applicant – copy will not be accepted)*
*(Applicant: Certificate bearing original signature of Arbitral Forum/Arbitrator must be returned to the State Bar)*

Subject to the provisions of California Code of Civil Procedure ("CCP") Section 1282.4 and applicable law, Applicant's appearance in the arbitration matter referenced in Section 1 above is **(check one)** ☐ approved or ☐ disapproved.*

Approved By: _____
          (signature)
Name: _____
     (print or type)
Title: _____

Date: _____

* Note that CCP Section 1282.4 states that, in the absence of special circumstances, repeated appearances shall be grounds for disapproval of the appearance and disqualification from serving as an attorney in the arbitration for which the Certificate was filed. Also, failure within a reasonable period of time to serve this Certificate on all other parties and counsel in the arbitration whose addresses are known to the Applicant and file the Certificate with the State Bar of California shall be grounds for disapproval of the appearance and disqualification from serving as an attorney in the arbitration for which the Certificate was filed. An applicant is not an Out-of-State Arbitration Counsel until approved, and the application is not complete until such approval is sent to the State Bar.

OSAAC Certificate 2008-3

JAMS Indicated in

Copy of Providian Credit Card Agreement w/ Consumer

**Finance Charges.** Except as described in the Grace Period for Purchases section of this Agreement, finance charges begin to accrue on a debit when it is included in one of your daily balances and continue to accrue until that balance is reduced by a payment or credit. Your Account has two daily balances: the Purchase Balance, which consists of purchases you make with your Card and fees for certain optional services; and the Cash Advance Balance, which consists of all cash advances. Any payment amount we receive that exceeds the finance charges and fees then due will ordinarily be applied first to the Balance with the lowest ANNUAL PERCENTAGE RATE (APR), until that Balance is zero, and then to the remaining Balance. We reserve the right to apply payments differently without further notice. The Purchase and Cash Advance Balances are reduced by payments as of the date received, and by credits (except for reversals of late, overlimit, and miscellaneous charges) as of the date posted. Purchases are included in your Purchase Balance as of the date made. Cash advances are included in your Cash Advance Balance as follows: cash advances from other financial institutions and through Automated Teller Machines, as of the date made; funds electronically transmitted, as of the date transmitted; cash advance checks made payable to you that are identified as cashier's checks that we may mail to you at your request, as of seven days after the date we print on the check; all other checks, including any convenience checks, as of the date presented to us. Other debits (except for late, overlimit, finance, and miscellaneous charges) are included in your Purchase or Cash Advance Balance as of the date posted. Finance charges are added to your Purchase and Cash Advance Balances each day and are then posted on the last day of the billing cycle.

To figure the daily finance charge for purchases and the daily finance charge for cash advances, we start with your previous day's Purchase Balance and Cash Advance Balance, and all debits and subtract all credits for the current day to the applicable Balance (as explained in the paragraph above), and multiply the net amount by the applicable daily periodic rate (see following paragraphs). The finance charge for your Purchase Balance, and the finance charge for cash advances is then added to and included in that day's Purchase Balance, and the finance charge for cash advances is then added to and included in that day's Cash Advance Balance. We treat a credit balance for any day as zero. We determine the total finance charges on your balances for the billing cycle by

adding together the finance charge for purchases for each day within the billing cycle and the finance charge for cash advances for each day within the billing cycle. In calculating finance charges, an adjustment will be made for any transaction or payment that would have affected the finance charge calculation in a prior billing cycle had it been posted in that cycle. The applicable daily periodic rate for such a transaction will be the rate in effect for the current billing cycle rather than the rate in effect on the date of the transaction.

The term "Prime Rate" as used in this Agreement means the Prime Rate published in The Wall Street Journal on the first business day of the previous calendar month. Any increase or decrease in the APR will take effect on the first day of your billing cycle and may result in a slight increase or decrease in the amount of your minimum payment.

For the first two monthly billing cycles your Account is open (the "Introductory Period"), the ANNUAL PERCENTAGE RATE for purchases is 1.9%, corresponding to a daily periodic rate of 0.0052%. If your minimum payment is received late once during the Introductory Period, the Introductory Period will end. After the Introductory Period, the ANNUAL PERCENTAGE RATE for purchases may vary and will be adjusted each billing cycle to 12.24% above the Prime Rate. Using this formula, the APR for purchases is 16.99% as of March 2002, corresponding to a daily periodic rate of 0.0465%.

The ANNUAL PERCENTAGE RATE for cash advances is 23.99%, corresponding to a daily periodic rate of 0.0657%.

If your Account payments are ever late during any Introductory Period, all Introductory Periods will end and the APR on your balances for purchases will adjust to 16.99%, which is 12.24% above the Prime Rate (corresponding to a daily periodic rate of 0.0465%). If your Account payments are late two or more times in any 6-month period, the APR for all your balances will adjust to 25.99% (corresponding to a daily periodic rate of 0.0712%) (the "Delinquency APR"). If, after your Account is adjusted to the Delinquency APR, your Account payments are received on time and you meet all the terms in this Account Agreement for 12 consecutive months, your Account will automatically revert to the APRs that were in effect prior to the adjustment to the Delinquency APR.

To determine the average daily balance shown on statement for purchases, add each day's Purchase Balance (including daily finance charge) in the billing cycle (including daily finance charge) in the billing cycle. To divide by the number of days in the billing cycle. To mine the average daily balance shown on your statement for cash advances, add each day's Cash Advance Balance (including daily finance charge) in the billing cycle divide by the number of days in the billing cycle. You multiply each of these average daily balances by the ber of days in the billing cycle and by the applicable periodic rate to obtain subtotals, and then add the subtotals together to determine the total amount of finance charges on your balances for the billing cycle. If a advance transaction fee (see the Fees section), e: delivery fee, credit line increase fee, or PaySmart℠ charged, that amount is also a FINANCE CHARGE.

**Grace Period for Purchases.** New purchases post your Account in billing cycles with no previous bal or when the previous balance was fully paid durin cycle, do not begin to incur a finance charge unt start of the next billing cycle. You will pay no fi charge on such new purchases if you pay the total balance in full by the payment due date shown on statement. New purchases posted in any other b cycle incur a finance charge, and there is no peri which such purchases may be repaid without incurr finance charge.

**Fees.** If you request and we issue an additional Ca your Account for an authorized user, a fee of $20 for additional Card will be charged to your Account. Th will be charged to your Account when the additi Card is issued and every 12 months thereafter for a: as each additional Card is outstanding. If you re and use our Express Card Service, a one-time f $19.95 will be charged to your Account. in some express processing may not be available. We will c your Account $29 for each Card you ask us to req each returned payment check; each check you wri your Account that we return unpaid; each stop pay order or renewal of such an order; and each billing within which your balance exceeds your credit line if your Account is closed. We may charge your Acco late fee for each billing cycle in which you fail to ma least the minimum payment by the payment due The amount of the fee will be determined as fol $15 on balances less than $100; $25 on balances

CARR F Exhibit

Case 3:04-cv-01047-HES-TEM   Document89-1-2   Filed 10/04/2004   Page 39 of 49
Case3:05-cv-03190-TEH   Document89   Filed02/25/09   Page3 of 6
Page 3 of 6

$100 or less than $1,000; and $35 on balances of $1,000 or more. The balance used to determine the amount of the late fee will be the new balance shown on your billing statement for which a minimum payment was due but not received by the payment due date. If you request copies of billing statements that were first sent to you more than two months earlier, we may charge a handling fee of $2 for each such copy. A cash advance fee of 3% (minimum $5), which is a FINANCE CHARGE, may be charged for each cash advance transaction made on your Account. If you accept a credit line increase, you may be charged a fee of $29 to $99, which is a FINANCE CHARGE; the amount will be disclosed to you before you accept the line increase offer. If you request a single payment by phone or online from your personal checking account to your Providian credit card account, a fee of $9.95 may apply. This fee is a FINANCE CHARGE and will apply even if the payment is returned for non-sufficient funds.

Default. You will be in default if any information you provided us proves to be incomplete or untrue; if you do not comply with any part of this Agreement; upon your death, bankruptcy, or insolvency; if you do not pay other debts when due; if a bankruptcy petition is filed by or against you; or if we believe in good faith that you may not pay or perform your obligations under this Agreement. If you are in default, we may, without further demand or notice, cancel your credit privileges, declare your Account balance immediately due and payable, and use any remedy we may have. In the event of your default, the outstanding balance on your Account shall continue to accrue interest at the APR(s) disclosed in the Finance Charges section of this Agreement, even if we have filed suit to collect the amount you owe.

Credit Line. Your credit line and cash advance line are specified from time to time in a separate notice. Your cash advance line is limited to a portion of your credit line. We may increase or decrease your credit line and/or your cash advance line based on information we obtain from your your credit records. Your available credit for purchases normally the difference between your credit line and your Account balance (including transactions made or authorized but not yet posted). Your available credit for a cash advance is normally the difference between your cash advance line and your Cash Advance Balance or the difference between your credit line and your Account bal-

ance, whichever is less. If you send us a large payment, we may limit your available credit while we confirm that the check will clear. For certain transactions, available credit may be less. You will not use your Account for, and we may refuse to honor, any transaction that would cause you to exceed your available credit or your available credit for cash advances.

Promise to Pay. You promise to pay us when due all amounts borrowed when you or someone else uses your Account (even if the amount charged exceeds your permission), all other transactions and charges to your Account, and collection costs we incur, including, but not limited to, reasonable attorney's fees and court costs. (If we sue you to collect the debt and you win the suit, we will pay your reasonable attorney's fees and court costs.)

Changes. After we provide you any notice required by law, we may change any part of this Agreement and add or remove any terms, conditions, or requirements. If a change is made to the Finance Charges section of this Agreement, the new finance charge calculation will apply to your entire Account balance from the effective date of the change. Changes will apply to balances that include items posted to your Account before the date of the change, and will apply whether or not you continue to use the Account.

Foreign Exchange/Currency Conversion. If you use your Card for transactions in a currency other than U.S. dollars, the transactions will be converted to U.S. dollars, generally using either a (i) government-mandated rate or (ii) wholesale market rate in effect the day before the transaction is processed, increased by 3%. If a credit is subsequently given for a transaction, it will be decreased by the same percentage. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card. You agree to accept the converted amount in U.S. dollars.

The Card; Cancellation. You may cancel your credit privileges at any time by notifying us in writing and destroying the Card(s). Upon the Card expiration at the end of the month shown on it, we reserve the right not to renew the Card. We may cancel the Card and your credit privileges at any time after 30 days notice to you, or without notice if permitted by law. If your Card is canceled or not renewed, finance charges and other fees will continue to be assessed, payments will continue to be due,

and all other applicable provisions of this Agreement remain in effect. If you terminate your credit privileges, if we cancel or do not renew the Card, you may no longer write checks on your Account, and you should destroy any unused checks we may have issued to you.

Personal Information; Documents. You will provide at least 10 days notice if you change your name, home mailing address, telephone numbers, employment, income. Upon our request, you will provide us additional financial information. We reserve the right to obtain information from others, including credit reporting agencies, and to provide your address and information about your Account to others. We may also share information with our business affiliates. However, you may write to us at any time instructing us not to share credit informat with our affiliates. If you do not fulfill your obligation under this Agreement, a negative credit report to may reflect on your credit may be submitted to credit reporting agencies.

Customer Service; Unauthorized Use, Loss, or Theft. Checks or the Card. Each Card must be signed receipt. You are responsible for safeguarding the Card your Personal Identification Number (PIN), which provides access to Automated Teller Machines, and checks issued to you from theft, and keeping your P separate from your Card. If you discover or suspect t the Card, PIN, or any unused checks are lost or stolen that there may be an unauthorized transaction on your Account, you will promptly notify us by calling Customer Service number on your statement or the back of your Card. So we can immediately act to limit los and liability, you will phone us even though you may notify us in writing. Your liability for unauthorized occurring before you notify us is limited to $0. If report or we suspect unauthorized use of your Accou we may suspend your credit privileges until we resolve t problem to our satisfaction or issue you a new Ca If your Card is lost or stolen, you will promptly dest all checks that may be in your possession. To impr customer service and security, you agree that your c may be monitored or recorded.

Merchant Relations. We will not be liable if any per or Automated Teller Machine refuses to honor the C or accept your checks, or fails to return the Card to y We have no responsibility for goods and servi

purchased with the Card or checks except as required by law. (See Special Rule below.) Certain benefits that are available with the Account are provided by third-party vendors. We are not responsible for the quality, availability, or results of any of the services you choose to use.

**Stop Payment Orders.** If you wish to stop payment on a check, you may send us a stop payment order by writing to us at our address for Customer Service listed on your statement. You can make a stop payment order orally by calling the number listed on your statement. When you make a stop payment order, you must provide your Account number and specific information about the check: the exact amount, the date on the check, the name of the party to whom it was payable, the name of the person who signed it, and the check number. You will be asked to confirm an oral stop payment order in writing. We may disregard your oral order if we do not receive a signed written confirmation within two weeks after the oral order, or if we have not received an adequate description of the item so that payment can be stopped. The order will not be effective if the check was paid by us before we had a reasonable opportunity to act on the order. We may, without liability, disregard a written stop payment order six months after receipt unless it is renewed in writing.

**Standard of Care.** Because this Account involves a credit card and may involve check transactions that are processed through separate national systems before the transactions are consolidated by us, and because not every check and Card slip will be sent to us, transactions in your Account will be processed mechanically without our necessarily reviewing every item. Our processing system will call our attention to certain items, which we will examine. We will examine all transactions when you report that your Card or any checks have been lost or stolen. We do not intend ordinarily to examine all items, and we will not be negligent if we do not do so. This rule establishes the standard of ordinary care that we in good faith will exercise in administering your Account. Because of our limited review, and because neither your canceled checks nor Card transaction slips will be returned to you with the monthly statement, you should be careful to enter all checks in your check register or otherwise keep a record of them. You should also save your credit card cash advance and purchase slips. You agree to check your monthly statements

8

against your record and to notify us immediately of an unauthorized transactions or errors.

**Waiver of Certain Rights.** We may delay or waive enforcement of any provision of this Agreement without losing our right to enforce it or any other provision later. You waive: the right to presentment, demand, protest, or notice of dishonor; any applicable statute of limitations and any right you may have to require us to proceed against anyone before we file suit against you.

**Applicable Law; Severability; Assignment.** No matter where you live, this Agreement and your Account are governed by federal law and by New Hampshire law. This Agreement is a final expression of the agreement between you and us and may not be contradicted by evidence of any alleged oral agreement. If any provision of this Agreement is held to be invalid or unenforceable, you and we will consider that provision modified to conform to applicable law, and the rest of the provisions of the Agreement will still be enforceable. At any time we determine in good faith that any proposed or enacted legislation, regulatory action, or judicial decision, has rendered or may render any material provisions of this Agreement invalid or unenforceable, or impose any increased tax, reporting requirement, or other burden in connection with any such provision or its enforcement, we may, after at least 30 days notice to you, or without notice if permitted by law, cancel the Card and/or your credit privileges. We may transfer or assign our right to all or some of your payments. If state law requires that you receive notice of such an event to protect the purchaser or assignee, we may give you such notice by filing a financing statement with the state's Secretary of State.

**Notices.** Other notices to you shall be effective when deposited in the mail addressed to you at the address shown in our records, unless a longer notice period is specified in this Agreement or by law, which period shall start upon mailing. Notice to us shall be mailed to our address for Customer Service on your statement (or other addresses we may specify) and shall be effective when we receive it.

---

**Your Billing Rights—**
**Keep This Notice for Future Use**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

9

## Notify Us in Case of Errors or Questions About Your Bill

If you think your bill is wrong, or if you need more information about any transaction on your bill, write us, on a separate sheet, at our address listed in the Billing Rights Summary on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following:

— Your name and Account number.

— The dollar amount of the suspected error.

— A description of the error and an explanation, if possible, of why you believe there is an error. If you need more information, describe the item you are not sure about.

### Your Rights and Our Responsibilities After We Receive Your Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct. After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charge related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up the missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you question your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is. If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of the property or services that you purchased with our credit card and you

10

have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the property or services. There are two limitations on this right: (a) you must have made the purchase in your home state, or if not within your home state, within 100 miles of your current mailing address; and (b) the purchase price must have been more than $50. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

## ARBITRATION PROVISION

Arbitration is a method of deciding disputes outside the court system. This Arbitration Provision (the "Provision") governs when and how any disputes you and we may have will be arbitrated instead of decided in court.

**Certain Definitions:** Certain words used in this Provision have special meanings:

"We," "us," and "our" mean Providian National Bank or Providian Bank (the "Bank") and also include: (1) the Bank's parent company, Providian Financial Corporation (the "Parent Company"); (2) all companies owned or controlled by the Parent Company or the Bank, including First Select Corporation; (3) any prior issuer of a credit account that we have acquired; (4) any company to which we transfer our rights under this Account Agreement (the "Agreement"); and (5) all of the employees or other individuals who manage these companies. Finally, if either you or we elect to arbitrate any Claim you bring against us, these terms include any other persons or companies whom you make Claims against in the same proceeding.

"Claim" means any dispute between you and us that arises as a result of or has anything at all to do with: (1) your Account; (2) the events leading up to your becoming an accountholder; (3) this Agreement; (4) any prior credit account or agreement relating to such account; or (5) your relationship with us. This includes disputes relating to any products, insurance, or other services offered to you as an accountholder. This includes disputes about whether this Provision is valid or binding or about whether or when it applies. It includes disputes relating to constitutional provisions; statutes; ordinances; regulations; case law; compliance with the Agreement or any agreement related to any prior credit account; and wrongful acts of every type (whether intentional; fraudulent; reckless; or just negligent). It includes requests for money, for orders requiring you or us to

11

ke certain actions (which are sometimes referred to as injunctive relief"), and for any other kind of relief. This Provision applies to Claims that arise prior to, on, or after the opening of your Account.

"**Administrator**" means the National Arbitration Forum, the American Arbitration Association, or JAMS. These companies administer arbitration proceedings. The arbitrator will be selected under the Administrator's Rules. You can select the Administrator if you give us written notice of your selection with your notice that you are electing to arbitrate any Claim or within 20 days after we give you notice that we are electing to arbitrate any Claim. If you do not select the Administrator on time, we will select one. If for any reason the Administrator you've select is unable or unwilling to serve or continue to serve as Administrator, you will have 20 days to select a different administrator.

**Starting an Arbitration:** You or we can give written notice of an intention to begin arbitration of a Claim or claims or to require arbitration of the other party's Claim or claims. This notice can be given by one party even if the other party has begun a lawsuit. If such a notice is given, any claim will be resolved by arbitration under this Provision and the Administrator's Rules that are in effect at the time the Claim is filed with the Administrator. The arbitrator must be a lawyer with more than 10 years experience or a retired judge. A copy of the Claim form may be obtained from the Administrator or from us. A party who has asserted a Claim in a lawsuit may still elect arbitration with respect to any Claim that is later asserted in the same lawsuit by any other party. All doubts about whether to arbitrate a Claim shall be resolved in favor of arbitration.

We will not elect to arbitrate an individual Claim that you bring against us in "small claims" court. However, we may elect to arbitrate a "small claims" court Claim that is later sent or appealed to any different court.

**Important Limitations**

IF YOU OR WE ELECT TO ARBITRATE A CLAIM, YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM. ALSO, YOUR ABILITY TO OBTAIN INFORMA-TION FROM US AND TO APPEAL IS MORE LIMITED IN AN ARBITRATION THAN IN A LAWSUIT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRA-TION. THE FEES CHARGED BY THE ADMINISTRATOR

12

MAY BE HIGHER THAN THE FEES CHARGED BY A COURT. THE SAME LIMITATIONS ALSO APPLY TO US.

IN ADDITION, IF YOU OR WE ELECT TO ARBI-TRATE A CLAIM: (1) NEITHER YOU NOR ANYONE ELSE ON YOUR BEHALF CAN PURSUE THAT CLAIM IN COURT IN A CLASS OR REPRESENTATIVE ACTION (SUCH AS A PRIVATE ATTORNEY GEN-ERAL ACTION); (2) NEITHER YOU NOR ANYONE ELSE ON YOUR BEHALF CAN PURSUE THAT CLAIM IN THE ARBITRATION ON A CLASS-WIDE OR REPRESENTATIVE (SUCH AS A PRIVATE ATTORNEY GENERAL) BASIS; AND (3) CLAIMS BROUGHT BY OR AGAINST ONE ACCOUNTHOLDER (OR JOINT ACCOUNTHOLDERS) MAY NOT BE BROUGHT TOGETHER WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER ACCOUNTHOLDER.

**Arbitration Location and Costs:** Any arbitration hearing that you attend will take place in the federal judicial district where you live. If you cannot afford to pay the fees charged by the Administrator and the arbitrator or if you believe that such fees are too high, we will consider any reasonable written request by you for us to pay the fees. We will pay any fees or expenses we are required to pay by law. You will never be required to pay us any fees we have previously paid to the Administrator. Each party must bear the expense of that party's attorneys, experts, and witnesses, regardless of who wins the arbitration, except to the extent that applicable law or the Administrator's Rules provide otherwise.

**Governing Law:** This Agreement involves interstate commerce and this Provision is governed by the Federal Arbitration Act ("FAA"), United States Code, Title 9, Sections 1 and following. The arbitrator must follow: (1) the FAA; (2) the substantive law, consistent with the FAA, related to any Claim; (3) statutes of limitations; and (4) claims of privilege recognized at law. Upon the timely request of either party, the arbitrator must provide a brief written explanation of the basis for the award. The arbitrator will determine the rules of procedure and evidence to apply, consistent with the FAA, the Administrator's Rules, and this Provision. The arbitrator shall not apply federal, state, or local rules of procedure and evidence or state or local laws concerning arbitration proceedings.

**Obtaining Information:** After an arbitration has been started, in addition to a party's right to obtain information from the other party under the Administrator's Rules, either

13

party may request the arbitrator in writing to allow that pe to obtain more information from the other party. A copy such request must be provided to the other party. That pa will then have the chance to object in writing wi 30 days. The objection must be sent to the arbitrator and other party. The arbitrator will decide the issue, in his or sole discretion, within 20 days after any objection to prov ing expanded information is submitted.

**Effect of Arbitration Award:** Any appropriate court n enter judgment upon the arbitrator's award. The arbitra decision will be final and binding, except for any appeal ri under the FAA and except for Claims involving more th $100,000. For these large Claims, any party may appeal award to a three-arbitrator panel appointed by Administrator. That panel will consider all over again part of the initial award that any party asserts was inc rectly decided. The decision of the panel will be by major vote and will be final and binding, except for an app right under the FAA. Unless applicable law provides oth wise, the fees charged by the Administrator and the arbit tors for such an appeal will be paid by the appealing pa regardless of who wins the appeal. However, we will c sider any reasonable written request by you for to pay such fees. All other provisions of this Provision shall apply any appeal to a three-arbitrator panel, and any reference this Provision to a single arbitrator shall apply to three-arbitrator panel.

**Continued Effect of Arbitration Provision:** T Provision will remain in force no matter what happens you or your Account. For example, it will remain in fo even if: (1) your credit privileges are ended or put on ho (2) you close your Account; (3) you repay your ent Account balance; (4) we begin a lawsuit to collect mon we think you owe; or (5) you become bankrupt or involv or a bankruptcy or insolvency proceeding is begun by to extent consistent with applicable bankruptcy law. If any p tion of this Provision cannot be enforced for any reason, rest of this Provision will continue to apply. In the event any conflict or inconsistency between this Provision on t one hand, and the Administrator's Rules or other provisi of this Agreement, on the other hand, this Provision v govern.

**Contacting Arbitration Administrators**

If you have a question about the arbitration compan who may serve as Administrator, would like to obtain

14

of their arbitration rules or fee schedules, or would like iim form, you can contact them as follows: National tration Forum, P.O. Box 50191, Minneapolis, MN 5, *www.arb-forum.com*, 1-800-474-2371, request the of Procedure; American Arbitration Association, Madison Avenue, New York, NY 10017, *www.adr.org*, st the Arbitration Rules for the Resolution of umer-Related Disputes (for Claims under $10,000) or mercial Arbitration Rules (for all other Claims); S, 45 Broadway, 28th floor, New York, NY 10006, *jamsadr.com*, request the Financial Services Arbitration Rules and Procedures. You may also obtain copies of the and Claim forms of the Administrators by calling mer Service.

15

# PROVIDIAN NATIONAL BANK
# VISA* ACCOUNT AGREEMENT

Please review this document and keep it with your other important papers. This Account Agreement contains the terms that govern your Visa card account with Providian National Bank. Your Visa credit account (the "Account") allows you to make purchases by using your Visa credit ca... (the "Card") wherever it is honored and to get cash advances from us or any other participating financial institution and from Automated Teller Machines. Convenience checks may also be provided to you as a additional way to use the Account. In this Agreement "you" and "your" mean each person for whom we have opened a credit card Account. "We," "our," "ours," and "us" mean Providian National Bank, or its assignees, as listed on your billing statement. The Account may be used only for personal, family, household, and charitable purposes, not for any business or commercial purpose. Any use of the Account shall constitute acceptance of the terms of this Agreement. You and we agree as follows:

Payments. You will receive a monthly statement showing your outstanding balance. Payment on this Account is required in U.S. dollars (checks must be payable at a U.S. office of the bank the check is drawn on) for at least the payment due as shown on your statement by the payment due date in accordance with payment instructions on your monthly statement. Convenience checks and other checks we may issue to you may nor be used to make payments on your Account or to make payments on any other account you have with us or our affiliates. The payment due will be 3% of the new balance shown on your statement plus the amount of any past due payment, and may also include the amount by which the new balance exceeds your credit line. However, the payment due will not be less than $15 (unless your new balance is less than $15, in which case the payment due will be the amount of the new balance). If your Account is past due or above the credit line, we may require a higher minimum payment, but we will notify you before doing so. If your payment is more than the payment due, it will be treated as a single payment and none of it will be applied to future payments due. We may accept late or partial payments, or payments marked "paid in full" or marked with other restrictions, without losing our right to collect all amounts owing under this Agreement.

3/02
R6448
F01-1477-8

Providian National Bank  MEMBER FDIC

PROVIDIAN

© 2002 Providian Financial Corporation

16

PROPOSED ORDER
ON MOTION FOR LEAVE TO FILE FOR MOTION FOR RECONSIDERATION

This Court, with consideration of the disability, including brain impairment & cognitive dysfunction of Ms. Carr, pro se and in considering the facts & issues in this matter, hearby GRANTS the Plaintiff's MOTION FOR LEAVE TO FILE FOR MOTION FOR RECONSIDERATION

DATED_____ _____

By_____
Honorable Judge Thelton Henderson, US DISTRICT COURT

PROPOSED ORDER
ON MOTION TO SET ASIDE THE JUDGEMENT

This Court, with consideration of the disability, including the brain impairment & cognitive dysfunction of Ms. Carr, pro se and in considering the facts and issues in this matter, hearby GRANTS the Plaintiff's MOTION TO SET ASIDE THE JUDGEMENT OF JANUARY 29, 2009.

DATED___ _____

By_____ _____
Honorable Judge Thelton Henderson, US DISTRICT COURT

25    CARR

1
2
3
4
5
6
7
8
9
10
11

PROPOSED ORDER
ON MOTION TO VACATE ARBITRATION

12

This Court hearby GRANTS the Plaintiff's MOTION TO VACATE ARBITRATION

13

DATED_____

14

By_____
Honorable Judge Thelton Henderson, US DISTRICT COURT

15
16
17
18
19
20
21
22
23
24
25
26
27
28

26    CARR

PROPOSED ORDER
ON MOTION FOR DISCOVERY

This is relevant to Consumer Cases handled at all locations of JAMS in the USA, in particular to Credit Card cases since both Providian Financial and Washington Mutual were large issuers of consumer credit cards across the USA. This Discovery Motion is meant to provide data/information in order to support the determination of Repeat Business Bias by JAMS in consumer arbitration cases or to support the determination of disclosure violations.

1. JAMS to provide a list of all consumer cases, whether stored in their computer system or in paper based files that JAMS handled for Providian Financial or Washington Mutual in any JAMS location in the USA between the years of 1998 and 2008.

2. Provide a total count of JAMS consumer cases for each Providian Financial and Washington Mutual and the total numbers of cases decided in favor of Providian Financial and Washington Mutual between the years of 1998 and 2008 for all JAMS in the USA. Include the total dollar amount awarded to each company by year.

3. JAMS to provide copies of each and every agreement or contract with Providian Financial and/or Washington Mutual, specifically related to the consumer arbitrations to be handled by JAMS.

4. JAMS to provide a list of investment vehicles available to any JAMS employee or consultant or arbitrator; specifically identify investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include Providian Financial, PayPal, VISA, Mastercard, TSYS (Total Systems), Washington Mutual, EXPERIAN, Transunion & Equifax & Fair Isaacs. Providian Financial had an ownership interest in PayPal. VISA & Mastercard are included because the credit card businesses at Providian Financial and Washington Mutual could not be conducted without the contracts & processing with VISA & Mastercard. EXPERIAN, Transunion & Equifax are credit bureaus and Providian Financial and Washington Mutual are wholly reliant on these businesses and have contracts with these businesses in order to market & provide credit cards to consumers. TSYS is a credit card processing company which also has contracts with Providian Financial and Washington Mutual

27    CARR

and both companies require TSYS processing to exist. Fair Isaacs provides FICO scoring to Providian and Washington Mutual.

5. JAMS to provide a list of investment vehicles available to any JAMS employee or consultant or arbitrator; specifically identify investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include Liberty Mutual or any of its subsidiaries and list the total dollars invested.

6. JAMS to provide a list of investment vehicles available to any JAMS employee or consultant or arbitrator; specifically identify investment vehicles, including IPOs, stocks, bonds, mutual funds & hedge funds which might include any disability insurance carrier. Please identify the disability insurance carrier and total dollars invested.

7. Identify the total number of consumer cases which the arbitrator Eugene Lynch arbitrated involving Providian Financial or Washington Mutual and the outcomes of those cases. Include the total dollar amount awarded in favor of the two companies.

8. Provide disclosure by the Arbitrator Eugene Lynch on the identity of other cases he adjudicated as a judge involving Providian Financial or Washington Mutual, the nature of the case & the outcome. It is known that the arbitrator did not disclose prior to or during the arbitration that he had involvement with one or more of the Providian Financial Securities Class Action lawsuits.

9. Provide disclosure by the Arbitrator Eugene Lynch on how many cases he handled as an attorney for insurance carriers & the outcomes of those cases.

10. Provide disclosure by the Arbitrator Eugene Lynch and relevant family members on the identity of any investment vehicles involving Providian Financial, Washington Mutual, VISA, MasterCard, PayPal, TSYS(total systems), Fair Issacs, EXPERIAN, Transunion, Equifax, Liberty Mutual or its subsidiaries and any disability insurance carrier.

11. Compel Steve Krafchick, former attorney of record for Anita B. Carr to disclose the identity of any investment vehicles, either he or his relevant family member hold(s), involving Providian Financial, Washington Mutual, VISA, MasterCard, PayPal, TSYS(total systems), Fair Issacs, EXPERIAN, Transunion, Equifax, Liberty Mutual or its subsidiaries and any disability insurance carrier.

28  CARR

12. Compel Liberty Life Assurance to provide Ms. Carr with all the 30(b)(6) information previously provided to Mr. Krafchick.  Ms. Carr was not allowed to review any of the 30(b)(6) previously.

PROPOSED ORDER FOR GRANTING MOTION FOR DISCOVERY

This Court hearby GRANTS the Plaintiff's MOTION FOR DISCOVERY
                         DATED_____

                    By_____
                    Honorable Judge Thelton Henderson, US DISTRICT COURT

29   CARR

CERTIFICATE OF SERVICE

I, Anita B. Carr, will ensure the service by US First Class Mail on the below parties, by an

authorized other party & proof provided to the clerk shortly thereafter.  Note to court & parties-

Ms. Carr does not have access to ECF.

Anita B. Carr

Edward McNamara, ESQ
Attorney of record for JP Morgan Chase (formerly Washington Mutual & Providian Financial)
Office of the General Counsel
9200 Oakdale Avenue
7th Floor
Mail Stop N110701
Chatsworth, CA 91311
Tel (818) 775-2636  FAX (818) 349-2734

Ms. Pam Cogan, Esq. (attorney for Liberty Life Assurance Company)
Ropers, Majeski, Kohn & Bentley
1001 Marshall Street
Redwood City, CA  94063

30   CARR